# 1: CV00-0834

f-STND CLOSED

## U.S. District Court
## U.S. District Court of Eastern Pennsylvania (Philadelphia)

### CIVIL DOCKET FOR CASE #: 99-CV-6517

CARTER, et al v. HORN, et al                                    Filed: 12/22/99
Assigned to: JUDGE ANITA B. BRODY
Demand: $0,000                          Nature of Suit: 555
Lead Docket: None                       Jurisdiction: Federal Question
Dkt# in other court: None

Cause: 42:1983 Prisoner Civil Rights

FILED
SCRANTON

MAY   9 2000

PER _____

DEPUTY CLERK

JOHN CARTER
    PLAINTIFF

JIMMY MCWHIRTER
    PLAINTIFF

MARIANO PELLOT
    PLAINTIFF

DAVID . CAMPBELL
    PLAINTIFF

ARTHUR CARMICHAEL, and all
others similarly situated at
SCI-Waymart
    PLAINTIFF

JOHN CARTER
CN-1404
[COR LD NTC] [PRO SE]
SCI - WAYMART
BOX 256
WAYMART, PA 18472

JIMMY MCWHIRTER
CC-8387
[COR LD NTC] [PRO SE]
SCI - WAYMART
P.O. BOX 256
WAYMART, PA 18472

MARIANO PELLOT
BE-2490
[COR LD NTC] [PRO SE]
S.C.I. WAYMART
P.O. BOX 256
WAYMART, PA 18472-0256
USA

DAVID . CAMPBELL
DJ-0505
[COR LD NTC] [PRO SE]
SCI-WAYMART
P.O.BOX 256
WAYMART, PA 18472

ARTHUR CARMICHAEL
DD-0875
[COR LD NTC] [PRO SE]
SCI-WAYMART
P.O. BOX 256
ROUTE 6

Docket as of May 4, 2000 9:49 am                    Page 1

A TRUE COPY CERTIFIED TO FROM THE RECORD
DATED: 5-4-00
ATTEST:

Proceedings include all events.                                                    f-STND
2:99cv6517 CARTER, et al v. HORN, et al                        CLOSED

                                        WAYMART, PA 18472-0256


   v.


MARTIN HORN, COMMISSIONER,          SETH A. MENDELSOHN
DEPT. OF CORRECTIONS                [COR LD NTC]
      DEFENDANT                     OFFICE OF ATTORNEY GENERAL
                                    STRAWBERRY SQUARE
                                    15TH FLOOR
                                    HARRISBURG, PA 17120-0031
                                    USA
                                    TEL 717-787-3391


JEFFREY A. BEARD, Ph.D., Exec.      SETH A. MENDELSOHN
Deputy Sect., Dept. Corr.           (See above)
      DEFENDANT                     [COR LD NTC]


RAYMOND J. COLLERAN, SUPT.,         SETH A. MENDELSOHN
SCI-WAYMART                         (See above)
      DEFENDANT                     [COR LD NTC]


JAMES T. WYNDER, JR., SUPT.,        SETH A. MENDELSOHN
CENTRALIZED SERVICES                (See above)
      DEFENDANT                     [COR LD NTC]


JOHN T. SHEMO, ., Dep. Supt.        SETH A. MENDELSOHN
for Facility Management             (See above)
      DEFENDANT                     [COR LD NTC]


THOMAS B. PATTERSON, MAJOR OF       SETH A. MENDELSOHN
THE GUARD                           (See above)
      DEFENDANT                     [COR LD NTC]


DONALD FISKE, HEALTH CARE ADM.      SETH A. MENDELSOHN
      DEFENDANT                     (See above)
                                    [COR LD NTC]


TAMRAT BEKELE, DR., MED. SER.       SETH A. MENDELSOHN
      DEFENDANT                     (See above)
                                    [COR LD NTC]

                                    LAWRENCE M. SILVERMAN
                                    FAX 215-636-3999
                                    [COR LD NTC]
                                    SILVERMAN, BERNHEIM & VOGEL

Docket as of May 4, 2000 9:49 am                    Page 2

```
Proceedings include all events.                                    f-STND
2:99cv6517 CARTER, et al v. HORN, et al              CLOSED
```

|  |  |
|---|---|
|  | TWO PENN CENTER PLAZA |
|  | SUITE 910 |
|  | PHILA, PA 19102 |
|  | USA |
|  | TEL 215-569-0000 |

```
LASLO KIRALY, MEDICAL DOCTOR      SETH A. MENDELSOHN
     DEFENDANT                    (See above)
                                  [COR LD NTC]

                                  LAWRENCE M. SILVERMAN
                                  (See above)
                                  [COR LD NTC]


MS. LOOMIS, PHYSICIAN'S ASST.     SETH A. MENDELSOHN
     DEFENDANT                    (See above)
                                  [COR LD NTC]

                                  LAWRENCE M. SILVERMAN
                                  (See above)
                                  [COR LD NTC]


GLEN JEFFES, REG. DIR. OF         SETH A. MENDELSOHN
CORR. PHYSICIAN SERVICES, INC.    (See above)
     DEFENDANT                    [COR LD NTC]

                                  LAWRENCE M. SILVERMAN
                                  (See above)
                                  [COR LD NTC]


PAUL DELROSSO                     SETH A. MENDELSOHN
     DEFENDANT                    (See above)
                                  [COR LD NTC]


GERALD SOBOTOR                    SETH A. MENDELSOHN
     DEFENDANT                    (See above)
                                  [COR LD NTC]


BERNARD CHIPEGO                   SETH A. MENDELSOHN
     DEFENDANT                    (See above)
                                  [COR LD NTC]


MILTON FRIEDMAN, UNIT MGRS.       SETH A. MENDELSOHN
     DEFENDANT                    (See above)
                                  [COR LD NTC]
```

Proceedings include all events.
2:99cv6517 CARTER, et al v. HORN, et al                                    f-STND
                                                          CLOSED

EMANUAL PATTERSON                    SETH A. MENDELSOHN
    DEFENDANT                      (See above)
                                     [COR LD NTC]


NOEL BOOTH                           SETH A. MENDELSOHN
    DEFENDANT                      (See above)
                                     [COR LD NTC]


PATRICK HERBERT, ZONE LTS.           SETH A. MENDELSOHN
    DEFENDANT                      (See above)
                                     [COR LD NTC]


JOHN DOE DOCTOR/S, BUREAU OF
HEALTH CARE SERVICES
    DEFENDANT


JOHN DOE HEAD/S, SCI-WAYMART'S
HOSPICE UNIT - and EACH IN
THEIR OFFICIAL AND INDIVIDUAL
CAPACITIES
    DEFENDANT

```
Proceedings include all events.                                    f-STND
2:99cv6517 CARTER, et al v. HORN, et al                   CLOSED
```

12/22/99  1    Complaint NO IFP AND NO FEE PAID. (1al)
               [Entry date 12/22/99]

12/22/99  --   Standard Case Management Track. (1al) [Entry date 12/22/99]

1/3/00    --    Filing Fee Paid;  filing fee $ 150.00  receipt # 720611
               (ajf) [Entry date 01/04/00] [Edit date 01/04/00]

1/3/00    --   (18) Summons(es) issued  Forwarded to: plaintiff 1/4/00 (lvj)
               [Entry date 01/04/00]

1/20/00   2    MOTION by PLAINTIFF JOHN CARTER, PLAINTIFF JIMMY MCWHIRTER,
               PLAINTIFF MARIANO PELLOT, PLAINTIFF DAVID . CAMPBELL,
               PLAINTIFF ARTHUR CARMICHAEL TO PROCEED IN FORMA PAUPERIS,
               FOR APPOINTMENT OF COUNSEL , AFFIDAVIT IN SUPPORT (ph)
               [Entry date 01/20/00]

1/27/00   3    Request by PLAINTIFF JIMMY MCWHIRTER and autorization for
               agency to calculate and disburse funds from trust account.
               (inmate account statement attached) (lvj)
               [Entry date 01/28/00]

2/7/00    4    MOTION BY PLAINTIFF JIMMY MCWHIRTER FOR SANCTIONS ,
               CERTIFICATION, PROOF OF SERVICE. (lvj) [Entry date 02/07/00]

2/18/00   5    MOTION BY DEFENDANT MARTIN HORN, DEFENDANT JEFFREY A.
               BEARD, DEFENDANT RAYMOND J. COLLERAN, DEFENDANT JAMES T.
               WYNDER JR., DEFENDANT JOHN T. SHEMO ., DEFENDANT THOMAS B.
               PATTERSON, DEFENDANT DONALD FISKE, DEFENDANT TAMRAT BEKELE,
               DEFENDANT LASLO KIRALY, DEFENDANT MS. LOOMIS, DEFENDANT
               GLEN JEFFES, DEFENDANT PAUL DELROSSO, DEFENDANT GERALD
               SOBOTOR, DEFENDANT BERNARD CHIPEGO, DEFENDANT MILTON
               FRIEDMAN, DEFENDANT EMANUAL PATTERSON, DEFENDANT NOEL
               BOOTH, DEFENDANT PATRICK HERBERT TO TRANSFER ,
               CERTIFICATE OF SERVICE. (lvj) [Entry date 02/18/00]

2/18/00   6    Brief by DEFENDANT MARTIN HORN, DEFENDANT JEFFREY A. BEARD,
               DEFENDANT RAYMOND J. COLLERAN, DEFENDANT JAMES T. WYNDER
               JR., DEFENDANT JOHN T. SHEMO ., DEFENDANT THOMAS B.
               PATTERSON, DEFENDANT DONALD FISKE, DEFENDANT TAMRAT BEKELE,
               DEFENDANT LASLO KIRALY, DEFENDANT MS. LOOMIS, DEFENDANT
               GLEN JEFFES, DEFENDANT PAUL DELROSSO, DEFENDANT GERALD
               SOBOTOR, DEFENDANT BERNARD CHIPEGO, DEFENDANT MILTON
               FRIEDMAN, DEFENDANT EMANUAL PATTERSON, DEFENDANT NOEL
               BOOTH, DEFENDANT PATRICK HERBERT  in support of [5-1]
               MOTION TO TRANSFER   , Certificate of Service. (lvj)
               [Entry date 02/18/00]

2/23/00   7    MOTION BY DEFENDANT TAMRAT BEKELE, DEFENDANT LASLO KIRALY,
               DEFENDANT MS. LOOMIS, DEFENDANT GLEN JEFFES TO DISMISS ,
               MEMORANDUM OF LAW. (lvj) [Entry date 02/24/00]

```

```
Proceedings include all events.                                          f-STND
2:99cv6517 CARTER, et al v. HORN, et al                       CLOSED
```

| | | |
|---|---|---|
| 3/6/00 | 8 | MOTION BY PLAINTIFF JOHN CARTER, PLAINTIFF JIMMY MCWHIRTER, PLAINTIFF MARIANO PELLOT, PLAINTIFF DAVID . CAMPBELL, PLAINTIFF ARTHUR CARMICHAEL IN OPPOSITION TO COMMONWEALTH DEFTS' MOTION TO TRANSFER , BRIEF IN SUPPORT , CERTIFICATE OF SERVICE. (lvj) [Entry date 03/06/00] |
| 3/13/00 | 9 | Response by PLAINTIFFS in Opposition to DEFENDANTS' Motion to Dismiss the Complaint, Memorandum, Certificate of Service. (fdc) [Entry date 03/13/00] |
| 3/31/00 | 10 | ORDER THAT DEFTS' MOTION TO TRANSFER VENUE IS GRANTED; AND THIS MATTER BE TRANSFERRED TO THE USDC FOR THE MIDDLE DIST. OF PA. ( SIGNED BY JUDGE ANITA B. BRODY ) 3/31/00 ENTERED AND COPIES MAILED AND FAXED BY CHAMBERS. (mld) [Entry date 03/31/00] |
| 3/31/00 | -- | Case closed (kv) [Entry date 04/03/00] |
| 5/4/00 | -- | Original record together with certified copy of docket entries forwarded to  District of Middle District of Pa . (lvj) [Entry date 05/04/00] |

IN THE UNITED STATES DISTRCT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN CARTER [CN-1404] | : | CIVIL ACTION |
| JIMMY McWHIRTER [CC - 8387] | : | |
| MARIANO PELLOT [BE - 2490] | : | NO.  99cv6517 |
| DAVID CAMPBELL [DJ-0505] | : | |
| ARTHUR CARMICHAEL [DD - 0875] ; | : | JURY TRIAL DEMAND |
| And, all others similarly | : | |
| situated at SCI-Waymart, | : | CLASS ACTION COMPLAINT |
|                     Plaintiffs | : | |
| | : | |
|              VS. | : | |
| | : | |
| MARTIN HORN,[Commissioner, | : | |
| Dept. of Corrections] | : | **FILED** |
| JEFFREY A. BEARD, Ph.D.[Exec. | : | |
| Deputy Sect., Dept. Corr.] | : | DEC 22 1999 |
| RAYMOND J. COLLERAN, [Supt., | : | |
| SCI-Waymart | : | MICHAEL E. KUNZ, Cle |
| JAMES T. WYNDER, Jr.,[Deputy | : | By |
| Supt., Centralized Services] | : |       Dep |
| JOHN T. SHEMO, [Dep.Supt.,for | : | |
| Facility Management] | : | |
| THOMAS B. PATTERSON, [ Major | : | |
| of the Guard] | : | |
| DONALD Fiske,[Health Care Adm.] | : | |
| TAMRAT BEKELE, [Dir.   Med. Ser. | : | |
| LASLO KIRALY, [ Medical Doctor] | : | |
| Ms. Loomis,[ Physician's Asst.] | : | |
| GLEN JEFFES,[Reg. Dir.of Corr. | : | |
| Physician Services, Inc.] | : | |
| PAUL DelROSSO, GERALD SOBOTOR, | : | |
| BERNARD CHIPEGO, and | : | |
| MILTON FRIEDMAN, [Unit Mgrs. | : | |
| EMANUAL PATTERSON, NOEL BOOTH, | : | |
| and PATRICK HERBERT,[Zone Lts.] | : | |
| JOHN DOE DOCTOR/S/ [Bureau of | : | |
| Health Care Services] | : | |
| JOHN DOE HEAD/S/ [SCI-Waymart's | : | |
| Hospice Unit ] | : | |
|              Defendants | : | |

AND EACH IN THEIR OFFICIAL and INDIVIDUAL CAPACITIES.



## JURISDICTION

A.     This Court has Jurisdiction over this Class Action pursuant to  28 U.S.C. § 1982;  And, by virtue of 1343 (3) and 1343 (a)(4) and  1331(a).  This being an action seeking Declaratory, Injunctive, and Monetary Relief  under an act  of Congress  providing for the protection of civil rights

B.     Venue is proper in this District pursuant to  28 U.S.C. § 1391.

1. **Previous Lawsuits**

Plaintiffs have begun no other lawsuits    in State or Federal Court dealing with the same facts involved in this action or otherwise relative to their imprisonment.

2. **Place of confinement:**

All named Plaintiffs are presently confined at the State Correctional Institution, in Waymart, Pennsylvania.

(a). Plaintiffs have complained to prison authorities,and/or otherwise have exhausted the prisoner grievance procedure in this institution/Hospice Unit about facts relating to this Complaint. **The Results:**

(b). Each of the named Plaintiffs, [ with the exception of Plaintiff Carter,who, after five months of complaining about his medical condition, and other unconstitutional prison conditions] was conceded a double mattress and pillow, to alleviate the pain and suffering he was caused to endure, as a result of inadequate and gross negligence on part of the Medical Department;  And, that concession was made only after plaintiff Carter was able to show that the Medical Director had made false statement/s/ on the record.  Otherwise, as to each Plaintiff named herein, the results have been laced with arbitrariness, capriciousness, serious and unsatisfactory and unfair responses resulting in no relief;  And, thus Plaintiffs now complains to this  Honorable Court.


3.                          NATURE OF THE CASE

Through a pattern of deliberate indifference to Plaintiffs'and the proposed Plaintiff class representatives' minimal measures of life's necessities, the Defendants, with knowledge aforethought, the named Defendants have denied to Plaintiffs' and the proposed class representatives ;          humane conditions of confinement;  Such as, adequate medical care- a knowing disregard of excessive risk to Plaintiffs' health and safety- unsanitary preparation and service of food and drink- inadequate ventilation and heat management- lack of storage space for personal belongings, resulting in loss or theft and exposure to dust and rodents-  Fire hazardous conditions, and

inadequate training of inmates regarding safe exit in case of fire-
rampant and reckless display of discriminatory practices in
employment and work place, and hiring- bias and discriminatory
practices in the reading Library- constant and unnecessary
intimidation and harrassment by some Staff, as well as, subordinate
officials- overcrowded conditions of confinement;  As well as, other
claims to be set forth in this Complaint, and each as if fully set
forth herein;  And, each of the named defendants, with full
knowledge of the existence of these unconstitutional conditions of
confinement at SCI- Waymart has acted and/or failed to act in such a
way as to cause exacerbation of the overcrowding and resulting
unacceptable conditions at this institution.'

(s).This overcrowding, and deprivation of services and subjection
of Plaintiffs, and proposed plaintiff representatives to injurious,
unsafe, unsanitary, hostile and degrading conditions, by the named
defendants, have deprived Plaintiffs and proposed class
representatives of rights guaranteed to them by the First, Fifth,
Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, as
well as, Article 1 § 8 of the Pennsylvania Constitution, and all in
violation of 42 U.S.C. § 1983. Also, Defendants' wrongful conduct is
in violation of the Governor's Code of Conduct.(1980);  And,
Responsibilities of Employees covered by  The Civil Service Act;
applicable Collective Bargaining Agreements;  Or  bylaws of the
Commonwealth.

## CLASS ACTION ALLEGATION

4.      <u>Plaintiffs bring this class action on behalf of themselves</u>
<u>and all others similarly situated , for the purpose of asserting</u>
<u>the claims alleged in this Complaint on a common basis.</u>
<u>Plaintiffs' proposed Class is defined as:  All inmates who has</u>
<u>been housed at SCI -Waymart, since 1993; who have been subjected</u>
<u>to a denial of the basic necessities of life; As well as,</u>
<u>violations of their rights guaranteed within the premises of the</u>

First, Fifth, Eight, and Fourteenth Amendments to the United
States constitution, as alleged by Plaintiffs in this Complaint:
And, which they reallege herein as if fully set forth.

Excluded from the Class are Defendants herein, any entity in which
any of the Defendants has a controlling interest , any officers,
directors or employees of any of the Defendants, and legal
representatives, heirs successors, and assignees of any of the
Defendants.

5.      This action is brought and may be properly maintained as a
class action pursuant to the provisions of Federal Rules of Civil
Procedure 23(a)(1)-4  and  as appropriate, 23(b)(1), (b)(2)
and/or (b)(3).  This action satisfies the numerosity, commonality,
typicality, adequacy and predominance  and superiority
requirements of those provisions.

##### Numerosity of the Class.  Fed. R. Civ. P. 23(a)(1).

6.      The class is so numerous that the individual joinder of
all its members is impracticable.  An estimated 1600 inmates have,
and continue to suffer inhumane conditions of confinement and
treatment, since 1993;  And, Defendants knew or should have known
that their actions and or failure to act in a way as to rectify
the inhumane conditions of confinement, and treatment of
plaintiffs, as alleged in this Complaint: constituted a knowing
and wanton infliction of cruel and unusual punishment upon
Plaintiffs and the proposed Class in violation of our civil and
equal rights guaranteed under both State and federal
Constitutions.  Plaintiffs are informed and believe, and on that

basis allege, that the Class includes hundreds of members;  And,
that the members may be informed of the pendency of this Class
Action by mail and/or broadcast notice, or both.

### Existence and predominance of common questions of law and fact. Fed. R. Civ. P. 23(a) and 23(b)(3).

Common questions of law and fact exist as to all members of the
Class and predominate over any questions affecting only individual
members of the Class.   These common legal and factual questions
arise from the following central issues, which do not vary from
class member to Class member and which may be determined without
reference to the individual circumstances of any particular Class
member:  (1)  Defendants' course of conduct in knowingly
permitting the unconstitutionally inadequate conditions of
confinement, and inhumane treatment of inmates housed at
SCI-Waymart;  (2) Defendants direct participation and/ or
proximate cause of bias and discriminatory act against blacks and
certain ones of indian heritage, who are housed at SCI-Waymart.
(3)   Whether Defendants action and or failure to act to remedy
the violations of plaintiffs' constitutional rights, as alleged in
this Complaint  amount to gross negligence.  These common legal
and factual questions include, but are not limited to, the
following :

(a)   Whether Plaintiffs  and the proposed Class
[hereinafter, "CLASS"] are being provided proper or adequate
medical care nd treatment;

(b)   Whether there are overcrowded conditions exhieting at
SCI-Waymart;

(c)   Whether the physical structure a SCI-Waymart is fit to
accommodate and house inmates;

(d)   Whether there is preferential treatment accorded to
certain inmates, and not to others;

(e)   Whether there is unsanitary preparation and service of
food and drink;

(f)   Whether there is inadequate screening of incoming
inmates resulting in chronically ill, or diseased inmates being
placed in general population, and thereafter placed to work in the

kitchen, on the food-serving lines and dining-rooms;

(g)    Whether there is inadequate ventilation and heat management at SCI-Waymart;

(h)    Whether there are fire-hazardous conditions at SCI-Waymart;

(i)    Whether there is proper and/or adequate training of inmates regarding safe exits in case of fire;

(j)Whether there is ongoing intimidation and harassment of inmates by subordinate officials here at SCI-Waymart;

(k)    Whether there is ongoing fratinazation between inmates and officials here at SCI-Waymart;

(l)    Whether there are violations of the Governor's Code of Conduct, and the Civil Service Act; Applicable Collective Bargaining Agreement;

(m)    Whether there is a denial to inmates of the basic necessities of life;

(n)    Whether there are on-the-spot policies, customs, edicts and acts set forth by subordinates, and condoned by the higher Officials here at Sci-Waymart;

(o)    Whether there exist a deliberate indifferent failure to train subordinate officers;

(p)    Whether there is retaliation against inmates who exercise their First Amendment rights;

(q)    Whether inmates have adequate living and storage space where they are being housed here at SCI-Waymart;

(r)    Whether Defendants conduct constitutes negligence;

(s)    Whether Defendants are liable for intentional infliction of emotional distress;

(t)    Whether the Class Members are threatened with irreparable harm and whether they are entitled to injunctive and other equitable relief , and if so, the nature of such relief;

(u)    Whether the Class Members are entitled to medical monitoring at defendants' expense;

(v)    Whether the Class is entitled to compensatory damages;

(w)    Whether /Defendants are liable for punitive or exemplary damages, and, if so,  how much is necessary and

appropriate to punish them for their conduct and deter others
and fulfill the other policies and purposes of punitive and
exemplary damages;  And,

(x)  How any and all punitive and exemplary damages awarded
to Plaintiffs should be equitably allocated among the Class.
Finally,

Whether the administrative remedies are inadequate and
abused by Correctional officials here at SCI-Waymart.

### ADEQUACY OF REPRESENTATION.  Fed. R. Civ. P. 23(a)(4)

8.    Plaintiffs are adequate representatives of the Class because
they are members of the Class and their interests do not conflict
with the interests of the members of the Class they seek to
represent;  And, they are  applying to this Honorable Court for
counsel competent and experienced in the prosecution of complex
class action cases;  Also, Plaintiffs intend to prosecute this
action viorously for the benefit of the Class.  The interests of
the members of the Class will be fairly and adequately protected
by Plaintiffs and said counsel.

### Superiority.  Fed. R. Civ. P. 23 (b)(3).

9.    A class action is superior to other available methods form
the fair and efficient adjudication of this litigation since
individual litigation of Class Members' claims is
impracticable. Even if any Class Members could afford individual
litigation,  the court system could not.  It would be unduly
burdensome to the courts in which individual litigation of the
facts of million of cases would proceed.  Individyual litigation
further presents a potential for inconsistent or contradictory
Judgment.  Individual litigation increases the delay and expenses
to all parties and the court system in resolving the complex legal
and factual issues of the case.  By contrast, the Class Action
device presents far fewer management difficulties and provides
the?benefits of single adjudication, economies of scale, and
comprehensive supervision by a single court.  Notice of the
pendency and of any resolution of this class action can be
provided to Class Members by mail or publication.

10.    The various claims asserted in this action are additionally or alternatively certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) and/or 23(b)(2) because

(a)    The prosecution of separate actions by the individuals members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members,  thus establishing incompatible standards of conduct for defendants;

(b)    The prosecution of separate individual Class members would a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interest of the other class members not parties o  such adjudications or would substantially impair or impede the ability of such non-party Class members to protect their interests;  And,

(c)    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## STATEMENT OF CLAIMS

11.    The Defendants named in this Complaint, as well as other
Officials yet to be named pending discovery, had to know, or
should have known prior to transferring prisoners from other State
Correctional Institutions, to SCI-Waymart, that the partially
refurbished structure, [both interior and exterior] was unfit for
habitation by inmates, or for that matter, unfit for any human
habitation to accord with the societal norm; And, yet refused to
do anything to rectify such conditions, when concertedly, and
acting under color of State Law

they knew or should have known that they had a duty to do so
constituted a violation of Plaintiffs' and the Class' under both
State and Federal Constitutions, as alleged under Section (3)(a)
to (x) of this Complaint: And, which is re-alleged herein as if
fully set forth herein.

12.    That since being housed at SCI-Waymart, Plaintiffs have
been subjected to inhumane treatment , bias, discrimination, by
both Correctional Staff, and subordinate officials, whose personal
involvement and/or personal knowledge of such wrongdoing; as well
as, allowing the administrative Officials at SCI-Waymart, to make
and create policies and customs that allowed the wrongdoing
alleged in this

Complaint by Plaintiffs. (if proved at a trial of this case)
constituted a gross violation of plaintiffs' rights under both
State and Federal Constitutions.

13.    That Defendants' allowance of the wrongs alleged in this
Complaint, and re-alleged herein as if fully set forth, and/or
Defendants' failing to properly oversee those Officials or
subordinates who caused the wrongdoing, if proven at a trial of
this case, as Plaintiffs' are prepared to do: constitutes gross
negligence, denial of due process; as well as, a deliberate
indifference to the Plaintiffs' and Class' basic needs and humane
treatment, in violation of their rights under both State and
Federal Constitutions and Statutes.

14.     Plaintiffs aver that they, and many of the Class Members
have been denied proper and/or adequate medical care and attention
in the following ways:

(A)     By denying to Plaintiffs and Class, follow-up
treatment, and medication, which had been prescribed to them by a
Physician in the Medical Department of the State Institution from
which they had been transferred to and housed  in SCI-Waymart;
And, the standard response to plaintiff inmates, who requested
that such treatment be continued by the Medical Department here at
SCI-Waymart was, " That was that prison or facility"; "And, this
is Waymart, and we do things different here". Then, instead of
proffering an adequate substitute to relieve such plaintiffs of
their pain and suffering: their serious medical needs were met
with deliberate indifference, sarcastic remarks and responses  [
following a plaintiff inmate's attempt to explain how the
medication and treatment given at the former Institution had been
working to stay and/or relieve the pain resulting from their
disease or other illness], was met  with such responses as, "
Stop trying to be a doctor and do as your told; Etc. Etc.

(B)     One example of the Defendants and in this instance the
Medical Department Staff's deliberate indifference to Plaintiffs'
medical needs is as follows:  On September 14, 1999, Plaintiff
McWhirter began to urinate blood.  Thereafter, he requested, and
was sent to the Medical Department, where he was seen by a
Physician, who following the asking of a few questions: then
looked back into Plaintiff McWhirter's Medical Record, where he
found that this Plaintiff had been given a Blood-Count long prior
to the instant blood-urinating matter; And, he stated to Plaintiff
" Oh, I see you had been given a blood-count which was 14 and 15,
which means the present blood-flow will not hurt".  Yet, at no
time then or since has said Physician taken a blood-count as it
relates to the instant blood-flow;  Moreover, said Physician's
treatment consisted of  (a) that Plaintiff would be seeing a
urologist in the latter part of the month (September);  However,

despite Plaintiff's continuing to suffer the painful results of
the blood-flow and the other illness which plaintiff also suffers:
to date, 9/27/99, this plaintiff has received NO adequate medical
treatment; And, he continues to urinate blood.

The foregoing example demonstrates just how negligent and
uncaring about Plaintiffs and CLASS' medical needs. And, given the
opportunity, Plaintiffs intend to prove at trial of this case
that the Defendants know of, yet totally disregards the pain, and
excessive risk to Plaintiffs' health and safety by their
deliberate indifference to Plaintiffs' serious medical needs,
which actions and or failure to act in a way as to meet the
evolving standards of decency, is causing Plaintiffs and CLASS to
suffer cruel and unusual punishment in violation of their rights
guaranteed to them under both State and Federal Constitutions and
Statutes.

15.     That the overcrowding of inmates at SCI-Waymart has
created conditions of confinement constituting cruel and unusual
punishment in violation of Plaintiffs' and CLASS' Constitutional
rights under both State and Federal Cotitutions  and Statutes,
because of the following reasons;

(a)    As a direct and proximate result of the overcrowded
conditions at SCI-Waymart, Plaintiffs and the CLASS have been
subjected to, and injured by the following deficiencies :

(a)    Inadequate screening of incoming inmates resulting in
especially diseased and mentally perverted inmates being placed in
general population;   For just one of many examples of such
placement follows:

One inmate named Michael Casey, who, [based upon
information given to his two room-mates, and believed by them]
aside from being infected with Hepatitis (B) and (C), also claimed
to be infected with the HIV Virus; And, when this inmate was
released on 9/29/99: the Block Officer moved another inmate into
the side-room with Plaintiff Carter;   And, when Plaintiff Carter
reminded said Officer that he (the Officer) knows that Mr. Casey

had the foregoing-stated diseases; And, that he should replace the
mattress and pillow which Mr. Casey had been sleeping upon for
approximately Eighteen Months; And, the Officers reply was, "
Yes! I know! I Know!   Moreover, Mr. Casey was also employed a
Kitchen worker, who served Dietary and Regular population meals.

The foregoing example goes to show how negligent and uncaring
the DOC, SCI-Waymart, and the Medical Department are as regards
placement of these and other mis-fitting inmates in the
over-crowded cubes, side-rooms and cells.

(b)   To further demonstrate the overcrowded conditions
existing here at SCI-Waymart: the side-room where Plaintiff
Carter, inmate Carmichael, and the former _mentioned  Mr. Casey,
are housed is a 9 by 12 Sq. FT. room.  The movable space alloted
for the three inmates therein is a 9 by 3 Sq. Ft. Strip extending
from the front door to the side-room, back to the room's window;
And, to the immediate right side, upon entering the room, there
stands a 3 inch by 1½ Locker; And, beside that and the wall sits a
Metal Bunk-bed, which is approximately 6 by 3 Inches long; Then
beyond the bed is a 2 SQ. Ft. space, containing personal property
belonging to the inmate who sleeps in that bed; adjacent to the
property stands another Locker, which belongs to the inmate, who
sleeps of the opposite side of the room, in the lower of the
Double-Bunk bed; And from said locker , extending to the window is
another  2 and a ½ SQ.Ft. of space which contains Personal
property belonging to the inmate who sleeps in the top of the
double bunk.   To the left side of the room, upon opening the
door, there is a 3 SQ.Ft. space, which allows the door to move
inward: then stands the double bunk afore-mentioned, which extends
along the left-side wall, leaving a 2 Sq.Ft. space which is
covered by the locker belonging to the inmate who occupies the
Lower Bunk Bed.

On the right side wall is placed Four separate clothing
racks, which have imbedded therein three wooden spikes each for
hanging of clothing items; And the same applies to the left wall.

The height of the room, from floor to ceiling is
approximately 12 feet;  And implinted within the ceiling is a 24
by 48 inch space for the florescent lightening of the room; Also
there is installed therein a small Smoke-Detector Unit. The ceiling
is one of Drop-Ceiling Panels.   Immediately beneath the ceiling,
on the front side of the room is a 4 by 12 inch vent, for air
and/or heat;  Also, there are exposed pipes along both the front
and left side walls. One of such pipes is for Cable, and the other
pipes are electrical conduits. Imbadded within the back wall
beside the window is another vent for heating: But, it is no
longer operable.

(c)    Plaintiffs maintain that, whether it relates to the
Cubes, Side-Rooms, or
Cells: the lack of maneurable space for inmates  housed therein,
and the lack of space to store personal property. such as Electric
type-writers [which inmates are ordered to store under the bed;
despite fact that such is liable to be damaged by dust, rodents,
insects or water. Moreover, since ones personal property cannot be
properly stored: but simply open to anyone who desires to steal
same: And, since there are no shelves provided for placing of
books and other reading materials and legal documents: And, since
the side-rooms containing three inmates in a space where no more
than two occupents should be housed; And, such lack of space is
similar in the  Cubes and Cells; Lastly, unlike all other State
Institutions in Pennsylvania: SCI-Waymart does not provide inmates
in side-rooms, or cubes, with anyplace to sit other than upon the
bed . There are no stools or chairs upon which to sit and write or
type and/or read and write.

(d)    As a result of the overcrowding here at SCI-Waymart,
and the deprivation of basic necessities of life;  As well as,
subjecting Plaintiffs and CLASS to injurious unsafe,and unsanitary
hostile and degrading conditions, have deprived Plaintiffs and
CLASS of rights guaranteed to them by both State and Federal
Constitutions and Statutes, in violation also of 42 U.S.C. § 1983.

16.    Plaintiffs submit that SCI-Waymart is unfit to house and
otherwise accommodate inmates;  Because, SCI-Waymart is a
partially remodeled   structure, of the original Fairview State
Mental Hospital For The Criminally Insane, which was opened in
1912; And it was closed by Order of the Court in 1988;
Subsequently, in 1989, it was reopened as SCI-Waymart;  Which
means that SCI-Waymart is approximately 87 years old;  And, since
the structure has as yet to be completely remodeled to meet
conventional standards in the way that the structure has never
been winterized to prevent cold cold summer or winted air and
drafts from entering the cubes, side-rooms and cells; which causes
Plaintiffs and CLASS from suffering from severe colds and/or the
Flu viruses.  The windows are old, and have not been properly
sealed in order to prevent air from filtering into the cubes,
side-rooms, and cells.  The outside walls are much the same as
they have been for the past 87 years; And, only minor repairs ,
And, those repairs have been mainly made upon the Officials
offices, dining-room, hospital, etc.;  Consequently,

    Since each of the defendants knew or should have  known of
the dilapidated, and antiquated condition of the various
buildings; where even the screens have not been repaired or
replaced to prevent insects from gaining entry, to bite and/or
otherwise annoy Plaintiffs; And, when the /Defendants knew or
should have known of these harmful conditions , but have not acted
to correct such defects; then,taken altogether with all of the
other wrongful conduct and cruel and unusual punishments being
inflicted upon  Plaintiffs and the CLASS constitutes a knowing
violation of the rights of Plaintiffs and the CLASS' guaranteed
within the premises of both State and Federal constitution, and
Statutes.

17.    Plaintiffs and the CLASS have and continue to be caused to
suffer from the unwritten policies, and practicies of
discrimination and preferential treatment, in the following ways:

-13-

discrimination and preferential treatment, in the following ways:

(a)    Discrimination is shown primarily against Blacks and Indians, by the Officials (both State and Civilian), and their subordinates, here at SCI-Waymart; To wit:

(A.)  IN GENERAL POPULATION, o

n each Block, 75% of the  blacks are given the dirtiest, and heaviest Job duties. Blacks are often referred to as idiots, coons and in cases niggers; Moreover, certain Block C/Os will order an inmate to refrain from the use of certain body fragrances which he finds offensive to his smell.  certain Officials and Subordinates have been heard to state ( when passing by where blacks are gathered that " It smells in here ".

(B). Preferential treatment is shown on the Blocks, by giving blacks such Jobs as, cleaning the Bathroom equiptment, Showers, scrubbing walls, Cleaning windows, Sweeping, scrubing, mopping, and picking up and distributing laundry, etc.; While, the Caucasians and Hispanics are given sedentary type of Jobs; Such as: wiping off the Officers desk- dusting - having charge of the cleaning-equiptment room; and dispensing of cleaning materials to inmates.  Furthermore, discrimination is shown against those black inmates, who for just cause may ask to be relieved of a Job which that inmate may come to fine he is unable to handle.  For Example:  one particular inmate, who WILL testify at a trial of this case: that he,Upon arrival at SCI-Waymart, was given a Job Cleaning of the Day Room; Which entailed his Sweeping, Dusting, Mopping, Buffing, Cleaning windows and screens. Said inmate, who had just two weeks prior to being transferred from SCI-Coal Township, suffered through Two very serious operations; And, his Medical Record attested to that fact; Along with the fact that he was not to lift anything heavier then Fifteen Pounds; Nevertheless, when this inmate informed the Block Officer that he could no longer handle the job, because of having to lift, and carry the heavy mop-buckets, mops, Lift the heavy oak benches in the Day Room, climb up to clean and wash the windows and screens, and manipulate the heavy Buffer: he was asked, " Are you saying that you want to quit the Job?" And would not accept any other

mitigating response from him: despite his producing for
inspection, a medical Department statement releasing him from any
but sedentary duties. That particular Block Officer, as does a
majority of subordinate officials take the quitting a job, as a
personal affront to their person; And, in the instant case above
the Block Officer, saw to it that the inmate did not receive
any Idle Pay, for two months and a half; Even though the Medical
Department had forwarded a copy of the Medical Release from heavy
work, to the Unit Mgr. and Unit Counselor, they both concurred
with the Block Officer's arbitrary and capricious decision to
withhold the inmate's Idle Pay. The inmate, who states that he
will testify in court as to the validity of the above-mentioned
wrongdoing against him, has further requested that his name, [
Arthur Carmichael ] be set forth herein as validation of what he
has permitted Plaintiffs to relate herein.

(C)  Preferential treatmennt, bias, and discrimination against
blacks is shown, when whites are shown special treatment; Such
as the following examples :  In the Kitchen,and Dininng-rooms,
Officers Mess, Educational Department, Legal and Law Library,
Hospital, Laundry, Maintenance Department, Industries,and all
other Work details: blacks are detailed to do the menial  and/or
heavest work; While Caucasians are given the better jobs, and
swifter pay-rises.

(D). Discrimination and Preferential treatment is shown against
blacks at SCI-Waymart, in the way of hiring practices;  Only 5% of
the SCI-Waymart's work force is black;  And, to the best of
Plaintiffs' knowledge: of that 5%, only one individual holds a
ranking Staff position as Major. the rest are relegated to a
subordinate position;  Which means that, in every Department, and
Office: plaintiffs are being deprived of black Officials on Staff,
and Departmental positions, who understand the black man's ways
and culture; And, with whom a black inmate can present his
problems, be understood, and receive a fair and just response;
Whereas, at present, seldom, if ever can a black inmate expect to
receive a favorable response to his problem/s/;  Because, under
the present Institutional system of management: the standard

response to a black inmate, who attempts to get a Department
Official, or Staff Member, to aid or otherwise assist him with a
problem: the Staff Member, Or other Official, or Subordinate, will
offer an inadequate, or fair solution to the inmate's Problem;
And, that is because, the white Officials, and subordinates do not
or even try to understand the black inmate's problem/s/;
Moreover, any attempt by a black inmate to explain, or disagree
with a negative response, he is met with a vexatious reply such
as, " an attitude like that will get you in RHU or a Write-Up.
      IN THE READING LIBRARY, there is only ONE black inmate.  IN
THE LAW LIBRARY there is only ONE inmate worker.  IN THE READING
LIBRARY the greater majority of books all relate to European
culture; For instance, there is only One small section of shelves
containing books relating to black culture;
and, One Section relating to Hispanic culture, and a smaller
section relating to Indian culture; And each of those sections are
incomplete for reading or study purposes;  Whereas, all the rest
of the books in the Library are related to European and/or
Euro-American culture.
  ,, AS TO MUSIC TAPES there are less than SIX Afro-American
Artist available: All the rest are tapes  of white, and Hispanic.
(E).    IN THE EDUCATION DEPARTMENT There are no black Teachers;
And, there are no Afro-American studies as part of the Schools

Curriculum;  Moreover, no black inmate is given a Job therein to
operate the Computers; Despite the fact that there are inmates
capable of doing so.  Only White inmates are selected for these
Jobs.
(F).    A final example of the preferential treatment by the Block
Officers, and condoned by the named Defendants is demonstrated in
the following manner:

      On every Block, to Plaintiffs knowledge and on information
received and believed: all Television programs selected for the
Day-Room viewing are given to inmates, who select only shows
adapted to viewing by white audiences, and the particular on duty
C/Os;  Such as, "As The World Turns" , " Wrestling ", " Hunting &

Fishing ", " Home and Gardening Program", and Car Races ", Etc.,

[ G ]. Dispensing of Items, such as, extra pillows mattresses, Back
Braces, Etc., are given to white inmates; While at the same time
be denied to black inmates; For example:  Plaintiff Carter, prior
to being sentenced to State Prison, had been involved in a car
accident, which left him with an ongoing serious back injury;
And, while at SCI-Sommerset, he had been prescribed extra
mattress and pillow, as well as, other medical remedies which had
served to assuage his back pain; However, upon arrival at
SCI-Waymart, Plaintiff's request to be given those pre-prescribed
treatments here, his request was denied, by the medical Staff
Doctors and Physician's Assistant Ms. Loomis; As well as, the Unit
Mgr., and Counselor: And each of the foregoing individuals gave
Plaintiff a similar reason for denial of said treatment; I.E. "
that " we do not give extra mattresses and pillows here; because,
such are considered against security regulations". Yet, when
plaintiff approached the Security Officer about that issue,
Plaintiff was told by said Officer, " I have never heard of such a
Rule. And, it was only after Plaintiff began the exhaustion
process, and was able to show that the Physician had falsified a
statement in the record: that the mattress, and Pillow issue was
played off, and Plaintiff was given the extra mattress and Pillow;
The items were given also, because Plaintiff was able to show that
at least Four White inmates on his Block had been issued extra
mattresses and Pillows, without having to even obtain Medical
permission;And the foregoing factual statements and examples
serves to show in part just how the named Defendants and their
Subordinates acquiesce in, and knowingly condone discrimination,
bias, and preferential treatment against Plaintiffs and the CLASS
here at SCI-Waymart;  And, Plaintiffs propose to show and prove
other examples of discriminatory acts and/or failure to act in a
way so as to cause discrimination and preferential treatment of
black inmates at SCI-Waymart to cease, has Plaintiffs and the
CLASS to suffer great stress, humiliation, mental anguish,
defamation of character, physical injury, and other injuries to be
proven at a trial of the allegations set forth in Plaintiffs'

Complaint.

18.    SAFETY CODE VIOLATION:

Plaintiffs maintain that for the past For years, workers in the C.I. Industries have had to work without being afforded safety equiptment;  For instance, in the Garment Plant, the workers are not provided with either Goggles or protective  Guards for the sewing machines: For example, an inmate working in the Garment Plant, on a Button Machine, received a wound to the eye, due to the fact that said machine did not have in place a Needle Guard; Also, of even more importance the inmate  worker had not been provided a pair of Goggles to protect his eyes from such injury. Moreover, given a trial of the issues set forth herein, Plaintiffs will be prepared to prove with witnesses relating to said allegation. Said inmate, who received the above-mentioned injury, was subsequently, ordered to return to that job, with out safety goggles, or the mentioned safety needle guards; And, when said CLASS inmate refused to return to the machine, from fear that he would be liable again to suffer the same type of injury: he was given a Write-Up, for failing to obey a direct order, and refusing to go to work.  Plaintiffs are also prepared, if afforded a trial on the issue/s/ in this Complaint, to produce a witness, who will attest to the fact that when the Garment Plant Machines were first installed: that he was ordered to take off the safety guards.

As of this date: 10/5/99, only  Five (5) Safety  Guards have been put in place in the Garment Plant. And, Plaintiffs are caused to suffer, not only because of such violations of the Safety Codes: but also suffer from the knowledge that individual Plaintiffs and CLASS, are fearful of being ordered to work in the Garment Plant: and being forewarned of the safety violations existing therein, upon refusing to take the assignment, will be issued a write-up, which in turn will cause that individual to suffer from being placed into RHU (solitary confinement);  All of which is violative of plaintiffs' and the CLASS' Constitutional rights, under both State and Federal Constitutions; AS well as, State and federal Statutes, and Codes.

19.        DENIAL OF RELIGIOUS FREEDOM:

Plaintiffs and CLASS are being denied their Constitutional right to practice their religion without fear or penalty:

(a)    The Defendants and their employees have clearly violated the Plaintiff Class' constitutional rights by imposing an unconstitutional policy, which is specifically aimed at Native Americans, and Jehovah"s Witnesses;  And, Plaintiffs submit that such a Policy/s/ constitutes unequal treatment that is not unjustified;       Moreover, such a Policy/s/, as Plaintiffs will show herein via examples, and more fully if given a trial of this issue: that the Revised Policies set forth in DC-ADM 807 et seq. are based on discrimination and illegitimacy;  And, that such unequal and unjustified treatment bears no rational relationship to a legitimate governmental purpose; Furthermore, such practices are not substantially related to the achievement of important governmental objectives;  And, in support of the foregoing allegation Plaintiffs submit the following violations of Plaintiffs' 1st, 5th, 8th and 14th Amendments to the U.S. Constitution; As well as, The Religious Freedom Act.:

AS IT RELATES TO THE RELIGIOUS FREEDOM OF NATIVE

NATIVE AMERICAN PLAINTIFFS:

(b)  When Religious Tenets or beliefs require one to wear long hair or beard you may usually do so;  Nevertheless, the inmate Plaintiffs' of the Native American Prayer Circle, [indians] at SCI-Weymart are being punished because of their Religious Beliefs; And,

(c).  The D.O.C. Commissioner knowingly revised a prior and just Policy; AND, instituted and caused to be enforced an illegal Policy that is in violation of the First, Eighth, and 14th Amendments to the U.S. Constitution: by allowing his employees to punish inmate Plaintiffs that practice Native American Beliefs.

(d).  Native American Inmate Plaintiffs are being put in Restrictive Housing Unit ( RHU ) because of an illegal Policy instituted by Commissioner, Martin F. Horn;  And, such Misconducts

causing one to be placed in RHU, amounts to cruel and unusual punishment; aimed at directly attempting to harm Native Americans at parole hearings, as well as, to thwart or otherwise hamper Native American inmate Plaintiffs in practicing their religion, which is an Established Religion recognized by Law.

[ LONG HAIR]:

(e).    The new policy DC-ADM 807-3; instituted by Defendant Martin Horn; And, which supersedes DC-ADM 815, dated May 1, 1984 is discriminatory, and used to deny Native American Plaintiffs the right to religious freedom ; And, Also, it is used to place Native American Plaintiffs into a disciplinary situation, in violation of The Freedom of Religion Clause of the 1st Amend. ( U.S.C.A. ).

Punish for wearing long hair based upon religious beliefs is a substantial inequality of treatment; And, the prevailing Policy DC-ADM 807-3, which directs Native American Plaintiffs to show proof for hair exemption, while at the same time other Religion, such as Islamic, Jewish, and Rasteferian NEED NOT SHOW PROOF to wear beads or dred-locks.

(F).    The Native American Religion is based upon the Creator.  All things are connected to have harmony and balance in Life and in the World.  The world itself is held dear to Native Americans, as it was given to us by the Creator of All.

Long hair is a sign of Spiritual attainment.  The issue of growing and wearing long hair " Traditional Style" lies at the root of many previous religious cases filed by Native American Inmates.

Hair is regarded as a sense of Origin, a symbol of growth, a manifestation of being.  Cutting of hair is an indication of disgrace, humiliation, or a death in the family;  And, such is deeply rooted in the Religious Beliefs of Native Americans.

(g).    DC-ADM 807-3 states:  All inmates who request a haircut exemption on the basis of religious conviction must supply something in writing confirming the inmate's participation in a particular religion .  This can be a Certified Letter, from the religious leader of that particular faith group, or in the case of Native Americans, a certificate of Participation from a

indicate that the inmate in question has demonstrated a history adhering to the Tenets of the particular faith group.

HOWEVER, despite the fact that the Native American Plaintiffs here at SCI-Waymart have demonstrated their sincerely held beliefs through attendance at Groups held herein: have or are undergoing genealogy research to check their heritage.

Some of the Native American Plaintiffs have already received documentation to prove their blood heritage from an outside Chief, which the Administrators ignored.

Three of the Indian Plaintiffs have even joined an outside Tribe and Reservation; And, some of the Native American Plaintiffs have received misconducts **for** **not** cutting **their** **hair** **based** **upon** **their** **religious** **beliefs.**

MEDICINE    BAG:

20.    Spiritually  and culturally, throughout countless centuries it has been and continues to be the tradition of Native Americans  to carry or wear a Medicine Bag.

The Medicine Bag becomes that persons invocation to the Creator to continually be with and watch over him.  It represents an Extremely personal relationship between the Creator and wearer and Must Not be violated.

The Medicine Bag might contain any natural object such as: Stone, Animal part, Herbs.  All natural objects possess a Spirit, as a part of one's Medicine Bag, the Spirit of these objects become a part of the wearer.

As it relates to the Native American Plaintiffs being housed here at SCI- Waymart: the Medicine bag must contain the following:  7 (Corn), 7 (Bean), 7(Squash), stone - sage - sweet grass - tobacco - cedar - crystal; And something Personal: Chief Taffe carries a gold earring (Sister's).  IT SHOULD BE SOMETHING THAT WOULD BRING YOU CLOSER TO YOUR SPIRITUAL WORLD;  Yet, notwithstanding the foregoing facts: the Defendant Martin Horn, has instituted an  arbitrary and capricious Policy, which causes Native American Plaintiffs to be deprived [ under threat of receiving a misconduct] the Constitutional right to possess those

Medicine Bag items, which are prerequisite to the fulfillment of their Natural and Spiritual duties before the creator.

The Defendants, and their subordinates have, by limiting required to make a Medicine Bag complete in the traditional Spiritual manner: have deprived Native American Plaintiffs here at SCI-Waymart, of an essential part of their Spiritual sustenance.

THe following items are the only ones , which the Defendants will allow to Native American Plaintiffs for placing into their Medicine Bag:

> SAGE, SWEET GRASS, TOBACCO,
>
> CEDAR, and PLASTIC TURTLE .

+++ A Medicine Bag is too small to contain or conceal contraband and therefore should be permitted;  And, in this regard, Native Americans should be accorded the Freedom of Religious Expression as that given to all religions at the prisons.  They should be allowed possession of ALL Sacred Objects. ( Except in those cases in which there is Proven demonstratable threat;  and in the instant case such is not the case;   Therefore Native American Plaintiffs Submit that the Defendants acts and or failure to act in a way so as to remedy the foregoing violations has and continues to cause Native American Plaintiffs, to suffer from needless mental anguish, stress, spiritual disruption, and cruel and unusual punishment, in violation of Native American Plaintiffs' Rights under both State and Federal Constitutions, Statutes; As well as, under Tribal Laws.

## Inadequate Ventilation & HEAT MANAGEMENT

21.    The system of ventilation, which is presently in place at
SCI-Waymart, is such that it is only adequate in all
Administrative Offices, and Medical Department.  On the Blocks and
Side-Rooms the Ventilation process is inadequate; For example,
beginning with the Side-Rooms of Block L-1, to the end of the
Block, which is Number 1012: while there are over-head
old-fashioned Ceiling Fans in place within the Cubes, and windows:
all of which are insufficient for giving relief to the Sixty-Five
inmates being housed therein;  Because, in the Side-Rooms, which
does not have any fans, nor or in close proximity to them: so that
what little benefit there is from such fans those ones do not
receive it. In FACT, neither the fans or windows suffice to
prevent Plaintiffs from suffering from the heat in the summer,
when the temperature is in the 80s to the 100s. Because, during
those periods of summer, the fans are ineffective for cooling off
the areas: since, the if there be any air coming in from the
windows; all the fans operate to do is circulate the stifling
heat; Moreover, Since there are no windows, or exhaust fans in the
bath-rooms: the Steam from those areas flow out into the Dormitory
areas, and is circulated by the fans;  It becomes so hot in the
dorm and side-room areas until all of the inmate Plaintiffs suffer
with breathing and other discomforts; Also, many of the inmate
Plaintiffs are elderly persons, who are already dealing with
aggravating physical disabilities, and various medical problems;
So that, they are being caused to suffer what amounts to cruel and
unusual conditions o f confinement.  Since the side-Rooms are
secluded from the fan area: then the inmates housed therein must
suffer even worse than those in the Cube areas; Because, when the
Thermometer rises to the 80cs and beyond, even with the one window
therein, with the hot airflow  coming in ,and no fan
therein. Inmates must just lie therein  and suffer from the
effects of the stifling heat;And, inmates with lung and or
bronchial ailments,such as PLaintiff Carmichael, who occupies a

side-room with two other inmates: then being triple-celled along
with  inadequate ventilation causes Plaintiffs to suffer
needlessly; Because the Defendants have knowledge of these defects
in the heating and ventilating systems; Yet, are not doing
anything to remedy the conditions as they relates to the inmates
being housed herein at SCI-Waymart

During the heat of the summer, even the Subordinates, who
must stand in the Main, or Other corridors in the Facility, as
well as on the Units suffer from the intense heat, which, due to
improper ventilation, exist through the prison. In the Corridors,
each C/O is provided with a fan; However, the inmates who must
traverse those corridors daily find it so that they state that "
man it is so hot in that corridor until I could hardly
breathe". And, this same type of heat prevails in the Staff Dining
Room; However, in that dining room, extra LARGE fans are taken
from the inmate areas and transferred to the Staff Dining Room;
While in the Inmate Dining Room, it is so hot, until the inmates
must rush to swallow their food and get out.

In the Winter seasons, on all Units the inmates must suffer
from inadequate heating. While there may be Radiators visible to
the naked eye: does not give off sufficient heat to override the
flow of cold and oftentimes freezing air which one has to face
when going down the Corridors to the dining room and other places;
Moreover, since all of the windows in the SCi-Waymart Facility are
old,  and not properly sealed so as to prevent air from filtering
in.  Many of the Plaintiffs and CLASS, if given the opportunity,
will attest to the inadequate ventilation and Heat Management, and
how they are constantly caused to suffer Flu and other more
serious ailments as a direct consequence of the Defendants failure
to at in a way , so as to rectify such lack of proper heating and
ventilation conditions.

22.        VIOLATIONS OF FIRE SAFETY LAWS-CODES AND ACTS
Plaintiffs and CLASS maintain that in the case of a fire here
at
SCI-Waymart, there could be that inmates would suffer death , or

other serious ailment , due to gross  negligence on part of the
Defendants, who are aware of the faltuy conditions of fire
prevention equiptment, unsafe fire-exit management, and other
violations of the Fire Panic Act; Yet knowing that these unsafe
conditions exist, they have failed to remedy them.

Plaintiffs and CLASS submit that the following Fire-Safety
violations exist here at SCI-Waymart:

(a).    All Fire-Extinguishers are kept behind locked doors;
So that, in case of a fire, only a C/O in the area would have
access to the Extinguishers. Inmates, who are instantly subject to
the fire's damaging effects, are precluded from access to the
fire-extinguishers.

(b).,  In the Main Corridors there are in place no preventive
measures, such as exhaust fans, for pulling out the fires death
dealing smoke fumes; And, since the inadequate evacuation process
[as presently exist at SCI-Waymart] means that inmates would be
fleeing en-mass down these corridors in a panicky state of frenzy:
not one of those inmates, or prison personell is likely to stop
and open any of the Corridor's windows;
as a result an accurate inference may be drawn that among the
crowds of inmates rushing for an exit, that there would be some
dying from smoke inhalation, while others are otherwise caused to
suffer serious injuries as a direct result of the Defendants show
of deliberate indifference to the safety, and welfare of the
Plaintiffs and CLASS' who have been placed by the Courts into
their care and keeping.

(c). All Fire Exit Doors are manually operated: which means
that in case of a fire, ONLY the Officer in charge of the Main
Corridors have the key to the exit doors, and the responsibiity to
open them; Moreover, the Fire Alarm system is so faulty, until
inmates upon hearing the alarm go off: would not know if there was
IN FACT a fire in progress, or just ANOTHER FALSE ALARM: Because,
many times in the course of each week the fire alarm goes off ,
when there is no fire.  Even fire-alarm switches in the Main

Corridor, can be seen to hang loosely from the wall; And, seen to
have been taped together and back against the wall.
Another piece of faulty equiptment are the fire emergency lights:
And, although there are many of such lights distributed throughout
the Facility: whenever the fire emergency alarm goes off, or the
main lights go out: the only area in which the emergency lights
can be seen to operate is in the area  of the Staff Dining Room,
while in the Units they do not come on ; So that, inmates are left
in total darkness, and are ordered to stand or sit on their beds
until the main lights are again turned on.

        These faulty conditions have been going on for  number of
years; And, the defendants knew of these faulty fire hazardous
conditions
existed; Yet to date have failed to upgrade the fire-safety
management procedures up to the required standards set by law.

    (d)    The Defendants knew or should know that the Plaintiffs
and Class housed here at SCI-Waymart, are not being trained
properly as to what they must do to protect themselves in case of
fire & smoke: In fact the only procedure ( in the way of a fire
drill) is as follows:

        All inmates are ordered to proceed from their respective

Units to the main corridor: then proceed down that corridor until
they come to what is called 42nd Street [ A corridor which crosses
the main corridor; And, is used primarily as the entrance to the
Facility by Administrative Staff.

        Inmates have never been told where they wold go after
arriving at that section of the main corridor.  In all other state
prisons and facilities, the inmates are given full fire-safety
drills, which in case of fire, and the resulting panic by
prisoners, they would know exactly every procedure leading inmates
orderly out from the burning building/s/.  However, the
SCI-Waymart Administrators/Defendants have until the filing of
this Complaint  failed to properly train the inmates about how to
get out safely from this facility in case of fire. IN fact, it
appears that such procedures that are in effect are geared to
effect a safe exit for the Staff and employees. All of which shows

a deliberate indifference to the welfare and safety of the
Facility's inmate population.

23.            INTIMIDATION-FRATENAZATION-VIOLATION

OF GOVERNOR'S CODE OF CONDUCT &

APPLICABLE COLLECTIVE BARGAINING AGREEMENT

The named Defendants and their Subordinates, have knowingly and
concertedly acted and/or failed to act in a way, so as to cease
violating Plaintiffs' and the CLASS' rights guaranteed to them
under both the State and federal Constitutions, and Statutes, in
the following ways:

(A).  **INTIMIDATION:**

Plaintiffs submit that in SCI-Waymart, there is in
constant play, a silent/unwritten Policy utilizes by both Staff
and Subordinates, which allows them unfettered discretion to
intimidate inmates, whom they may have a personal dislike for, or
grudge against, because of racial hatred, or because an inmate may
have submitted a Grievance against an Official or C/O, or simply
because an inmate does not condescend to submit to the "Daddy-Son"
or Boss-Slave routine in play by ALL Block C/Os, Medical
Department Staff, as well as, played out by Employees of all Units
and Departments here at SCI-Waymart.

Such intimidation comes about in many and varied form; And,
is usually geared to incite an inmate to anger: with the hope that
the inmates response can be such that would lead to his being
given a misconduct. Such unjustified acts are bent on entrapment.

A Block C/O has been known to Order an inmate to keep an
appointment; Despite the fact such appointment may not be a
mandatory: but a voluntary appointment acceptance;  And, when the
inmate states that he does not have to go to the appointment: then
the C/O will respond, " Well, I Order you to go; So that if the
inmates,  who has a right not to voluntarily go to the
appointment: then he is written up for Failure to Obey a Direct

-27-

Order:  which amounts to a sort of covert entrapment;  And,such
unjustified acts are condoned by all Staff and Subordinate
Officials.

In the Medical Department, Doctors and Nurses make use of
Psychological intimidation upon any inmate, who may question or
disagree with their diagnosis and/or prescribed treatment.  They
assume the position that , " I'm the Doctor/Nurse, and you don't
question what I say".

Unit C/Os, will make biased remarks in earshot of a black
inmate; Or, will move him from one place to another; Or,
unnecessarily threaten an inmate with a writ-up for some simple
act, which in fact violated no established rule: The C/O simply
makes an on-the-spot policy, which, if the inmate fails to act in
accord with such a policy: he is threatened with a write-up.
There are many forms of intimidation by both Sergeant and C/Os in
charge of the various Units herein. Either one may pass by and
kick a sleeping inmate's bunk, bang on the trash-can or wall
out-side a side-room.  This type of Official activity creates
great tension in the inmates; Also, causes Plaintiffs and Class to
suffer unnecessarily from expecting to receive a
write-up, or some other unfair treatment simply because he dosen't
like the inmate.

(B).  HARASSMENT:

Plaintiffs and Class are constantly being harassed on a
daily and nightly basis by Unit C/Os, and the shake-down crews.

The shake-down crews come on the Units before breakfast, to
begin Unit or side-room searches of inmates.'

For instance, on this Plaintiffs Unit  the shake-down crew
will get with the Block C/O, or sergeant; And, these searches are
always aimed at those inmates whom they dislike: So they will
search that inmate more often than any other inmate: One example
is that of Plaintiff McWhirter, who is constantly being searched,
because, he is a native American; And all Native

Americans are hated and discriminated against by both Officials and Staff here at SCI-Waymart. The search team searched Plaintiff Mcwhirter twice within three days; And have done the same to certain other disliked Plaintiffs based upon bias and prejudice.

Plaintiffs Ad CLASS are harassed in numerous ways; Such as

1.    A C/O will enter a side Room, which is overcrowded with three inmates, and order an inmate to put personal clothing, or typewriter, etc. under the bed: when he knows very well there is no room thereunder to place anything.

2.    Being placed in a Side-Room is considered to be a priviledge; Yet, the Doors to such rooms on L-1 Unit, only are ordered (via an on the spot policy ) to keep the doors open; And, this is not done for any security reason; on the contrary, this unwritten policy was enacted by L-1 SGT. and the Night C/Os, in order that they will not have to open the door to see the inmates housed therein; however, otherwise this would not be necessary; Because, the Side-Room Doors are such that each door has a square viewing slot, which was cut for the very purpose of being able to either count or view the occupants.

The Block C/O/s, will also harass an inmate, by conducting Security Checks, which by Rule is supposed to consist of simply checking the Doors, windows,  Electric Out-Lets, Radios, and TVs, to observe whether or not they have been tampered with;  However, when a C/O desires to harass and or intimidate an inmate, he will go further than the Rule requires; and, conduct a full search of an inmates locker, personal papers, and  clothing: which is the specific duty of the Search Team;  And the foregoing examples are just a few of the examples of official harassment/intimidation. Plaintiffs and CLASS are prepared to offer many other such examples, when and if they are fortunate enough to be given a trial of ALL issues set forth in this Complaint.  The named Defendants and their Subordinates knowingly condone such abuse of authority, and the making of on the spot policies and practices; Yet have failed to rectify such abuses, in violation of PLaintiffs' and CLASS' right to be free from such

illegal abuses, under both the State and Federal Constitutions, and Statutes.

24.    **VIOLATIONS OF THE GOVERNOR'S CODE OF CONDUCT/ETHICS**

**CIVIL SERVICE ACT: APPLICABLE COLLECTIVE BARGAINING AGREEMENT**

The Correctional Officials, Civilian Personell, and their Subordinates, employed to work here at SCI-Waymart, are vested with the power and authority of the Department of Corrections; And as such, all have an ongoing responsibility to perform their duties with **Integrity**, and **Impartiality**, and to never permit **Bias**, **Prejudice**, or **Personal Gain** influence their official decisions: As is the case demonstrated in an ongoing manner, by a majority of the Executive Officials, and Subordinates illegal and abusive behavior: personally observed, as well as experienced by Plaintiffs and the Class here at SCI-Waymart;  And, Plaintiffs and the Class **aver** the following Examples of such illegl and wrongful acts have been heaped upon Plaintiffs and the CLASS here at SCI-Waymart :

(a). <u>INTEGRITY:</u>

SCI-Waymart's Officials and Subordinates have shown, by their inability tot relate, or lack of desire to even try to understand the problems set before them by various  inmates;  To Wit: they seemingly do not care to understand;  And, this attitude is made apparent, by their show of a lack of concern when approached by an inmate with a personal problem.

Especially  noticeable, is the show of a lack of concern, by the Counselors, and Unit Managers, to whom an inmate must turn, when faced with a prison problem, personal problem, or the need for emergency contact with Family; In many instances, as it relates to such matters, neither of the two can be found in their Office in the Unit;  AS a matter of fact, the only time an inmate can be fairly certain of finding the Unit Manager, or the Counselor, is during those days, when they are holding Inmate Staffings; Or, otherwise whenever they have to give an inmate bad

news or pass out Parole Board Green Sheets;  Otherwise, both
Staff, as well as, Subordinates, when approached by an inmate
seeking help with some problem: the inmate is usually told that
the matter will be looked into; Yet seldom, if ever, are such
promises followed through with. They all seem to be more concerned
with effectuating/enhancing their own personal interests: rather
than that of the inmate, or penal interests.

   (b).  <u>IMPARTIALITY</u> AND PREJUDICE

     Partiality runs rampant throughout the Administration at
SCI-Waymart: from the Superintendent, and Subordinates , to even
the Civilian Personell;  And following are examples of such
partiality;

  (1):  The majority of Officials, and subordinates, as well as
Civilian Personell, have yet to surface , in the sense that they
have come to be in accord with the Constitution's Preamble that "
All men are created equal ", and should be treated as such;  Or,
as it relates to prisoners: they should be treated with **due**
respect and **humaneness**;  However, such is not the case  with the
named Defendants and their subordinates;  And, an unbiased inquiry
will reveal that most of the Officials herein hate blacks,
hispanics and those of Indian heritage; And, especially those who
would show a proclivity for standing up for the limited
constitutional rights, which, even our United State Supreme Court
has assured could not be parked at the prison Gate's entrance.

   Their biased attitude is shown in every Administrative
Department. as well as, by ALL subordinate officials who are , or
may be in charge of the Units, where, all blacks, hispanics, and
Native Americans, are given the most demeaning jobs, suffer from
hearing racist remarks made about them. Also,

   Acting in the same vein , Prejudice is shown by the
SCI-Waymart Officials, and subordinates, toward all blacks,
hispanics and Native Americans , who are not informers,
homosexuals, or those imbued with the house-boy mentality.

   Such prejudice against Plaintiffs and CLASS, in any attempt

by such ones to get into desired Educational Programs;  Or, to enter into other available Positive rehabilitation programs geared toward aiding Plaintiffs And CLASS,:(especially blacks and Native Americans) who are seriously endeavoring to rehabilitate themselves, in readiness for re-entry into society;  Also, among other examples of the Defendants' show of prejudice, and bias ed acts against Plaintiffs and the CLASS is shown in the selection of Black and Native American inmates seeking employment in such positions as computer operators, Library Workers, Carpenter shops, and Electric Shop.  In such jobs/positions, only Caucasians are selected for the best assignments: despite the fact that many blacks and/or Native Americans may be , and in fact are qualified to hold such elevated positions/jobs.

25.          CONFLICTS OF PECUNIARY INTEREST :

    Plaintiffs aver, and will testify given a trial of the issues in this Complaint that certain C/Os have been observed accepting swags, in the form of candy bars, packs of cigarettes, potato chips, etc.; And, is subsequently accorded preferential treatment,of having TV Programs of the inmate's choice: over the desires of the majority of inmates sitting in the Day-Room: despite the fact of there being a Daily Schedule to be followed; Or, will allow such inmates to visit with other inmates outside the Unit; Which, if done by another inmate, he would receive a misconduct for being in an unauthorized area.

    One of the Plaintiffs would testify at trial, about he was told by a Block C/O: that in order for that inmate Plaintiff to be given an emergency pass to see one of the Officials: that it would cost him a candy bar; And, said Plaintiff in fact, did leave a candy bar laying in near reach of said 'C/O's grasp, as soon as the Plaintiff departed; And, another inmate standing within  the Day-Room did observe this transaction.

    Information about inmates, from C/Os, to inmate and/ or from inmate to C/Os : horse-play and hassling between inmate and C/O happens on a daily basis;  In fact, this Plaintiff, as well as, other plaintiffs, would testify about how they have witnessed a

particular C/O roughing up an inmate, in horse-play manner; then
would hand-cuff one of the inmate's wrist; then swing him around;
while other of the C/O's favorite stooge inmates, would all join
in laughing, chiding and deriding said inmate, who was of hispanic
descent;  C/Os have been observed sleeping on night duty;  And,
watching TV in the day room; As well as, reading Mags.& Newspapers

25. SPECIFIC RULES AND REGULATIONS ( Department of Corrections);

Defendants and their Subordinates, consistently fail to abide
by the Department of Corrections Standards, Policies, Practices
and Procedures;  And, a response to an inmate who might question
one of such  violations is " We don't care about how other
Institutions followed a particular stated Policy; Because, we here
at Waymart have our own way of doing things";  And, this shown, in
the manner in which the Waymart Staff, Subordinates, and Medical
Department Officials DO make on-the-spot policies, practices and
procedures;  And, take the position that right or wrong has
nothing to do with their on-the-spot decision; Which as such a
decision may relate to a matter of concern to a black, hispanic,
or Native American;  Because, here at SCI-Waymart, by their
actions toward blacks, hispanics and Native Americans; are such
that they look upon and treat such ones from that worn-out
perspective that " they are ALL alike; and must be so treated.

The Defendants and their Subordinates, therefore fail to
accord an intelligent, humane, and  impartial treatment to all
inmates.  For example:

Due to a lack of understanding, or being able to relate to,
or, for lack of not being properly trained  by way of the
DEpartment of Corrections Commissioner Martin Horn, in a way, so
as to be able to advise an inmate with a legitimate and serious
problem; there is a reverting to that rock-age principle: To Wit,

" I don't want to hear anymore". " Go to your cell/unit!"

Moreover, both Staff, as well as, subordinates most often prefix their responses, or orders to an inmate, whom that official may have a dislike for, with profanity;  Or, otherwise will respond with a sarcastic phrase: " Yes, I know". " So sue me!!".

27.  <u>FRATERNIZATION:</u>

<u>Fraternization includes, but is not limited to the giving of swags to C/Os by inmates; And visa/versa;  Giving certain inmates the privilege of wandering about on/or off the Unit for their own personal reasons.</u>

28.  <u>PERSONAL PROPERTY</u>

The abuse of personal property, by the search teams, is a daily occurance.  Specifically, for purpose of the following examples:  On U-1 Unit, Plaintiffs and Class are subjected to harassing searches Eighty-Four times a month: Three times daily, and seven days a week;  And, the search team is given unfettered discretion, in determining what is to be considered contraband; Which, in turn leads to a frivolous misconduct; And, that in turn, causes an inmate, who happens to in order for parole, or some other favorable program, to lose out on the privilege.

(a).    Shake-down teams, will abuse an inmate's legal papers, which that inmate happens to be assembling for an appeal. There are cases where,[witnesses will attest to the validity of this assertion if a trial is afforded] an inmate's legal papers have either been deliberately taken because of a dislike for a particular inmate.

(b)    Another unjust abuse by the search team, and condoned by the Defendants is: an inmate, who is transferred to SCI-Waymart, from another State prison, has his property searched, and is then given  an itemized slip: And, upon arrival to this Facility, said property is again searched, and is given another itemized list: okaying the property acceptable for possession at this Institution:  Yet, a search team in the process of shaking an inmate's LOCKer: upon finding that he

possesses property which isn't sold in the Commissary here at
Waymart, will take those items, and then write a Misconduct
against the inmate; Subsequently, at the Hearing, the Hearing
Examiner will find the inmate guilty of possessing Contraband;
Moreover, the inmate isn's even afforded the option set forth in
the Inmate Handbook: of either sending the items home, or allowed
them to be destroyed.

(c). Plaintiffs and  the CLASS, have suffered hundreds of
dollars loss of Commissary items, which, because of negligence on
part of both the sending and receiving Institutions who, after
violating  § 5,¶ 4  of DC-ADM 815;  And, such a violation places
Plaintiffs and CLASS in a Catch-22 position; Wherein, an inmate
believing that he possesses Commissary items legally, because of
the fact that both the sending and the receiving Institution has
Okayed his right to have the items in his possession: then on a
later date, the search team comes and confiscates said property
pursuant to  DC-ADM 815 § VI.D.; And, subsequently issues a
Class-1 Misconduct upon such an inmate; And, thereafter, at a
Misconduct Hearing the Hearing Examiner will sanction said
inmate/s/, by reducing the Class-1 misconduct, to a Class II
Misconduct, and confiscate the inmate's property, pursuant to §
C.(4.) of DC-ADM 801.

(d).Plaintiffs and Class maintains that such actions as the
foregoing, by the Administrative Officials and their Subordinate
Search Teams, constitutes entrapment to defraud Plaintiffs and
CLASS of personal property, ( which they had been led to believe
was being possessed legally; All of which is violative of the
rights of Plaintiffs and CLASS' guaranteed under both State and
Federal Constitutions, and applicable Statutes.

(e).Plaintiffs and CLASS are lulled into believing that they
retain Consumable Items at the receiving Institution by the
following DC-ADM, § V. ¶ 4 Policy,which states:

" It is the responsibility of the sending institution to
inventory inmate property prior to transfer and ensure that

it complies with policy.  Inmates will be  permitted to keep
no-longer-allowed-property as long as the items /were noted
on the inmate/s/ Personal Property Inventory (DC-153) as of
the effective date of the revised DC-ADM 815, which was
12/28/92;    As well as,
Under 1.Rules General

PERSONAL PROPERTY ¶¶s 2 and 3, which states:

" When transferred from one institution to another, all
property will be properly inventoried and packed by the
inmate in presence of the Officer. Both will sign the
Inventory Sheet".

" At the receiving institution, the property will be unpacked
and re-inventoried by the inmate in the presence of an
Officer. Both will sign the inventory sheet".

(e).    Search Teams will subject Certain Plaintiffs  and
CLASS' cell/side-room or Dorm area to purposeful and unnecessary
disruption; And, in such instances are conducted for the express
purpose of harassment and punishment; Because of dislike for the
inmate, by an Official, C/O, or
Search-Team.

29. SECURITY INSPECTIONS OF INMATE CELL/DORM/SIDE-ROOM:

Unit Officers, who may be on duty on given days, are known to
violate DC-ADM 203 § IV., as it relates to Security Inspections of
Inmate Cells;  By opening  inmate Locker, to view what is therein;
And, in case he thinks that an inmate might have consumable items
in excess of the Policy amount: will then notify the Search-Team,
who will then, ( on the Officer's assumptive information) conduct
a search of the inmate's cell/area, only to find nothing to be
considered contraband.

Such infractions of the stated Rule/s/, causes Plaintiffs amd
the CLASS to suffer humiliation, negligent infliction of emotional
distress, mental anguish, and fear of further  reprisals, because
of Plaintiffs and CLASS' alleging this and all other claims set
forth in this Complaint.

## 29(a). FALSIFICATION OF DOCUMENTS:

Plaintiffs aver that various C/Os, as well as the Search teams, will, writing out a misconduct against an inmate, which the official knows will be looked upon by the Hearing Examiner, to be frivolous, or at most an infraction for which should have gone no far than an on-the -spot reprimand: will enhance said Misconduct report, with false and misleading information, which raises the rule infraction from a misdemeanor, to a Class 1 misconduct. And, all in violation of Plaintiff/s/ and the Class' right to due process and equal protection of the laws under both State and Federal Constitutions, and applicable Statutes.

30.    INMATE CONTROL OVER OTHER INMATE/S/

On various jobs , as well as, on the Dorm Units: an  Official on duty/in charge of a particular Dorm Unit, or Block: will permit a favored inmate to be in control of another inmate; I.E.: tell another inmate what to do, in relation to his assigned job/duties;
 P

Also, said favored inmate will report to the Officer/ CO, in charge: how an inmate is conducting his assigned duties.


Plaintiffs and CLASS submit that when such rules, regulations, policies and procedures are not [ as is in the present case] complied with :  Then the consequences are that everybody suffers;  Including, but not limited to the Public, whose votes and tax-dollars are spent toward the end that they may feel secure in their homes;  And, that their votes and taxes are alloted to responsible Officials over-seeing the Penal System;  And, who will utilize same toward the goal of putting a dent in crime and recidivism, by instituting programs to aid prisoners seeking to honestly re-habilitate themselves;  And, done so with unnecessary inhumane treatment and conditions of confinement.  All of which serves to the best of the penological aim/s/, the public interest; And indeed, the befuddled prisoner's best interest as well.

## FIRST CLAIM FOR RELIEF

### [Inadequate Medical Care & Treatment]

31.   Plaintiffs on behalf of themselves and all others similarly situated, reallege, as if fully set forth, each and every allegation contained in paragraph 1 through 30 above, and further allege:

32.   At all times during the course of dealing between Defendants and Plaintiffs and members of the CLASS: Defendants have followed a course of conduct, in knowingly permitting the the housing of inmates with communicable diseases with other inmates, such as inmate Casey, referred to in this complaint, who the Medical Doctors and Staff, as well as Block C/Os, knew Mr. Casey was being treated for Aids, Hepatitis (B) and (C); And, who by his own admission to a number of us Plaintiffs, also had Herpes when he entered State prison. This inmate housed with Plaintiffs Carter and Carmichael for some months prior to his parole; And, during that period of time Plaintiffs Carter and Carmichael, had to live in constant fear of contracting one or the other of this inmate's diseases. Because, Mr. Casey day and night would be constantly harking and spitting up sputum, which he would spit into the waste basket, on the floor at night; And, even spit up blood, and sputum into T-shirts. Yet the Medical Department Officials and Subordinates knowing of this inmate's diseased condition, made no complaint, nor issued any orders to cause this inmate to be removed from being housed in a cell with two other inmates; Or, to have orders issued to deny this inmate a job working in the Kitchen and Dining Rooms;

MOreover, The Medical Department knew that Plaintiffs Carter and Carmichael were being subjected to the possibility of catching Tuberculosis, from another inmate, who was housed in Plaintiffs' room, where this inmate's constant coughing, spitting up of phlegm into cloths and napkins, which he then cast into the room's wastebasket, as well as, other unsanitary personal hygiene acts, under which Plaintiffs had to endure, and be fearful of being contaminated to their serious injury; Until, finally, this inmate

was removed to the infirmary, where to date he is still in serious
life-threatening condition from his T.B disease.

33.    While Plaintiffs do understand that they should not
try to second-guess a Medical Doctor's  judgement, ( so long as
that judgement is professionally sound);  Yet, in the instant
case, when it comes to Doctor Bakela, and the Physician's
Assistant, Ms Loomis, both Defendants herein: Plaintiffs suggest
that Both HIS and HER Diagnosis and prescribed treatment of
Plaintiffs and CLASS, (based upon results of treatment, and
misdiagonosis of inmates) shows a deliberate indifference to a
patience serious medical condition;  Moreover,
Plaintiffs submit that the following examples will serve to show
that there is a knowing intent, by the Medical Department
Officials and their Subordinates, to misdiagnosis falsely to a
patient, prescribe medication and treatment which they know is
inadequate, for the purpose of saving money,; And, since the
Hospital and /or Hospice Unit is not equipped to handle serious
emergencies,  or conduct operations: many plaintiffs are caused to
suffer lack of proper and/or adequate medical care; Because, the
Department of Corrections, and/or the SCI-Waymart Administration
hesitates to expend the
capital necessary to pay for serious operations or treatment by
outside Physicians or Hospital/s/.

34.    Following are a few examples  of the Medical
DEpartment's Officials and their Subordinates  state  of mind,
deliberate indifference to the health and well-being of Plaintiffs
And CLASS, which to any one of common sense would say res ipsa
loquitur:

(A)...Since October 11, 1999, Plaintiff McWhirter has been
passing blood; To the extent that, as
of today, 10/29/99,
Plaintiff McWhirter, is finding it difficult to urinate, because
of the blood-clots which has obstructed his urinary tract. He
further states that this bleeding is causing him painful bladder
problems;  And, inasmuch as Plaintiffs Carter, Carmichael,
Campbell, and Pellot, are in daily close contact with Plaintiff

McWhirter, and are witnessing his painful reactions, from his
illness: we believe what he is voicing to us;  Moreover, Plaintiff
McWhirter, will testify  as to the validity of the foregoing
statements if this case goes to the trial, which Plaintiffs and
CLASS demand for all issues herein triable before a Jury.

    Plaintiff McWhirter avers that he is caused to suffer denial
of adequate medical care in a needless and wanton manner, by the
Medical Department Officials: primarily Dr. Bekele, and
the Physician's Assistance, Ms. Loomis.

  (B).Plaintiff Campbell, will testify at a trial of this issue;
And, avers that he has been, and continues to be denied adequate
medal care and treatment, By the Medical Department Officials and
their Subordinates, causing him to suffer ongoing pain and
needless suffering, because of the deliberate indifference shown
by the Medical Department Officials and their Subordinates, to his
serious medical needs.

    Plaintiff Campbell avers that the latest intent shown by
Dr. Bekele, to deny him adequate and proper medical care, (when he
knows such care is absolutely necessary to estop the pain and
suffering that Plaintiff Campbell avers he is enduring occured on
10/27/99, during a Sick-Call appointment with Dr. Bekele; Whereat,
the following action and/or lack of action on part of Dr. Bekele
was taken on Plaintiff Campbell's medical complaint:

    Plaintiff Campbell avers that, " I asked why I haven't been
taken back to the outside Hospital for my treatment;  And, to
consult with the orthopedic Surgeon?"  Dr. Bekele fliped through
my medical record; And, I saw where he had written cancelled on
the prior Approved Order.   This Order by the Orthopedic Surgeon
was to the effect that I was to be transported to the outside
Hospital to be given Six(6) to Eight (8) nerve block injections,
before I would experience any real relief;  Nevertheless,
Dr. Bekele, faced with this information, selected to bypass the
Orthopedic's Order, by telling me." If no pain lessening effect
was noticed after the first couple of shots, then the rest of the
shots would do no good." but, " I will call the Hospital and talk
to them." Also, regarding the rash I received after the first shot

given, the Doctor stated, " the rash isn't related to the shot
taken". And my response that the rashes never started until I
began taking the shots was, " Look, I'm the Doctor; And to date
Plaintiff Campbell avers that he still suffers from the pain;
which keeps him from getting adequate sleep at night and through
the day.

(C). Plaintiff Carmichael, will testify at trial, if such be
awarded in this case to the following show of deliberate
indifference, lack of adequate medical treatment and care in the
following context :

Plaintiff Carmichael was transferred to SCI-Waymart, in June,
1999, from SCI-Waymart: following two serious operations; And,
Plaintiff's first encounter with the Medical Staff here at
Waymart,occured after plaintiff had put in a sick-call slip:
During the Sick-call interview, by the physician's Assistant,
Ms. Loomis: ( Following PLaintiff's complaint of experiencing
chest pains, and arthritic bodily pain, and extreme shortness of
breathe: Plaintiff was given a surface examination, prescribed
Motrin, which is the standard Medication prescribed by the Medical
Department Staff, despite the fact that this plaintiff's medical
problems called for more extensive examination and treatment.

On another occasion, (one of many such) Plaintiff was told,
after being examined by a Hospice Nurse, that Plaintiff had
imphosema; Subsequently, on sick call, Plaintiff was informed by
the Physician's Assistant that Plaitiff had Bronchitis: Then at a
later sick call interview by Dr. Bekele, Plaintiff was told that
he had neither of the foregoing ailments; So that, as of today
Plaintiff has been given no detailed response by the Doctor/s/, or
other Medical Staff, as to what specific ailment/s/ he has;
Moreover, since Plaintiff's arrival at SCI-Waymart, he has never
been examined as to the
post-operation status of same: And, despite the fact that
Plaintiff has been unable to gain weigh, subsequent to his two
operations: and keep going to sick call to inquire as to what may
be the cause of his continuing weakened state: Plaintiff is being

told that his 119 Lbs. is normal; Notwithstanding the fact that
prior to the operations, plaintiff was enjoying adequate health
and strength. Plaintiff had gone into the operations at a loss of
weight down to 119 Lbs.;  And, despite the fact that after the
Doctor here placing plaintiff on the supplement bag List,
Plaintiff after two months was weighed and found to still be at
119 Lbs. And, Plaintiff's  request for a High Protean Diet, was
met with sarcastic remark, both from Dr. Bekele, and the
Physician's Assistant, Ms. Lloomis;  And, Ms. loomis, (whenever ANY
inmate questions her diagnosis or prescribed treatment) threatened
plaintiff, who was attempting to explain what treatment he had
received at the previous Institution  responded to Plaintiff, "
talk like that will get you in RHU";  And, this remark came as a
result of Plaintiff stating to her that he wished to see the
Doctor about the Matter; Because, she was not a Doctor, and
therefore not supposed to be examining, and prescribing medication
and treatment prior to A Physician's examination of the patient,
and thereafter prescribe treatment to be given/administered by
Subordinate Staff Members.

     Plaintiff will be prepared to testify to other such incidents
if a trial of these issues and all other issues set forth in this
Complaint.

     (D).   Plaintiffs and CLASS reallege herein as if fully set
forth the allegations
of inadequate medical care and treatment set forth in Paragraph
Fourteen

          35.   The Medical Department Officials, and their
Subordinate Staff, were under a duty to disclose to an inmate
patient the true nature of his ailment/disease; Yet, the named
Defendants have chose with malicious intent, to misrepresent to a
plaintiff/s/ the true nature and extent of their injury, illness
or disease; And, Plaintiffs maintain that this policy intentional
deception is caused by the Defendants' desire to save, for
departmental reasons monies which have been allocated for the
express purpose of fulfilling the duty of adequate care and

treatment of inmates in their care.

(36).   Defendants are liable for punitive damages for their
reckless or wanton disregard for the health and welfare of the
Plaintiffs and the CLASS.

Defendants' conduct constitutes malice, oppression, and
fraudulent representation to Plaintiffs and CLASS, regarding their
medical  condition and  ongoing painful sufferings; And, thereby,
warrants the imposition of punitive and exemplary damages against
against Defendants as provided by Federal Laws, Statutes, and
Codes; As well as, those damages provided by any state's laws
and/or  as authorized by the choice of law provisions of the State
of Pennsylvania in which this Court sits.

## SECOND CLAIM FOR RELIEF
### [ Overcrowding ]

(37).   Plaintiffs on behalf of themselves and all others
similarly situated, reallege, as if fully set forth, each and
every allegation containred in paragraphs 1 through 38 above, and
further allege:

(38).   By reason of their knowledge of the fact that
inmates who were being selected to be transferred to SCI-Waymart,
would be housed in and under overcrowded conditions then and now
existing at this Facility, would cause Plaintiffs and CLASS to be
subjected to inhumane, and unsanitary conditions of confinement,
and to suffer from being housed in overcrowded Unit Cubes, and
Side-Rooms with three in a room;
and, inadequate screening of inmates selected to be housed with
general population;
and, like of proper ventilation, storage space for personal
belongings:(which in many cases, Plaintiffs have been ordered to
dispose of legal materials needed for litigating their case in
Court), as well as, other personal property, which an inmate could
not secret from view,(Which meant that plaintiff/s/ would have to
store typewriters, and other valuables on the floor, under the
bed, for lack of space, and/or shelves upon which to store
personal property; And, no chair or stool upon which to sit for

study, typing, etc.;

And, many other instances of injury to Plaintiffs and CLASS, which results from said overcrowded conditions of confinement.  All of which causes Plaintiffs and CLASS to suffer inhumane, unsaft, degrading and hostile conditions of confinement here at SCI-Waymart.

(39)    Defendants breached their duty of care, when they knowingly subjected Plaintiffs and CLASS to the inhumane condition of confinement set forth in the above paragraph, as well as, the allegations set forth in paragraph 15; Which Plaintiffs and CLASS reallege herein as if fully set forth;  Consequently, Plaintiffs and CLASS are entitled to the equitable relief described in the First Claim for Relief and to damages according to proof.

## THIRD CLAIM FOR RELIEF

[ Intential infliction of Emotional Distress-
pain, suffering and mental anguish

(40)    Plaintiffs, on behalf of themselves and all others similarly situated, reallege, as if fully set forth, each and every allegation contained in paragraphs 1 through 39 hereof, and further allege:

At all times relevant to this Complaint, Defendants have acted in an extreme and outrageous manner towards Plaintiffs and members of the Class through a course of conduct which included, but not limited to, denying Plaintiffs and the CLASS adequate medical care and treatment; By acts of intentional intimidation; Threats for the expressing opinion; And, denial of basic necessities of life, via unwritten policies and practices, bent upon saving to the interests of the Department of Corrections, Officials, and the SCI-Waymart's Administration, monies being allocated for the purpose of paying the necessary costs for the adequate care , and treatment of all Plaintiffs being housed at at SCI-Waymart.   Defendants have acted with the intention of causing, or reckless disregard of the probability of causing,

emotional distress to Plaintiffs and members of the  Class.

[41].    As a direct, foreseeable, actual and proximate result of the Defendants' conduct, Plaintiffs and the CLASS have suffered and continue to suffer injury, damage and severe emotional distress for which they are entitled  to damages according to proof.

[42].    At all times relevant hereto, Defendants conduct was intentional  and/or outrageous and beyond the bounds of reasonableness and was in reckless disregard for the safety and well-being of plaintiffs and the Class.  Plaintiffs and the CLASS are therefore entitled to punitive and exemplary damages.

## FOURTH CLAIM FOR RELIEF
## [ Negligence, Negligent Infliction of Emotional Distress]b

[43].    Plaintiffs, on behalf of themselves and all others similarly situated, reallege, as if fully set forth, each and every allegation contained in paragraphs 1 through 42  hereof, and  further allege:

[44].    Defendants had a duty to Plaintiffs and members of the Class to provide a reasonably safe, and sanitary  prison facility in which to house inmates/Plaintiffs and CLASS;  As well as, a non-discriminatory Staff of workers, whose minds were set to treat inmates humanely.

[45].    Defendants breached their duty of reasonable care to Plaintiffs and the members of the Class, by the acts and omissions set forth in (but not limited to) paragraphs 14 through 30; And realleged herein as if fully set forth; And, otherwise failing to exercise due care under the circumstances.

[46].    As a direct and proximate result of the carelessness and negligence of Defendants, Plaintiffs and members of the Class have suffered reasonably and especially foreseeable damages in an amount to be proven at trial including, without limitation, economic injury and severe emotional distress.

## FIFTH CLAIM FOR RELIEF

[ Equitable ( Injunctive and/or Declaratory) Relief]

(47).    Plaintiffs, on behalf of themselves and all others similarly situated, reallege, as if fully set forth, each and every allegation contained in paragraphs 1 through 46 above, and further allege :

(48).    The Class members have no adequate remedy at law, rendering injunctive and other equitable  appropriate in that damages cannot adequately compensate Plaintiffs and Class Members foro the injuries suffered and threatened.

(49).    Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, request the following equitable relief:

(a)    that a judicial determination and declaration be made of the rights of Plaintiffs and the Class members, and the corresponding responsibilities of Defendants.

(b)    That Defendants be declared to be financially responsible to Plaintiffs and Class Members for restitution and refunds of all or part of the sums paid by them, for Co-Pay medicine illegally charged against Plaintiffs and members of the Class, when such medicine should have been freely prescribed and given, in accord with Medical Follow-Up  Prescription Rules/Procedures.

(c)    That /Defendants be ordered to create a medical monotoring fund,  under the continuing jurisdiction and supervision of the Court,  to monotor the health of Plaintiffs and Class Members  and to pay or reimburse Class Members for all medical expenses, and/or out-of-pocket expenses caused by Defendants wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated pray for judgement against defendants and each of them, jointly and severally as follows:

1.    An Order certifying the Class and any appropriate subclass thereof under the appropriate provisions of Fed.R. Civ. P. 23, and appointing Plaintiffs Counsel, and requested Investigator to represent the Class;

2.    For the equitable relief requested in the Fifth Claim for relief;

3.    For compensatory damages as alleged herein;

4.    For punitive or exemplary damages against each Defendant found guilty of oppression, fraud, malice, recklessness and/or despicable behavior, in an amount sufficient to punish each such Defendant and deter others from similar wrongdoing;

5.    For all applicable statutory damages ( including multiple damages and punitive damages) under the Federal and State Constitutions, and Protection Statutes;

6.    For Medical motoring  NITORING  whether denominated as damages or in the form of equitable relief;

7.    For attorney's fees;/

8.    For pre-judgement interests;

9.   For cost of suit;   and

10.   For such other and further relief as this Court may deem just and proper.

**JURY  TRIAL  DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

RESPECTFULLY SUBMITTED,

/s/ *John D Carter*

JOHN CARTER [CN-1404]

/s/ *Jimmy McWhirter*

JIMMY McWhirter[CC-8387]

/s/ *Mariano Pellot*

MARIANO PELLOT[BE-2490]

/s/ *David L. Campbell*

DAVID CAMPBELL[DJ-0505]

/s/ *Arthur Carmichael*

ARTHUR CARMICHAEL[DD-0875]

PLAINTIFFS" ADDRESS:

SCI - WAYMART

P.O. BOX 256

WAYMART, PA.   18472-0256

DATED: __12/ 20__ , 1999 c.e.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER [ CN - 1404 ],Et al., :       CIVIL ACTION
               Plaintiffs :

VS. :       NO._____

MARTIN HORN,[Commissioner,DOC] :    CLASS ACTION COMPLAINT
              Defendants :         JURY TRIAL DEMAND
                    :

### VERIFICATION

    WE THE UNDERSIGNED, hereby verify that the foregoing CIVIL RIGHTS COMPLAINT is true and correct to the best of our knowledge, information,,and belief; And, as to our belief, we believe that also to be true.

/S/ _John D Carter_

_Jimmy McWhister_

_Mariano Pellot_

_Dan't L Campbell_

_Arthur Carmichael_

DATED: _12 / 20_ , 1999 c.e.
                        Pro. Per.
                        SCI-Waymart
                        P.O. Box 256
                        Waymart, Pa. 18472

ARTHUR CARMICHAEL
DD - 0875
P.O. BOX 256
WAYMART, PA  18472-0256

TO: Michael Kunz (Clerk)
    United States District court
    2609 U.S. Courthouse
    1601 Market Street
    Philadelphia, PA  19106

    Dear Clerk:
            Enclosed please find one (1) Original and one (1) copy
of the following documents:
Plaintiffs' Motion In Opposition To Commonwealth Defendants' Motion
to Transfer; And, Brief In Support of Plaintiffs' Motion In
Opposition to Commonwealth Defendants' Motion To transfer.
    A Copy of same have this day been forwarded to Commonwealth
Defendants' Attorney, as depicted on the attached Certificate  of
Service.
    I thank you for your consideration and cooperation as it
relates to the foregoing matter.

                        Respectfully submitted,

Arthur Carmichael

P.O. Box 256
Waymart, PA 18472-0256

DATED:February 28, 2000 c.e.

AB

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER [CN-1404]                      :       CIVIL ACTION
JIMMY McWHIRTER [CC - 8387]                :
MARIANO PELLOT [8E - 2490]                 :       NO. 99cv6517
DAVID CAMPBELL [DJ-0505]                   :
ARTHUR CARMICHAEL [DD - 0875] ;            :       JURY TRIAL DEMAND
     And, all others similarly            :
situated at SCI-Waymart,                   :       CLASS ACTION COMPLAINT
                    Plaintiffs             :
                                           :
                                           :
              vs.                          :
                                           :
MARTIN HORN,[Commissioner,                 :
Dept. of Corrections]                      :
JEFFREY A. BEARD, Ph.D.[Exec.              :
Deputy Sect., Dept. Corr.]                 :
RAYMOND J. COLLERAN, [Supt.,               :
SCI-Waymart                                :
JAMES T. WYNDER, Jr.,[Deputy               :
Supt., Centralized Services]               :
JOHN T. SHENO, [Dep.Supt.,for              :
Facility Management]                       :
THOMAS S. PATTERSON, [ Major               :
of the Guard]                              :
DONALD Fiske,[Health Care Adm.]            :
TAMRAT SEKELE, [Dir.    Med. Ser.          :
LASLO KIRALY, [ Medical Doctor]            :
Ms. Loomis,[ Physician's Asst.]            :
GLEN JEFFES,[Reg. Dir.of Corr.             :
Physician Services, Inc.]                  :
PAUL DelROSSO, GERALD SOSDTOR,             :
BERNARD CHIPEGO, and                       :
MILTON FRIEDMAN, [Unit Mgrs.               :
EMANUAL PATTERSON, NOEL BOOTH,             :
and PATRICK HERBERT,[Zone Lts.]            :
JOHN DOE DOCTOR/S/ [Bureau of              :
Health Care Services]                      :
JOHN DOE HEAD/S/ [SCI-Waymart's            :
Hospice Unit ]                             :
                    Defendants             :
AND EACH IN THEIR OFFICIAL and INDIVIDUAL CAPACITIES.

## JURISDICTION

A.    This Court has jurisdiction over this Class Action pursuant to  28 U.S.C. § 1983;  And, by virtue of 1343 (3) and 1343 (a)(4) and  1331(a).  This being an action seeking Declaratory, Injunctive, and Monetary Relief  under an act  of Congress  providing for the protection of civil rights

B.     Venue is proper in this District pursuant to  28 U.S.C. § 1391.



### 1. Previous Lawsuits

Plaintiffs have begun no other lawsuits     in State
Court dealing with the same facts involved in this action
otherwise relative to their imprisonment.

### 2. Place of confinement:

All named Plaintiffs are presently confined at the St
Correctional Institution, in Waymart, Pennsylvania.

(a). Plaintiffs have complained to prison authorities,
otherwise have exhausted the prisoner grievance procedure i
institution/Hospice Unit about facts relating to this Compl

### The Results:

(b). Each of the named Plaintiffs, [ with the exception of
Plaintiff Carter,who, after five months of complaining abou
medical condition, and other unconstitutional prison condit
conceded a double mattress and pillow, to alleviate the pai
suffering he was caused to endure, as a result of inadequat
gross negligence on part of the Medical Department;  And, t
concession was made only after plaintiff Carter was able to
that the Medical Director had made false statement/s/ on th
record.  Otherwise, as to each Plaintiff named herein, th
have been laced with arbitrariness, capriciousness, carr
unsatisfactory and unfair responses resulting in no
thus Plaintiffs now complains to this  Honorable C

### 3.                    NATURE OF THE CASE

Through a pattern of deliberate in
the proposed Plaintiff class represent
life's necessities, the Defendants, a
named Defendants have denied to Plain
representatives :         humane nec

adequate medical care- a knowin
Plaintiffs' health and safety- unsan
food and drink- inadequate ventilat
storage space for personal belongin

inadequate training of inmates regarding safe exit in case of fire-
rampant and reckless display of discriminatory practices in
employment and work place, and hiring- bias and discriminatory
practices in the reading Library- constant and unnecessary
intimidation and harrasment by some Staff, as well as, subordinate
officials- overcrowded conditions of confinement;  As well as, other
claims to be set forth in this Complaint, and each as if fully set
forth herein;  And, each of the named defendents, with full
knowledge of the existence of these unconstitutional conditions of
confinement at SCI- Waymart has acted and/or failed to act in such a
way as to cause exacerbation of the overcrowding and resulting
unacceptable conditions at this Institution.'

  (a).This overcrowding, and deprivation of services and subjection
of Plaintiffs, and proposed plaintiff representatives to injurious,
unsafe, unsanitary, hostile and degrading conditions, by the named
defendants, have deprived Plaintiffs and proposed class
representatives of rights guaranteed to them by the First, Fifth,
Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, as
well as, Article 1 § 9 of the Pennsylvania Constitution, and all in
violation of 42 U.S.C. § 1983. Also, Defendants' wrongful conduct is
in violation of the Governor's Code of Conduct,(1980);  And,
Responsibilities of Employees covered by  The Civil Service Act:
applicable Collective Bargaining Agreements;  Or  bylaws of the
Commonwealth.

## CLASS ACTION ALLEGATION

4.    Plaintiffs bring this class action on behalf of themselves and all others similarly situated , for the purpose of asserting the claims alleged in this Complaint on a common basis. Plaintiffs' proposed Class is defined as:  All inmates who has been housed at SCI -Waymart, since 1993; who have been subjected to a denial of the basic necessities of life; As well as, violations of their rights guaranteed within the premises of the First, Fifth, Eight, and Fourteenth Amendments to the United States constitution, as alleged by Plaintiffs in this Complaint: And, which they reallege herein as if fully set forth.

Excluded from the Class are Defendants herein, any entity in which any of the Defendants has a controlling interest , any officers, directors or employees of any of the Defendants, and legal representatives, heirs successors, and assignees of any of the Defendants.

5.    This action is brought and may be properly maintained as a class action pursuant to the provisions of Federal Rules of Civil Procedure 23(a)(1)-4  and  as appropriate, 23(b)(1), (b)(2) and/or (b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy and predominance  and superiority requirements of those provisions.

### Numerosity of the Class.  Fed. R. Civ. P. 23(a)(1).

6.    The class is so numerous that the individual joinder of all its members is impracticable.  An estimated 1600 inmates have, and continue to suffer inhumane conditions of confinement and treatment, since 1993;  And, Defendants knew or should have known that their actions and or failure to act in a way as to rectify the inhumane conditions of confinement, and treatment of plaintiffs, as alleged in this Complaint: constituted a knowing and wanton infliction of cruel and unusual punishment upon Plaintiffs and the proposed Class in violation of our civil and equal rights guaranteed under both State and federal Constitutions.  Plaintiffs are informed and believe, and on that

basis allege, that the Class includes hundreds of members;  And,
that the members may be informed of the pendency of this Class
Action by mail and/or broadcast notice, or both.

### Existence and predominance of common questions of law and Fact. Fed. R. Civ. P. 23(a) and 23(b)(3).

Common questions of law and fact exist as to all members of the
Class and predominate over any questions affecting only individual
members of the Class.  These common legal and factual questions
arise from the following central issues, which do not vary from
class member to Class member and which may be determined without
reference to the individual circumstances of any particular Class
member:  (1)  Defendants' course of conduct in knowingly
permitting the unconstitutionally inadequate conditions of
confinement, and inhumane treatment of inmates housed at
SCI-Waymart;  (2) Defendants direct participation and/ or
proximate cause of bias and discriminatory act against blacks and
certain ones of indian heritage, who are housed at SCI-Waymart.
(3)   Whether Defendants action and or failure to act to remedy
the violations of plaintiffs' constitutional rights, as alleged in
this Complaint  amount to gross negligence.  These common legal
and factual questions include, but are not limited to, the
following :

(a)   Whether Plaintiffs  and the proposed Class
[hereinafter, "CLASS"] are being provided proper or adequate
medical care nd treatment;

(b)   Whether there are overcrowded conditions exhisting at
SCI-Waymart;

(c)   Whether the physical structure a SCI-Waymart is fit to
accommodate and house inmates;

(d)   Whether there is preferential treatment accorded to
certain inmates, and not to others;

(e)   Whether there is unsanitary preparation and service of
food and drink;

(f)   Whether there is inadequate screening of incoming
inmates resulting in chronically ill, or diseased inmates being
placed in general population, and thereafter placed to work in the

kitchen, on the food-serving lines and dining-rooms;

(g)    Whether there is inadequate ventilation and heat management at SCI-Waymart;

(h)    Whether there are fire-hazardous conditions at SCI-Waymart;

(i)    Whether there is proper and/or adequate training of inmates regarding safe exits in case of fire;

(j)Whether there is ongoing intimidation and harassment of inmates by subordinate officials here at SCI-Waymart;

(k)    Whether there is ongoing fratinazation between inmates and officials here at SCI-Waymart;

(l)    Whether there are violations of the Governor's Code of Conduct, and the Civil Service Act; Applicable Collective Bargaining Agreement;

(m)    Whether there is a denial to inmates of the basic necessities of life;

(n)    Whether there are on-the-spot policies, customs, edicts and acts set forth by subordinates, and condoned by the higher Officials here at Sci-Waymart;

(o)    Whether there exist a deliberate indifferent failure to train subordinate officers;

(p)    Whether there is retaliation against inmates who exercise their First Amendment rights;

(q)    Whether inmates have adequate living and storage space where they are being housed here at SCI-Waymart;

(r)    Whether Defendants conduct constitutes negligence;

(s)    Whether Defendants are liable for intentional infliction of emotional distress;

(t)    Whether the Class Members are threatened with irreparable harm and whether they are entitled to injunctive and other equitable relief , and if so, the nature of such relief;

(u)    Whether the Class Members are entitled to medical monitoring at defendants' expense;

(v)    Whether the Class is entitled to compensatory damages;

(w)    Whether /Defendants are liable for punitive or exemplary damages, and, if so,  how much is necessary and

appropriate to punish them for their conduct and deter others and fulfill the other policies and purposes of punitive and exemplary damages;  And,

(x)   How any and all punitive and exemplary damages awarded to Plaintiffs should be equitably allocated among the Class. Finally,

Whether the administrative remedies are inadequate and abused by Correctional officials here at SCI-Waymart.

### ADEQUACY OF REPRESENTATION.  Fed. R. Civ. P. 23(a)(4)

8.    Plaintiffs are adequate representatives of the Class because they are members of the Class and their interests do not conflict with the interests of the members of the Class they seek to represent;  And, they are  applying to this Honorable Court for counsel competent and experienced in the prosecution of complex class action cases;  Also, Plaintiffs intend to prosecute this action viorously for the benefit of the Class.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and said counsel.

### Superiority.  Fed. R. Civ. P. 23 (b)(3).

9.    A class action is superior to other available methods form the fair and efficient adjudication of this litigation since individual litigation of Class Members' claims is impracticable. Even if any Class Members could afford individual litigation,  the court system could not.  It would be unduly burdensome to the courts in which individual litigation of the facts of million of cases would proceed.  Individyual litigation further presents a potential for inconsistent or contradictory judgment.  Individual litigation increases the delay and expenses to all parties and the court system in resolving the complex legal and factual issues of the case.  By contrast, the Class Action device presents far fewer management difficulties and provides the?benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Notice of the pendency end of any resolution of this class action can be provided to Class Members by mail or publication.

10.    The various claims asserted in this action are additionally or alternatively certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) and/or 23(b)(2)  because

(a)    The prosecution of separate actions by the individuals members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members,    thus establishing incompatible standards of conduct for defendants;

(b)    The prosecution of separate individual Class members would a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interest of the other class members not parties o such adjudications or would substantially impair or impede the ability of such non-party Class members to protect their interests; And,

(c)    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## STATEMENT OF CLAIMS

11.    The Defendants named in this Complaint, as well as other Officials yet to be named pending discovery, had to know, or should have known prior to transferring prisoners from other State Correctional Institutions, to SCI-Waymart, that the partially refurbished structure, [both interior and exterior] was unfit for habitation by inmates, or for that matter, unfit for any human habitation to accord with the societal norm; And, yet refused to do anything to rectify such conditions, when concertedly, and acting under color of State law

they knew or should have known that they had a duty to do so constituted a violation of Plaintiffs' and the Class' under both State and Federal Constitutions, as alleged under Section (3)(a) to (x) of this Complaint: And, which is re-alleged herein as if fully set forth herein.

12.    That since being housed at SCI-Waymart, Plaintiffs have been subjected to inhumane treatment , bias, discrimination, by both Correctional Staff, and subordinate officials, whose personal involvement and/or personal knowledge of such wrongdoing; as well as, allowing the administrative Officials at SCI-Waymart, to make and create policies and customs that allowed the wrongdoing alleged in this

Complaint by Plaintiffs. (if proved at a trial of this case) constituted a gross violation of plaintiffs' rights under both State and Federal Constitutions.

13.    That Defendants' allowance of the wrongs alleged in this Complaint, and re-alleged herein as if fully set forth, and/or Defendants' failing to properly oversee those Officials or subordinates who caused the wrongdoing, if proven at a trial of this case, as Plaintiffs' are prepared to do: constitutes gross negligence, denial of due process; as well as, a deliberate indifference to the Plaintiffs' and Class' basic needs and humane treatment, in violation of their rights under both State and Federal Constitutions and Statutes.

14.     Plaintiffs aver that they, and many of the Class Members have been denied proper and/or adequate medical care and attention in the following ways:

(A)     By denying to Plaintiffs and Class, follow-up treatment, and medication, which had been prescribed to them by a Physician in the Medical Department of the State Institution from which they had been transferred to and housed in SCI-Waymart; And, the standard response to plaintiff inmates, who requested that such treatment be continued by the Medical Department here at SCI-Waymart was, " That was that prison or facility"; "And, this is Waymart, and we do things different here". Then, instead of proffering an adequate substitute to relieve such plaintiffs of their pain and suffering: their serious medical needs were met with deliberate indifference, sarcastic remarks and responses  [ following a plaintiff inmate's attempt to explain how the medication and treatment given at the former Institution had been working to stay and/or relieve the pain resulting from their disease or other illness], was met  with such responses as, " Stop trying to be a doctor and do as your told; Etc. Etc.

(B)     One example of the Defendants and in this instance the Medical Department Staff's deliberate indifference to Plaintiffs' medical needs is as follows:  On September 14, 1999, Plaintiff McWhirter began to urinate blood.  Thereafter, he requested, and was sent to the Medical Department, where he was seen by a Physician, who following the asking of a few questions: then looked back into Plaintiff McWhirter's Medical Record, where he found that this Plaintiff had been given a Blood-Count long prior to the instant blood-urinating matter; And, he stated to Plaintiff " Oh, I see you had been given a blood-count which was 14 and 15, which means the present blood-flow will not hurt".  Yet, at no time then or since has said Physician taken a blood-count as it relates to the instant blood-flow;  Moreover, said Physician's treatment consisted of  (a) that Plaintiff would be seeing a urologist in the latter part of the month (September);  However,

despite Plaintiff's continuing to suffer the painful results of
the blood-flow and the other illness which plaintiff also suffers:
to date, 9/27/99, this plaintiff has received NO adequate medical
treatment; And, he continues to urinate blood.

The foregoing example demonstrates just how negligent and
uncaring about Plaintiffs and CLASS' medical needs. And, given the
opportunity, Plaintiffs intend to prove at trial of this case
that the Defendants know of, yet totally  disregards the pain, and
excessive risk to Plaintiffs' health and safety by their
deliberate indifference to Plaintiffs' serious medical needs,
which actions and or failure to act in a way as to meet the
evolving standards of decency, is causing Plaintiffs and CLASS to
suffer cruel and unusual punishment in violation of their rights
guaranteed to them under both State and Federal Constitutions and
Statutes.

15.     That the overcrowding of inmates at SCI-Waymert has
created conditions of confinement constituting cruel and unusual
punishment in violation of Plaintiffs' and CLASS' Constitutional
rights under both State and Federal Costitutions  and Statutes,
because of the following reasons;

     (a)    As a direct and proximate result of the overcrowded
conditions at SCI-Waymert, Plaintiffs and the CLASS have been
subjected to, and injured by the following deficiences :

     (a)    Inadequate screening of incoming inmates resulting in
especially diseased and mentally perverted inmates being placed in
general population;  For just one of many examples of such
placement follows:

     One inmate named Michael Casey, who, [based upon
information given to his two room-mates, and believed by them]
aside from being infected with Hepatitis (B) and (C), also claimed
to be infected with the HIV Virus; And, when this inmate was
released on 9/29/99: the Block Officer moved another inmate into
the side-room with Plaintiff Carter;  And, when Plaintiff Carter
reminded said Officer that he (the Officer) knows that Mr. Casey

had the foregoing-stated diseases; And, that he should replace the mattress and pillow which Mr. Casey had been sleeping upon for approximately Eighteen Months; And, the Officers reply was, " Yes! I know! I Know!   Moreover, Mr. Casey was also employed a Kitchen worker, who served Dietary and Regular population meals.

The foregoing example goes to show how negligent and uncaring the DOC, SCI-Waymart, and the Medical Department are as regards placement of these and other mis-Fitting inmates in the over-crowded cubes, side-rooms and cells.

(b)    To further demonstrate the overcrowded conditions existing here at SCI-Waymart: the side-room where Plaintiff Carter, inmate Carmichael, and the former _mentioned  Mr. Casey, are housed is a 9 by 12 Sq. FT. room.  The movable space alloted for the three inmates therein is a 9 by 3 Sq. Ft. Strip extending from the front door to the side-room, back to the room's window; And, to the immediate right side, upon entering the room, there stands a 3 inch by 1½ Locker; And, beside that and the wall sits a Metal Bunk-bed, which is approximately 6 by 3 Inches long; Then beyond the bed is a 2 SQ. Ft. space, containing personal property belonging to the inmate who sleeps in that bed; adjacent to the property stands another Locker, which belongs to the inmate, who sleeps of the opposite side of the room, in the lower of the Double-Bunk bed; And from said locker , extending to the window is another  2 and a ¼ SQ.Ft. of space which contains Personal property belonging to the inmate who sleeps in the top of the double bunk.    To the left side of the room, upon opening the door, there is a 3 SQ.Ft. space, which allows the door to move inward: then stands the double bunk afore-mentioned, which extends along the left-side wall, leaving a 2 Sq.Ft. space which is covered by the locker belonging to the inmate who occupies the Lower Bunk Bed.

On the right side wall is placed Four separate clothing racks, which have imbedded therein three wooden spikes each for hanging of clothing items; And the same applies to the left wall.

The height of the room, from floor to ceiling is approximately 12 Feet; And implainted within the ceiling is a 24 by 48 inch space for the florascent lightening of the room; Also there is installed therein a small Smoke-Detector unit. The celing is one of Drop-Ceiling Panels. Immediately beneath the ceiling, on the front side of the room is a 4 by 12 Inch vent, for air and/or heat; Also, there are exposed pipes along both the front and left side walls. One of such pipes is for Cable, and the other pipes are electrical conduits. Imbedded within the back wall beside the window is another vent for heating: But, it is no longer operable.

(c)  Plaintiffs maintain that, whether it relates to the Cubes, Side-Rooms, or Cells: the lack of maneuvrable space for inmates housed therein, and the lack of space to store personal property. such as Electric type-writers [which inmates are ordered to store under the bed; despite fact that such is liable to be damaged by dust, Rodents, Insects or water. Moreover, since ones personal property cannot be properly stored: but simply open to anyone who desires to steal same: And, since there are no shelves provided for placing of books and other reading materials and legal documents: And, since the side-rooms containing three inmates in a space where no more than two occupants should be housed; And, such lack of space is similar in the Cubes and Cells; Leatly, unlike all other State Institutions in Pennsylvania: SCI-Waymart does not provide inmates in side-rooms, or cubes, with anyplace to sit other than upon the bed . There are no stools or chairs upon which to sit and write or type and/or read and write.

(d)  As a result of the overcrowding here at SCI-Waymart, and the deprivation of basic necessities of life; As well as, subjecting Plaintiffs and CLASS to injurious unsafe,and unsanitary hostile and degrading conditions, have deprived Plaintiffs and CLASS of rights guaranteed to them by both State and Federal Constitutions and Statutes, in violation also of 42 U.S.C. § 1983;

16. W O  Plaintiffs Submit that SCI-Waymart is unfit to house and

16.    Plaintiffs submit that SCI-Waymart is unfit to house and otherwise accommodate inmates; Because, SCI-Waymart is a partially remodeled  structure, of the original Fairview State Mental Hospital For The Criminally Insane, which was opened in 1912; And it was closed by Order of the Court in 1988; Subsequently, in 1989, it was reopened as SCI-Waymart;  Which means that SCI-Waymart is approximately 87 years old;  And, since the structure has as yet to be completely remodeled to meet conventional standards in the way that the structure has never been winterized to prevent cold cold summer or winted air and drafts from entering the cubes, side-rooms and cells: which causes Plaintiffs and CLASS from suffering from severe colds and/or the Flu viruses.  The windows are old, and have not been properly sealed in order to prevent air from filtering into the cubes, side-rooms, and cells.  The outside walls are much the same as they have been for the past 87 years; And, only minor repairs , And, those repairs have been mainly made upon the Officials offices, dining-room, hospital, etc.;  Consequently,

Since each of the defendants knew or should have  known of the delapidated, and antiquated condition of the various buildings: where even the screens have not been repaired or replaced to prevent insects from gaining entry, to bite and/or otherwise annoy Plaintiffs; And, when the /Defendants know or should have known of these harmful conditions , but have not acted to correct such defects: then, taken altogether with all of the other wrongful conduct and cruel and unusual punishments being inflicted upon  Plaintiffs and the CLASS constitutes a knowing violation of the rights of Plaintiffs and the ClASS' guaranteed within the premises of both State and Federal constitution, and Statutes.

17.    Plaintiffs and the CLASS have and continue to be caused to suffer from the unwritten policies, and practicies of discrimination and preferential treatment, in the following ways:

(a)    Discrimination is shown primarily against Blacks and
Indians, by the Officials (both State and Civilian), and their
subordinates, here at SCI-Waymart; To wit:

(A.)  IN GENERAL POPULATION, o
n each Block, 75% of the  blacks are given the dirtiest, and
heaviest job duties. Blacks are often referred to as idiots, coons
and in cases niggers; Moreover, certain Block C/Os will order an
inmate to refrain from the use of certain body fragrances which he
finds offensive to his smell.  certain Officials and Subordinates
have been heard to state ( when passing by where blacks are
gathered that " It smells in here ".

(B). Preferential treatment is shown on the Blocks, by giving
blacks such jobs as, cleaning the Bathroom equiptment, Showers,
scrubbing walls, Cleaning windows, Sweeping, scrubing, mopping,
and picking up and distributing laundry, etc.; While, the
Caucasians and Hispanics are given sedantary type of jobs; Such
as: wiping off the Officers desk- dusting - having charge of the
cleaning-equiptment room; and dispensing of cleaning materials
to inmates.  Furthermore, discrimination is shown against those
black inmates, who for just cause may ask to be relieved of a job
which that inmate may come to fine he is unable to handle.  For
Example:  one particular inmate, who WILL testify at a trial of
this case: that he,Upon arrival at SCI-Waymart, was given a job
Cleaning of the Day Room; Which entailed his Sweeping, Dusting,
Mopping, Buffing, Cleaning windows and screens. Said inmate, who
had just two weeks prior to being transferred from SCI-Coal
Township, suffered through Two very serious operations; And, his
Medical Record attested to that fact; Along with the fact that he
was not to lift anything heavier than Fifteen Pounds;
Nevertheless, when this inmate informed the Block Officer that he
could no longer handle the job, because of having to lift, and
carry the heavy mop-buckets, mops, Lift the heavy oak benches in
the Day Room, climb up to clean and wash the windows and screens,
and manipulate the heavy Buffer: he was asked, " Are you saying
that you want to quit the job?" And would not accept any other

mitigating response from him;  despite his producing for
inspection, a medical Department statement releasing him from any
but sedentary duties. That particular Block Officer; as does a
majority of subordinate officials take the quitting a job, as a
personal affront to their person; And, in the instant case above
the Block Officer, saw to it that the inmate did not receive
any Idle Pay, for two months and a half; Even though the Medical
Department had forwarded a copy of the Medical Release from heavy
work, to the Unit Mgr. and Unit Counselor, they both concurred
with the Block Officer's arbitrary and capricious decision to
withhold the inmate's Idle Pay. The inmate, who states that he
will testify in court as to the validity of the above-mentioned
wrongdoing against him; has further  requested that his name, [
Arthur Carmichael ] be set forth herein as validation of what he
has permitted Plaintiffs to relate herein.

(C)   Preferential treatment, bias, and discrimination against
blacks is shown, when whites  are shown special treatment; Such
as the following examples :  In the Kitchen, and Dining-rooms,
Officers Mess, Educational Department, Legal and Law Library,
Hospital, Laundry, Maintenance Department, Industries, and all
other Work details: blacks are detailed to do the menial  and/or
heavest work; While Caucasians are given the better jobs, and
swifter pay-rises.

(D). Discrimination and Preferential treatment is shown against
blacks at SCI-Waymart, in the way of hiring practices;  Only 5% of
the SCI-Waymart's work force is black;  And, to the best of
Plaintiffs' knowledge: of that 5%, only one individual holds a
ranking Staff position as Major. the rest are relegated to a
subordinate position.  Which means that, in every Department, and
Office: plaintiffs are being deprived of black Officials on Staff,
and Departmental positions, who understand the black man's ways
and culture; And, with whom a black inmate can present his
problems, be understood, and receive a fair and just response;
Whereas, at present, seldom, if ever can a black inmate expect to
receive a favorable response to his problem/s/;  Because, under
the present Institutional system of management: the standard

response to a black inmate, who attempts to get a Department
Official, or Staff Member, to aid or otherwise assist him with a
problem: the Staff Member, Or other Official, or Subordinate, will
offer an inadequate, or fair solution to the inmate's Problem;
And, that is because, the white Officials, and subordinates do not
or even try to understand the black inmate's problem/s/;
Moreover, any attempt by a black inmate to explain, or disagree
with a negative response, he is met with a vexatious reply such
as, " an attitude like that will get you in RHU or a Write-Up.

IN THE READING LIBRARY, there is only ONE black inmate.  IN
THE LAW LIBRARY there is only ONE inmate worker.  IN THE READING
LIBRARY the greater majority of books all relate to European
culture; For instance, there is only One small section of shelves
containing books relating to black culture;
and, One Section relating to Hispanic culture, and a smaller
section relating to Indian culture; And each of those sections are
incomplete for reading or study purposes;  Whereas, all the rest
of the books in the Library are related to European and/or
Euro-American culture.
 , AS TO MUSIC TAPES there are less than SIX Afro-American
Artist available: All the rest are tapes  of white, and Hispanic.
(E).    IN THE EDUCATION DEPARTMENT There are no black Teachers;
And, there are no Afro-American studies as part of the Schools
Curriculum;  Moreover, no black inmate is given a job therein to
operate the Computers; Despite the fact that there are inmates
capable of doing so.  Only White inmates are selected for these
jobs.
(F).    A final example of the preferential treatment by the Block
Officers, and condoned by the named Defendants is demonstrated in
the following manner:
    On every Block, to Plaintiffs knowledge and on information
received and believed; all Television programs selected for the
Day-Room viewing are given to inmates, who select only shows
adapted to viewing by white audiences, and the particular on duty
C/Os;  Such as, "As The World Turns" , " Wrestling ", " Hunting &
Fishing ", " Home and Gardening Program", and Car Races ", Etc.,

G. Dispensing of items, such as, extra pillows, Mattresses, Back
Braces, Etc., are given to white inmates; While at the same time
be denied to black inmates; For example: Plaintiff Carter, prior
to be sentenced to State Prison, had been involved in a car
accident, which left him with an ongoing serious back injury;
And, while at SCI-Somerset, he had been prescribed extra
mattress and pillow, as well as, other medical remedies which had
served to assuage his back pain; Moreover, upon arrival at
SCI-Way,art, Plaintiffs request to be given these pre-prescribed
treatments here, his request was denied, by the Medical Staff
Doctors, and Physicians Assistant Ms. Loomis; As well as, the Unit

Mgr., and Counselor; And each of the foregoing individuals gave
Plaintiff a similar reason for denial of said treatment; I.E.
that " We do not give extra mattresses and pillows here; Because,
such are considered against security regulations". Yet, when
plaintiff approached the Security Officer about that  issue,
Plaintiff was told by said Officer, " I have never heard of such a
Rule. And, it was  only after Plaintiff began the exhaustion
process, and was able to show that the Physician had falsified a
statement in the Record: that the mattress, and pillow issue was
played off, and Plaintiff was given the extra mattress and pillow;
The items were giv3en also, because Plaintiff was able to show
that

at least four white inmates on this Block has been issued extra
mattresses and pillows, without even having to obtain Medical'
permission; And, the foregoing factual statements and examples
serves to show in part just how the named Defendants and their
Subordinates acquiesce in, and knowingly condone discrimination,
bias, and preferential treatment against Plaintiffs and the CLASS
here at SCI-Waymart;  And, Plaintiffs propose to show and prove
other examples of discriminatory acts and/or failure to act in a
way as to cause discrimination and preferential treatment of
black inmates at SCI-Waymert to cease, has Plaintiffs and the
CLASS to suffer great stress, humiliation, mental anguish,
defamation of character, physical injury, and other injuries to be

proven at a trial of the allegations set forth in Plaintiffs'

Complaint.

18.    SAFETY CODE VIOLATION:

Plaintiffs maintain that for the past For years, workers in the C.I. Industries have had to work without being afforded safety equipment;   For instance, in the Garment Plant, the workers are not provided with either Goggles or protective Guards for the sewing machines: For example, an inmate working in the Garment Plant, on a Button Machine, received a wound to the eye, due to the fact that said machine did not have in place a Needle Guard; Also, of even more importance the inmate   worker had not been provided a pair of Goggles to protect his eyes from such injury. Moreover, given a trial of the issues set forth herein, Plaintiffs will be prepared to prove with witnesses relating to said allegation. Said inmate, who received the above-mentioned injury, was subsequently, ordered to return to that job, with out safety goggles, or the mentioned safety needle guards; And, when said CLASS inmate refused to return to the machine, from fear that he would be liable again to suffer the same type of injury: he was given a Write-Up, for failing to obey a direct order, and refusing to go to work.  Plaintiffs are also prepared, if afforded a trial on the issue/s/ in this Complaint, to produce a witness, who will attest to the fact that when the Garment Plant Machines were first installed: that he was ordered to take off the safety guards.

As of this date: 10/6/99, only  Five (5) Safety  Guards have been put in place in the Garment Plant. And, Plaintiffs are caused to suffer, not only because of such violations of the Safety Codes: but also suffer from the knowledge that Individual Plaintiffs and CLASS, are fearful of being ordered to work in the Garment Plant: and being forewarned of the safety violations existing therein, upon refusing to take the assignment, will be issued a write-up, which in turn will cause that individual to suffer from being placed into RHU (solitary confinement);   All of which is violative of plaintiffs' and the CLASS' Constitutional rights, under both State and Federal Constitutions; AS well as, State and Federal Statutes, and Codes.

19.    DENIAL OF RELIGOUS FREEDOM:

19.        DENIAL OF RELIGOUS FREEDOM:

Plaintiffs and CLASS are being denied their Constitutional right to practice their religion without fear  or penalty:

(a)    The Defendants and their employees have clearly violated the Plaintiff Class' constitutional  rights by imposing an unconstitutional policy, which is specifically aimed at Native Americans, and Jehovah"s Witnesses;  And, Plaintiffs submit that such a Policy/s/ constitutes unequal treatment that is not  unjustified;    Moreover, such a Policy/s/, as Plaintiffs will show herein via examples, and more fully if given a trial of this issue: that the Revised Policies set forth in DC-ADM 807 et seq. are based on discrimination and illegitimacy;  And, that such unequal and unjustified treatment bears no rational relationship to a legitimate governmental purpose; Furthermore, such practices are not substantially  related to the achievement of important governmental objectives;  And, in support of the foregoing allegation Plaintiffs submit the following violations of Plaintiffs' 1st, 5th, 8th and 14th Amendments to the U.S. Constitution; As well as, The Religious Freedom Act.:

AS IT RELATES TO THE RELIGIOUS FREEDOM OF NATIVE NATIVE AMERICAN PLAINTIFFS:

(b)  When Religious Tenets or beliefs require one to wear long hair or beard you may usually do so;  Nevertheless, the inmate Plaintiffs' of the Native American Prayer Circle, [indians] at SCI-Waymart are being punished because of their Religious Beliefs; And,

(c).  The D.O.C. Commissioner knowingly revised a prior and just Policy; AND, instituted and caused to be enforced an illegal Policy that is in violation of the First, Eighth, and 14th Amendments to the U.S. Constitution: by allowing his employees to punish inmate Plaintiffs that practice Native American Beliefs.

(d).  Native American Inmate Plaintiffs are being put in Restrictive Housing Unit ( RHU ) because of  an illegal Policy instituted by Commissioner, Martin F. Horn;  And, such Misconducts

causing one to be placed in RHU, amounts to cruel and unusual
punishment; aimed at directly attempting to harm Native Americans
at parole hearings, as well as, to thwart or otherwise hamper
Native American Inmate Plaintiffs in practicing their Religion,
which is an  Established Religion recognized by Law.

[ LONG HAIR ]:

(o).   The NEW Policy, DC-ADM 807-3; Instituted by Defendant
Martin Horn; And, which supersedes DC - ADM-819 dated May 1, 1984
is discriminatory, and used to deny Native American Plaintiffs the
right to Religious freedom;  And, also, it is used to place Native
American Plaintiffs into a disciplinary situation, in violation of
the Freedom of Religion Clause of the 1st Amend. ( U.S.C.A. ).

Punishment for wearing long hair based upon Religious beliefs
is a substantial inequality of treatment;  And, the prevailing
Policy # DC-ADM  807-3, which directs Native American Plaintiffs
to show proof for hair exemption; while at the same time other
Religions, such as Islamic, Jewish, and Rastafarian  NEED NOT SHOW
PROOF to wear beads or drad-locks.

(f) The Native American's Religion is based upon the
Creator.  All things are connected to have harmony and balance in
life and in the world. The world  itself is held dear to Native
Americans, as it was given to us by the creator of all.

Long hair is a sign if Spiritual Attainment.  The issue of
growing and wearing long hair " Traditional Style " lies at the
root of many previous religious cases filed by Native American
Inmates.

Hair is regarded as a Sense of Origin, a Symbol of Growth,
a manifestation of Being.  Cutting of hair is an indication of
disgrace, humiliation, or a death in the family;  And, such is
deeply rooted in the Religious Beliefs  of Native Americans.

(g).   DC-ADM 807-3 states:  All inmates who request  a
haircut exemption on the basis of religious conviction must supply
something in writing confirming the inmate's participation in a
particular religion. This can be a  Certified Letter, from the
religious leader of that particular faith group, or in the case o
f Native Americans, a certificate of participation from a
recognized Chief or Tribal leader, the letter or certificate must

indicate that the inmate in question has demonstrated a history adhering to the Tenets of the particular faith group.

HOWEVER, despite the fact that the Native American Plaintiffs here at SCI-Waymart have demonstrated their sincerely held beliefs through attendance at Groups held herein: have or are undergoing genealogy research to check their heritage.

Some of the Native American Plaintiffs have already received documentation to prove their blood heritage from an outside Chief, which the Administrators ignored.

Three of the Indian Plaintiffs have even joined an outside Tribe and Reservation; And, some of the Native American Plaintiffs have received misconducts <u>for not cutting their hair based upon their religious beliefs.</u>

<u>MEDICINE  BAG:</u>

20.    Spiritually  and culturally, throughout countless centuries it has been and continues to be the tradition of Native Americans  to carry or wear a Medicine Bag.

The Medicine Bag becomes that persons invocation to the Creator to continually be with and watch over him.  It represents an Extremely personal relationship between the Creator and wearer and Must Not be violated.

The Medicine Bag might contain any natural object such as: Stone, Animal part, Herbs.  All natural objects possess a Spirit, as a part of one's Medicine Bag, the Spirit of these objects become a part of the wearer.

As it relates to the Native American Plaintiffs being housed here at SCI-Waymert: the Medicine bag must contain the following:  7 (Corn), 7 (Bean), 7(Squash), stone - sage - sweet grass - tobacco - cedar - crystal; And something Personal: Chief Taffe carries a gold earring (Sister's).  IT SHOULD BE SOMETHING THAT WOULD BRING YOU CLOSER TO YOUR SPIRITUAL WORLD;  Yet, notwithstanding the foregoing facts: the Defendant Martin Horn, has instituted an  arbitrary and capricious Policy, which causes Native American Plaintiffs to be deprived [ under threat of receiving a misconduct] the Constitutional right to possess those

Medicine Bag items, which are prerequisite to the fulfillment of their natural and Spiritual duties before the Creator.

The Defendants, and their Subordinates have, by limiting Native American Plaintiffs, to only Five (5) of the Ten it3ems required to make a Medicine Bag complete in the traditional Spiritual manner.

The following items are the only ones, which the Defendants will allow to Native American Plaintiffs for placing into their Medicine Bag:

> SAGE,   SWEET GRASS, TOBACCO,
> CEDAR,   AND   PLASTIC TURTLE.

+++   A Medicine Bag is too small to contain or conceal contraband and therefore should be permitted;   And, in this regard, Native Americans should be accorded the Freedom of Religious Expression as that given to all religions at the prisons.   They should be allowed possession of ALL SACRED OBJECTS. ( Except in those cases in which there is <u>Proven</u> <u>demonstrable</u> <u>threat</u> ;   and in the instant case such is not the case;   Therefore Native American Plaintiffs   submit that the Defendants acts   and or failure to act in a way so as to remedy the foregoing violations has and continues to cause Native American Plaintiffs, to suffer from needless mental anguish, stress, spiritual disruption, and cruel and unusual punishment, in violation of Native American Plaintiffs' Rights under both State and Federal Constitutions, Statutes; As well as, under Tribal Laws.

## Inadequate ventilation & HEAT MANAGEMENT

21.     The system of ventilation, which is presently in place at
SCI-Waymart, is such that it is only adequate in all
Administrative Offices, and Medical Department.  On the Blocks and
Side-Rooms the Ventilation process is inadequate; For example,
beginning with the Side-Rooms of Block L-1, to the end of the
Block, which is number 1012: while there are over-head
old-fashioned Colling Fans in place within the Cubes, and windows:
all of which are insufficient for giving relief to the Sixty-five
inmates being housed therein;  Because, in the Side-Rooms, which
does not have any fans, nor or in close proximity to them: so that
what little benefit there is from such fans those ones do not
receive it. In FACT, neither the fans or windows suffice to
prevent Plaintiffs from suffering from the heat in the summer,
when the temperature is in the 80s to the 100s. Because, during
those periods of summer, the fans are ineffective for cooling off
the areas: since, the if there be any air coming in from the
windows; all the fans operate to do is circulate the stifling
heat; Moreover, Since there are no windows, or exhaust fans in the
bath-rooms: the Steam from those areas flow out into the Dormitory
areas, and is circulated by the fans;  It becomes so hot in the
dorm and side-room areas until all of the inmate Plaintiffs suffer
with breathing and other discomforts; Also, many of the inmate
Plaintiffs are elderly persons, who are already dealing with
aggravating physical disabilities, and various medical problems;
So that, they are being caused to suffer what amounts to cruel and
unusual conditions o f confinement.  Since the side-Rooms are
secluded from the fan area: than the inmates housed therein must
suffer even worse than those in the Cube areas; Because, when the
Thermometer rises to the 80s and beyond, even with the one window
therein, with the hot airflow  coming in ,and no fan
therein. Inmates must just lie therein  and suffer from the
effects of the stifling heat;And, inmates with lung and or
bronchial ailments,such as Plaintiff Carmichael, who occupies a

side-room with two other Inmates; then being triple-celled along with inadequate ventilation causes Plaintiffs to suffer needlessly; Because the Defendants have knowledge of these defects in the heating and ventilating systems; Yet, are not doing anything to remedy the conditions as they relates to the Inmates being housed herein at SCI-Waymart

During the heat of the summer, even the Subordinates, who must stand in the Main, or Other corridors in the Facility, as well as on the Units suffer from the intense heat, which, due to Improper ventilation, exist through the prison. In the Corridors, each C/O is provided with a fan; However, the Inmates who must traverse those corridors daily Find it so that they state that " man it is so hot in that corridor until I could hardly breathe". And, this same type of heat prevails in the Staff Dining Room; However, in that dining room, extra LARGE Fans are taken from the Inmate areas and transferred to the Staff Dining Room; while in the Inmate Dining Room, it is so hot, until the Inmates must rush to swallow their food and get out.

In the Winter seasons, on all Units the Inmates must suffer from inadequate heating. While there may be Radiators visible to the naked eye: does not give off sufficient heat to override the flow of cold and oftentimes freezing air which one has to Face when going down the Corridors to the dining room and other places; Moreover, since all of the windows in the SCI-Waymart Facility are old, and not properly sealed as as to prevent air from filtering in. Many of the Plaintiffs and CLASS, IF given the opportunity, will attest to the inadequate ventilation and Heat Management, and how they are constantly caused to suffer Flu and other more serious ailments as a direct consequence of the Defendants failure to act in a way, so as to rectify such lack of proper heating and ventilation conditions.

22.         VIOLATIONS OF FIRE SAFETY LAWS-CODES AND ACTS

Plaintiffs and CLASS maintain that in the case of a fire here at

SCI-Waymart, there could be that inmates would suffer death , or

other serious ailment , due to gross  negligence on part of the
Defendants, who are aware of the faltuy conditions of fire
prevention equiptment, unsafe fire-exit management, and other
violations of the Fire Panic Act; Yet knowing that these unsafe
conditions exist, they have failed to remedy them.

Plaintiffs and CLASS submit that the following Fire-Safety
violations exist here at SCI-Waymart:

(a).    All Fire-Extinguishers are kept behind locked doors;
So that, in case of a fire, only a C/O in the area would have
access to the Extinguishers. Inmates, who are instantly subject to
the fire's damaging effects, are precluded from access to the
fire-extinguishers.

(b).,   In the Main Corridors there are in place no preventive
measures, such as exhaust fans, for pulling out the fires death
dealing smoke fumes; And, since the inadequate evacuation process
[as presently exist at SCI-Waymart] means that inmates would be
fleeing en-mass down these corridors in a panicky state of frenzy;
not one of those inmates, or prison personell is likely to stop
and open any of the Corridor's windows;
as a result an accurate inference may be drawn that among the
crowds of inmates rushing for an exit, that there would be some
dying from smoke inhalation, while others are otherwise caused to
suffer serious injuries as a direct result of the Defendants show
of deliberate indifference to the safety, and welfare of the
Plaintiffs and CLASS' who have been placed by the Courts into
their care and keeping.

(c). All Fire Exit Doors are manually operated; which means
that in case of a fire, ONLY the Officer in charge of the Main
Corridors have the key to the exit doors, and the responsibility to
open them; Moreover, the Fire Alarm system is so faulty, until
inmates upon hearing the alarm go off; would not know if there was
IN FACT a fire in progress, or just ANOTHER FALSE ALARM; Because,
many times in the course of each week the fire alarm goes off ,
when there is no fire.  Even fire-alarm switches in the Main

Corridor, can be seen to hang loosely from the wall; And, seen to
have been just taped together and back against the wall.

Another faulty piece of equiptment are the fire emergency lights:
And, although there are many of such lights distributed throughout
the Facility: whenever the fire emergency alarm goes off, or the
main lights go out: the only area in which the emergency lights
can be seen to operate is in the area of the Staff Dining Room,
while in the Units they do not come on; So that, inmates are left
in total darkness, and are ordered to stand or sit on their beds
until the Main Lights are again turned on.

These faulty conditions have been going on for a number of
years;  And the Defendents knew of these fire hazardous conditions
existed; yet to date have failed to  upgrade the fire-safety
management procedures up to the required standards set by law.

(d).   The Defendents know or should know that the Plaintiffs
and CLASS housed here at SCI-Waymart, are not being trained
properly as to what they must do to protect themselves in case of
Fire & Smoke: In fact the only procedure ( in the way of a Fire
Drill) is as follows:

All inmates are ordered to proceed from their respective
Units to the Main Corridor; then proceed down that Corridor until
they come to what is called 42nd Street [ A Corridor which crosses
the Main corridor; and, is used primarily as the entrance to the
Facility by Administrative Staff.

Inmates have NEVER been told where they would go after
arriving at that section of the Main Corridor.  In ALL other State
Prisons and Facilities, the inmates are given Full Fire-Safety
Drills, which in case of fire, and the resulting panic by
prisoners, they would know exactly every procedure leading inmates
orderly out from the burning building/s/.  However, the
SCI-Waymart Administrators/Defendents have until the filing of
this Complaint failed to properly train the inmates about how to
get out safely from this Facility in case of fire. IN fact, it
appears that such procedures that are in effect are geared to
effect a safe exit for the Staff and Employees. All of which shows

a deliberate indifference to the welfare and safety of the
Facility's inmate population.

23.                    INTIMIDATION-FRATENAZATION-VIOLATION
                          OF GOVERNOR'S CODE OF CONDUCT &
            APPLICABLE COLLECTIVE BARGAINING AGREEMENT

The named Defendants and their Subordinates, have knowingly and
concertedly acted and/or failed to act in a way, so as to cease
violating Plaintiffs' and the CLASS' rights guaranteed to them
under both the State and Federal Constitutions, and Statutes, in
the following ways:

  (A).  INTIMIDATION:

      Plaintiffs submit that in SCI-Waymart, there is in
constant play, a silent/unwritten Policy utilized by both Staff
and Subordinates, which allows them unfettered discretion to
intimidate inmates, whom they may have a personal dislike for, or
grudge against, because of racial hatred, or because an inmate may
have submitted a Grievance against an Official or C/O, or simply
because an inmate does not condescend to submit to the "Daddy-Son"
or Boss-Slave routine in play by ALL Block C/Os, Medical
Department Staff, as well as, played out by Employees of all Units
and Departments here at SCI-Waymart.

      Such intimidation comes about in many and varied form; And,
is usually geared to incite an inmate to anger; with the hope that
the inmates response can be such that would lead to his being
given a misconduct. Such unjustified acts are bent on entrapment.

      A Block C/O has been known to Order an inmate to keep an
appointment; Despite the fact such appointment may not be a
mandatory; but a voluntary appointment acceptance;  And, when the
inmate states that he does not have to go to the appointment: then
the C/O will respond, " Well, I Order you to go; So that if the
inmates,  who has a right not to voluntarily go to the
appointment: then he is written up for Failure to Obey a Direct

Order: Which amounts to a sort of covert entrapment;  And, such
unjustified act are condoned by All STaff and Subordinate
Officials.

In the Medical Department: Doctors and Nurses make use of
Psychological intimidation upon any inmate who may question  or
disagree with their diagnosis and/or prescribed treatment.  They
assume the position that, : I'm the Doctor/Nurse, and you don't
question what I say".

Unit C/Os, will make biased remarks in earshot of a black
inmate;  Or, will move him from one place to another; or
unnecessarily threaten an inmate with a write-up for some simple
act which in fact violates no established rule: the C/O simply
makes an on the spot policy, which, if the inmate fails to act in
accord with such a policy; he is threatened with a write-up.
There are many forms of intimidation by both Sargents and C/Os in
charge of the various Units herein. either one may pass by and
kick a sleeping inmate's bunk, bang on the trash cans or wall
outside of a Side-Room.  This type of Official activity creates
great tension in the inmates; Also, causes Plaintiffs and the
Class to suffer unnecessarily from expecting to receive a
write-up, or some other unfair treatment simply because he dosen't
like the inmate.


(B). HARASSMENT

Plaintiffs and Class are constantly being harassed on a
daily and nightly basis by Unit C/Os, and the Shake-Down Crews.

The Shake-down crew comes on the units before breakfast, to
begin Unit or Side-Room searches of inmates.

For instance , on this Plaintiff's unit the shake-down crew
will get with the Block C/O, or Sargeant; And, in concert, they
determine which inmates they are going to search; And, these
searches are always aimed at those inmates whom they dislike: so
they will search that inmate more often than any other inmate; One
Example is that of Plaintiff McWhirter, who is constantly being
searched, because , he is a Native American: and all Native

Americans are hated and discriminated against by both Officials and Staff here at SCI-Waymart. The search team searched Plaintiff Noshirter twice within three days; And have done the same to certain other disliked Plaintiffs based upon bias and prejudice.

Plaintiffs Ad CLASS are harassed in numerous ways; Such as:

1.    A C/O will enter a Side Room, which is overcrowded with three inmates, and order an inmate to put personal clothing, or typewriter, etc. under the bed; when he knows very well there is no room thereunder to place anything.

2.    Being placed in a Side-Room is considered to be a privilidge; Yet, the Doors to such rooms on C-1 Unit, only are ordered (via an on the spot policy) to keep the doors open; And, this is not done for any security reason; on the contrary, this unwritten policy was enacted by C-1 SGT, and the Night C/Os, in order that they will not have to open the door to see the inmates housed therein; however, otherwise this would not be necessary; Because, the Side-Room Doors are such that each door has a square viewing slot, which was cut for the very purpose of being able to either count or view the occupants.

The Block C/O's, will also harass an inmate, by conducting Security Checks, which by Rule is supposed to consist of simply checking the Doors, windows,  Electric Out-Lets, Radios, and TVs, to observe whether or not they have been tampered with;  However, when a C/O desires to harass and or intimidate an inmate, he will go further than the Rule requires; and, conduct a full search of an inmates locker, personal papers, and  clothing; which is the specific duty of the Search Team;  And the foregoing examples are just a few of the examples of official harassment/intimidation. Plaintiffs and CLASS are prepared to offer many other such examples, when and if they are fortunate enough to be given a trial of ALL issues set forth in this Complaint.  The named Defendents and their Subordinates knowingly condone such abuse of authority, and the making of on the spot policies and practices; Yet have failed to rectify such abuses, in violation of Plaintiffs' and CLASS' right to be free from such

illegal abuses, under both the State and Federal Constitutions, and Statutes.

24.    VIOLATIONS OF THE GOVERNOR'S CODE OF CONDUCT/ETHICS

CIVIL SERVICE ACT: APPLICABLE COLLECTIVE BARGAINING AGREEMENT

The Correctional Officials, Civilian Personell, and their Subordinates, employed to work here at SCI-Waymart, are vested with the power and authority of the Department of Corrections; And as such, all have an ongoing responsibility to perform their duties with Integrity, and Impartiality, and to never permit Bias, Prejudice, or Personal Gain influence their official decisions: As is the case demonstrated in an ongoing manner, by a majority of the Executive Officials, and Subordinates illegal and abusive behavior: personally observed, as well as experienced by Plaintiffs and the Class here at SCI-Waymart;  And, Plaintiffs and the Class aver the following Examples of such illegl and wrongful acts have been heaped upon Plaintiffs and the CLASS here at SCI-Waymart :

(a). INTEGRITY:

SCI-Waymart's Officials and Subordinates have shown, by their inability tot relate, or lack of desire to even try to understand the problems set before them by various  inmates;  To Wit: they seemingly do not care to understand;  And, this attitude is made apparent, by their show of a lack of concern when approached by an inmate with a personal problem.

Especially  noticable, is the show of a lack of concern, by the Counselors, and Unit Managers, to whom an inmate must turn, when faced with a prison problem, personal problem, or the need for emergency contact with Family; In many instances, as it relates to such matters, neither of the two can be found in their Office in the Unit;  AS a matter of fact, the only time an inmate can be fairly certain of finding the Unit Manager, or the Counselor, is during those days, when they are holding Inmate Staffings; Or, otherwise whenever they have to give an inmate bad

news or pass out Parole Board Green Sheets;  Otherwise, both
Staff, as well as, Subordinates, when approached by an inmate
seeking help with some problem: the inmate is usually told that
the matter will be looked into; Yet seldom, if ever, are such
promises followed through with. They all seem to be more concerned
with effectuating/enhancing their own personal interests: rather
than that of the inmate, or penal interests.

    (b).   <u>IMPARTIALITY AND PREJUDICE</u>

      Partiality runs rampant throughout the Administration at
SCI-Waymart: from the Superintendent, and Subordinates , to even
the Civilian Personell;  And following are examples of such
partiality;

    (1):  The majority of Officials, and subordinates, as well as
Civilian Personell, have yet to surface , in the sense that they
have come to be in accord with the Constitution's Preamble that "
All men are created equal ", and should be treated as such;  Or,
as it relates to prisoners: they should be treated with due
respect and humaneness;  However, such is not the case  with the
named Defendants and their subordinates;  And, an unbiased inquiry
will reveal that most of the Officials herein hate blacks,
hispanics and those of Indian heritage; And, especially those who
would show a proclivity for standing up for the limited
constitutional rights, which, even our United State Supreme Court
has assured could not be parked at the prison Gate's entrance.

    Their biased attitude is shown in every Administrative
Department. as well as, by ALL subordinate officials who are , or
may be in charge of the Units, where, all blacks, hispanics, and
Native Americans, are given the most demeaning jobs, suffer from
hearing racist remarks made about them. Also,

    Acting in the same vein , Prejudice is shown by the
SCI-Waymart Officials, and subordinates, toward all blacks,
hispanics and Native Americans , who are not informers,
homosexuals, or those imbued with the house-boy mentality.

    Such prejudice against Plaintiffs and CLASS, in any attempt

by such ones to get into desired Educational Programs;  Or, to
enter into other available Positive rehabilitation programs geared
toward aiding Plaintiffs And CLASS,:(especially blacks and Native
Americans) who are seriously endeavoring to rehabilitate
themselves, in readiness for re-entry into society;  Also, among
other examples of the Defendants' show of prejudice, and bias ed
acts against Plaintiffs and the CLASS is shown in the selection of
Black and Native American inmates seeking employment in such
positions as computer operators, Library Workers, Carpenter shops,
and Electric Shop.  In such jobs/positions, only Caucasians are
selected for the best assignments: despite the fact that many
blacks and/or Native Americans may be , and in fact are qualified
to hold such elevated positions/jobs.

25.            CONFLICTS OF PECUNIARY INTEREST :

    Plaintiffs aver, and will testify given a trial of the issues
in this Complaint that certain C/Os have been observed accepting
swags, in the form of candy bars, packs of cigarettes, potato
chips, etc.; And, is subsequently accorded preferential
treatment,of having TV Programs of the inmate's choice: over the
desires of the majority of inmates sitting in the Day-Room:
despite the fact of there being a Daily Schedule to be followed;
Or, will allow such inmates to visit with other inmates outside
the Unit; Which, if done by another inmate, he would receive a
misconduct for being in an unauthorized area.

    One of the Plaintiffs would testify at trial, about he was
told by a Black C/O: that in order for that inmate Plaintiff to be
given an emergency pass to see one of the Officials: that it would
cost him a candy bar; And, said Plaintiff in fact, did leave a
candy bar laying in near reach of said 'C/O's grasp, as soon as
the Plaintiff departed; And, another inmate standing within  the
Day-Room did observe this transaction.

    Information about inmates, from C/Os, to inmate and/ or from
inmate to C/Os : horse-play and heseling between inmate and C/O
happens on a daily basis; In fact, this Plaintiff, as well as,
other plaintiffs, would testify about how they have witnessed a

particular C/O roughing up an inmate, in horse-play manner; then
would hand-cuff one of the inmate's wrist: then swing him around;
while other of the C/O's favorite stooge inmates, would all join
in laughing, chiding and deriding said inmate, who was of hispanic
descent;   C/Os have been observed sleeping on night duty;   And,
watching TV in the day room; As well as, reading Mags.& Newspapers

## 26. SPECIFIC RULES AND REGULATIONS ( Department of Corrections):

Defendants and their Subordinates, consistently fail to abide
by the Department of Corrections Standards, Policies, Practices
and Procedures;   And, a response to an inmate who might question
one of such  violations is " We don't care about how other
Institutions followed a particular stated Policy; Because, we here
at Waymart have our own way of doing things";   And, this shown, in
the manner in which the Waymart Staff, Subordinates, and Medical
Department Officials DO make on-the-spot policies, practices and
procedures;   And, take the position that right or wrong has
nothing to do with their on-the-spot decision; Which as such a
decision may relate to a matter of concern to a black, hispanic,
or Native American;   Because, here at SCI-Waymart, by their
actions toward blacks, hispanics and Native Americans: are such
that they look upon and treat such ones from that worn-out
perspective that " they are ALL alike; and must be so treated.

The Defendants and their Subordinates, therefore fail to
accord an intelligent, humane, and  impartial treatment to all
inmates.  For Example:

Due to a lack of understanding, or being able to relate to,
or, for lack of not being properly trained  by way of the
DEpartment of Corrections Commissioner Martin Horn, in a way, so
as to be able to advise an inmate with a legitimate and serious
problem: there is a reverting to that rock-age principle: To Wit,

33

" I don't want to hear any more". " So go to your cell/Unit!"

Moreover, both Staff, as well as, Subordinates most often prefix their responses, or orders to an inmate, whom that Official may have a dislike for, with profanity; Or otherwise will respond with a sarcastic phrase: " Yes, I know". " So sue me".

## 27. FRATERNIZATION:

Fraternization includes, but is not limited to the giving of gifts to C/Os by inmates; And, visa-versa; Giving certain inmates
the privilege of wandering about on or off the Unit for their own personal reasons.

## 28. PERSONAL PROPERTY:

1. The abuse of personal property, by the Search team, is a daily occurance. Specifically, for purpose of the following examples: On L-1 Unit, Plaintiffs and Class are subjected to harassing searches Eighty-Four times a month: Three times daily: and Seven days a week; And, the Search Team is given unfettered discretion, in determining what is to be considered contraband, which, in turn leads to a frivolous misconduct; And, that in turn, causes an inmate, who happens to be in order for Parole, or some other favorable Program, to lose out on the priviledge.

(a). Shake-down teams, will abuse an inmate's Legal Papers, which that inmate happens to be assembling for an appeal. there are cases where,[ witnesses will attest to the validity of this assertion if a trial is afforded] an inmates legal papers have either been deliberately taken because of a dislike for a particular inmate.

(b). Another unjust abuse by the search team, And condoned by The Defendants is : an inmate, who is transferred to Waymart, from another State Prison, has his property searched, and is then given an itemized Slip: And, upon arrival to this Facility, said property is again searched; Whereafter, the inmate is given another itemized List: okaying the property acceptable for possession at this Institution; Yet, a search team in the process of shaking an inmate' Locker: upon finding that he

possesses property which isn't sold in the Commissary here at
Waymart, will take those items, and then write a Misconduct
against the inmate;  Subsequently, at the Hearing, the Hearing
Examiner will find the inmate guilty of possessing Contraband;
Moreover, the inmate isn's even afforded the option set forth in
the Inmate Handbook: of either sending the items home, or allowed
them to be destroyed.

(c). Plaintiffs and  the CLASS, have suffered hundreds of
dollars loss of Commissary items, which, because of negligence on
part of both the sending and receiving Institutions who, after
violating  § 5,¶ 4  of DC-ADM 815;  And, such a violation places
Plaintiffs and CLASS in a Catch-22 position; Wherein, an inmate
believing that he possesses Commissary items legally, because of
the fact that both the sending and the receiving Institution has
Okayed his right to have the items in his possession: then on a
later date, the search team comes and confiscates said property
pursuant to  DC-ADM 815 § VI.D.; And, subsequently issues a
Class-1 Misconduct upon such an inmate; And, thereafter, at a
Misconduct Hearing the Hearing Examiner will sanction said
inmate/s/, by reducing the Class-1 misconduct, to a Class II
Misconduct, and confiscate the inmate's property, pursuant to §
C.(4.) of DC-ADM 801.

(d).Plaintiffs and Class maintains that such actions as the
foregoing, by the Administrative Officials and their Subordinate
Search Teams, constitutes entrapment to defraud Plaintiffs and
CLASS of personal property, ( which they had been led to believe
was being possessed legally; All of which is violative of the
rights of Plaintiffs and CLASS' guaranteed under both State and
Federal Constitutions, and applicable Statutes.

(e).Plaintiffs and CLASS are lulled into believing that they
retain Consumable Items at the receiving Institution by the
following DC-ADM, § V. ¶ 4 Policy,which states:

" It is the responsibility of the sending institution to
inventory inmate property prior to transfer and ensure that

complies with policy.   Inmates will be  permitted to keep
no-longer-allowed-property as long as the items /were noted
on the inmate/s/ Personal Property Inventory (DC-153) as of
the effective date of the revised DC-ADM 815, which was
12/28/92;   As well as,
Under 1.Rules General

PERSONAL PROPERTY ¶¶s 2 and 3, which states:

" When transferred from one institution to another, all
property will be properly inventoried and packed by the
inmate in presence of the Officer. Both will sign the
Inventory Sheet".

" At the receiving institution, the property will be unpacked
and re-inventoried by the inmate in the presence of an
Officer. Both will sign the inventory sheet".

(e).   Search Teams will subject Certain Plaintiffs  and
CLASS' cell/side-room or Dorm area to purposeful and unnecessary
disruption; And, in such instances are conducted for the express
purpose of harassment and punishment; Because of dislike for the
inmate, by an Official, C/O, or
Search-Team.


29. SECURITY INSPECTIONS OF INMATE CELL/DORM/SIDE-ROOM:

Unit Officers, who may be on duty on given days, are known to
violate DC-ADM 203 § IV., as it relates to Security Inspections of
Inmate Cells;  By opening  inmate Locker, to view what is therein;
And, in case he thinks that an inmate might have consumable items
in excess of the Policy amount: will then notify the Search-Team,
who will then, ( on the Officer's assumptive information) conduct
a search of the inmate's cell/area, only to find nothing to be
considered contreband.

Such infractions of the stated Rule/s/, causes Plaintiffs and
the CLASS to suffer humiliation, negligent infliction of emotional
distress, mental anguish, and fear of further  reprisals, because
of Plaintiffs and CLASS' alleging this and all other claims set
forth in this Complaint.

### 29(a). FALSIFICATION OF DOCUMENTS:

Plaintiffs aver that various C/Os, as well as the Search teams, will, writing out a misconduct against an inmate, which the official knows will be looked upon by the Hearing Examiner, to be frivolous, or at most an infraction for which should have gone no far than an on-the-spot reprimand: will enhance said Misconduct report, with false and misleading information, which raises the rule infraction from a misdemeanor, to a Class 1 misconduct. And, all in violation of Plaintiff/s/ and the Class' right to due process and equal protection of the laws under both State and Federal Constitutions, and applicable Statutes.

### 30.     INMATE CONTROL OVER OTHER INMATE/S/

On various jobs , as well as, on the Dorm Units: an Official on duty/in charge of a particular Dorm Unit, or Block: will permit a favored inmate to be in control of another inmate; I.E.: tell another inmate what to do, in relation to his assigned job/duties;

p

Also, said favored inmate will report to the Officer/ CO, in charge: how an inmate is conducting his assigned duties.

Plaintiffs and CLASS submit that when such rules, regulations, policies and procedures are not [ as is in the present case] complied with :  Then the consequences are that everybody suffers;  Including, but not limited to the Public, whose votes and tax-dollars are spent toward the end that they may feel secure in their homes;  And, that their votes and taxes are alloted to responsible Officials over-seeing the Penal System;  And, who will utilize same toward the goal of putting a dent in crime and recidivism, by instituting programs to aid prisoners seeking to honestly re-habilitate themselves;  And, done so with unnecessary inhumane treatment and conditions of confinement.  All of which serves to the best of the penological aim/s/, the public interest;  And indeed, the befuddled prisoner's best interest as well.

## FIRST CLAIM FOR RELIEF

### [Inadequate Medical Care & Treatment]

31.    Plaintiffs on behalf of themselves and all others similarly situated, reallege, as if fully set forth, each and every allegation contained in paragraph 1 through 30 above, and further allege:

32.    At all times during the course of dealing between Defendants and Plaintiffs and members of the CLASS: Defendants have followed a course of conduct, in knowingly permitting the the housing of inmates with communicable diseases with other inmates, such as inmate Casey, referred to in this complaint, who the Medical Doctors and Staff, as well as Block C/Os, knew Mr. Casey was being treated for Aids, Hepatitis (B) and (C); And, who by his own admission to a number of us Plaintiffs, also had Herpes when he entered State prison. This inmate housed with Plaintiffs Carter and Carmichael for some months prior to his parole; And, during that period of time Plaintiffs Carter and Carmichael, had to live in constant fear of contracting one or the other of this inmate's diseases. Because, Mr. Casey day and night would be constantly harking and spitting up sputum, which he would
spit into the waste basket, on the floor at night; And, even spit up blood, and sputum into T-shirts. Yet the Medical Department Officials and Subordinates knowing of this inmate's diseased condition, made no complaint, nor issued any orders to cause this inmate to be removed from being housed in a cell with two other inmates; Or, to have orders issued to deny this inmate a job working in the Kitchen and Dining Rooms;

MOreover, The Medical Department knew that Plaintiffs Carter and Carmichael were being subjected to the possibility of catching Tuberculosis, from another inmate, who was housed in Plaintiffs' room, where this inmate's constant coughing, spitting up of phlegm into cloths and napkins, which he then cast into the room's wastebasket, as well as, other unsanitary personal hygiene acts, under which Plaintiffs had to endure, and be fearful of being contaminated to their serious injury; Until, finally, this inmate

was removed to the infirmary, where to date he is still in serious
life-threatening condition from his T.B disease.

33.    While Plaintiffs do understand that they should not
try to second-guess a Medical Doctor's  judgement, ( so long as
that judgement is professionally sound);  Yet, in the instant
case, when it comes to Doctor Bakels, and the Physician's
Assistant, Ms Loomis, both Defendants herein: Plaintiffs suggest
that Both HIS and HER Diagnosis and prescribed treatment of
Plaintiffs and CLASS, (based upon results of treatment, and
misdiagnosis of inmates) shows a deliberate indifference to a
patience serious medical condition;  Moreover,
Plaintiffs submit that the following examples will serve to show
that there is a knowing intent, by the Medical Department
Officials and their Subordinates, to misdiagnosis falsely to a
patient, prescribe medication and treatment which they know is
inadequate, for the purpose of saving money,; And, since the
Hospital and /or Hospice Unit is not equipped to handle serious
emergencies,  or conduct operations: many plaintiffs are caused to
suffer lack of proper and/or adequate medical care; Because, the
Department of Corrections, and/or the SCI-Waymart Administration
hesitates to expend the
capital necessary to pay for serious operations or treatment by
outside Physicians or Hospital/s/.

34.    Following are a few examples  of the Medical
DEpartment's Officials and their Subordinates  state  of mind,
deliberate indifference to the health and well-being of Plaintiffs
And CLASS, which to any one of common sense would say res ipsa
loquitur:

(A)...Since October 11, 1999, Plaintiff McWhirter has been
passing blood; To the extent that, as
of today, 10/29/99,
Plaintiff McWhirter, is finding it difficult to urinate, because
of the blood-clots which has obstructed his urinary tract. He
further states that this bleeding is causing him painful bladder
problems;  And, inasmuch as Plaintiffs Carter, Carmichael,
Campbell, and Pellot, are in daily close contact with Plaintiff

McWhirter, and are witnessing his painful reactions, from his
illness: we believe what he is voicing to us; Moreover, Plaintiff
McWhirter, will testify  as to the validity of the foregoing
statements if this case goes to the trial, which Plaintiffs and
CLASS demand for all issues herein triable before a Jury.

Plaintiff McWhirter avers that he is caused to suffer denial
of adequate medical care in a needless and wanton manner, by the
Medical Department Officials: primarily Dr. Sekele, and
the Physician's Assistance, Ms. Loomis.

(8).Plaintiff Campbell, will testify at a trial of this issue;
And, avers that he has been, and continues to be denied adequate
medal care and treatment, By the Medical Department Officials and
their Subordinates, causing him to suffer ongoing pain and
needless suffering, because of the deliberate indifference shown
by the Medical Department Officials and their Subordinates, to his
serious medical needs.

Plaintiff Campbell avers that the latest intent shown by
Dr. Sekele, to deny him adequate and proper medical care, (when he
knows such care is absolutely necessary to stop the pain and
suffering that Plaintiff Campbell avers he is enduring secured on
10/27/99, during a Sick-Call appointment with Dr. Sekele; Whereat,
the following action and/or lack of action on part of Dr. Sekele
was taken on Plaintiff Campbell's medical complaint:

Plaintiff Campbell avers that, " I asked why I haven't been
taken back to the outside Hospital for my treatment; And, to
consult with the orthopedic Surgeon?" Dr. Sekele fliped through
my medical record; And, I saw where he had written cancelled on
the prior Approved Order.   This Order by the Orthopedic Surgeon
was to the effect that I was to be transported to the outside
Hospital to be given Six(6) to Eight (8) nerve block injections,
before I would experience any real relief; Nevertheless,
Dr. Sekele, faced with this information, selected to bypass the
Orthopedic's Order, by telling me." IF no pain lessening effect
was noticed after the first couple of shots, then the rest of the
shots would do no good." but, " I will call the Hospital and talk
to them." Also, regarding the rash I received after the first shot

given, the Doctor stated, " the rash isn't related to the shot
taken". And my response that the rashes never started until I
began taking the shots was, " Look, I'm the Doctor;  And to date
Plaintiff Campbell avers that he still suffers from the pain;
which keeps him from getting adequate sleep at night and through
the day.

   (c).    Plaintiff Carmichael, will testify at trial, if such be
awarded in this case to the following show of deliberate
indifference, lack of adequate medical treatment and care in the
following context :

     Plaintiff Carmichael was transferred to SCI-Waymart, in June,
1988, from SCI-Waymart: following two serious operations;  And,
Plaintiff's first encounter with the Medical Staff here at
Waymart, occured after plaintiff had put in a sick-call slip:
during the sick-call interview, by the physician's Assistant,
Ms. Loomis: ( following Plaintiff's complaint of experiencing
chest pains, and arthritic bodily pain, and extreme shortness of
breath:  Plaintiff was given a surface examination, prescribed
Motrin, which is the standard Medication prescribed by the Medical
Department Staff, despite the fact that this plaintiff's medical
problems called for more extensive examination and treatment.

     On another occasion, (one of many such) Plaintiff was told,
after being examined by a Hospice Nurse, that Plaintiff had
imphosoma;  Subsequently, on sick call, Plaintiff was informed by
the Physician's Assistant that Plaitiff had Bronchitis:  Then at a
later sick call interview by Dr. Bekale, Plaintiff was told that
he had neither of the foregoing ailments;  So that, as of today
Plaintiff has been given no detailed response by the Doctor/s/, or
other Medical Staff, as to what specific ailment/s/ he has;
Moreover, since Plaintiff's arrival at SCI-Waymart, he has never
been examined as to the
post-operation status of same:  And, despite the fact that
Plaintiff has been unable to gain weigh, subsequent to his two
operations: and keep going to sick call to inquire as to what may
be the cause of his continuing weakened state: Plaintiff is being

- 41 -

told that his 119 Lbs. is normal; Notwithstanding the fact that
prior to the operations, plaintiff was enjoying adequate health
and strength. Plaintiff had gone into the operations at a loss of
weight down to 119 Lbs.;  And, despite the fact that after the
Doctor here placing plaintiff on the supplement bag List,
Plaintiff after two months was weighed and found to still be at
119 Lbs. And, Plaintiff's  request for a High Protein Diet, was
met with sarcastic remark, both from Dr. Bakale, and the
Physician's Assistant, Ms. Locais;  And, Ms. Locais, (whenever ANY
inmate questions her diagnosis or prescribed treatment) threatened
plaintiff, who was attempting to explain what treatment he had
received at the previous Institution  responded to Plaintiff, "
talk like that will get you in RHU";  And, this remark came as a
result of Plaintiff stating to her that he wished to see the
Doctor about the Matter; Because, she was not a Doctor, and
therefore not supposed to be examining, and prescribing medication
and treatment prior to A Physician's examination of the patient,
and thereafter prescribe treatment to be given/administered by
Subordinate Staff Members.

Plaintiff will be prepared to testify to other such incidents
if a trial of these issues and all other issues set forth in this
Complaint.

(D).  Plaintiffs and CLASS reallege herein as if fully set
forth the allegations
of inadequate medical care and treatment set forth in Paragraph
Fourteen

35.   The Medical Department Officials, and their
Subordinate Staff, were under a duty to disclose to an inmate
patient the true nature of his ailment/disease; Yet, the named
Defendants have chose with malicious intent, to misrepresent to a
plaintiff/s/ the true nature and extent of their injury, illness
or disease; And, Plaintiffs maintain that this policy intentional
deception is caused by the Defendants' desire to save, For
departmental reasons monies which have been allocated for the
express purpose of fulfilling the duty of adequate care and

treatment of inmates in their care.

(36).    Defendants are liable for punitive damages for their reckless or wanton disregard for the health and welfare of the Plaintiffs and the CLASS.

Defendants' conduct constitutes malice, oppression, and fraudulent representation to Plaintiffs and CLASS, regarding their medical  condition and  ongoing painful sufferings; And, thereby; warrants the imposition of punitive and exemplary damages against against Defendants as provided by Federal Laws, Statutes, and Codes; As well as, those damages provided by any state's laws and/or  as authorized by the choice of law provisions of the State of Pennsylvania in which this Court sits.

## SECOND CLAIM FOR RELIEF
### [ Overcrowding ]

(37).    Plaintiffs on behalf of themselves and all others similarly situated, reallege, as if fully set forth, each and every allegation contained in paragraphs 1 through 36 above, and further allege:

(38).    By reason of their knowledge of the fact that inmates who were being selected to be transferred to SCI-Waymart, would be housed in and under overcrowded conditions than and now existing at this Facility, would cause Plaintiffs and CLASS to be subjected to inhumane, and unsanitary conditions of confinement, and to suffer from being housed in overcrowded Unit Cubes, and Side-Rooms with three in a room;

and, inadequate screening of inmates selected to be housed with general population;

and, like of proper ventilation, storage space for personal belongings;(which in many cases, Plaintiffs have been ordered to dispose of legal materials needed for litigating their case in Court), as well as, other personal property, which an inmate could not secret from view,(Which meant that plaintiff/s/ would have to store typewriters, and other valuables on the floor, under the bed, for lack of space, and/or shelves upon which to store personal property; And, no chair or stool upon which to sit for

study, typing, etc.;

And, many other instances of injury to Plaintiffs and CLASS, which
results from said overcrowded conditions of confinement.  All of
which causes Plaintiffs and CLASS to suffer inhumane, unsafe,
degrading and hostile conditions of confinement here at
SCI-Waymart.

(39)   Defendants breached their duty of care, when they
knowingly subjected Plaintiffs and CLASS to the inhumane condition
of confinement set forth in the above paragraph, as well as, the
allegations set forth in paragraph 15; Which Plaintiffs and CLASS
reallege herein as if fully set forth;  Consequently, Plaintiffs
and CLASS are entitled to
the equitable relief described in the First Claim For Relief and
to damages according to proof.

THIRD CLAIM FOR RELIEF
[ Intential Infliction of Emotional Distress-
pain, suffering and mental anguish

(40)   Plaintiffs, on behalf of themselves and all others
similarly situated, reallege, as if fully set forth, each and
every allegation contained in paragraphs 1 through 39 hereof, and
further allege:

At all times relevent to this Complaint, Defendants have
acted in an extreme and outrageous manner towards Plaintiffs and
members of the Class through a course of conduct which included,
but not limited to, denying Plaintiffs and the CLASS adequate
medical care and treatment; By acts of intentional intimidation;
Threats for the expressing opinion; And, denial of basic
necessities of life, via unwritten policies and practices, bent
upon saving to the interests of the Department of Corrections,
Officials, and the SCI-Waymart's Administration, monies being
allocated for the purpose of paying the necessary costs for the
adequate care , and treatment of all Plaintiffs being housed at at
SCI-Waymart.   Defendants have acted with the intention of
causing, or reckless disregard of the probability of causing,

Emotional distress to Plaintiffs and members of the Class.

(41).    As a direct, foreseeable, actual and proximate result of the Defendants' conduct, Plaintiffs and the Class have suffered and continue to suffer injury, damage and severe emotional distress for which they are entitled to damages according to proof.

(42).    At all times relevant hereto, Defendants conduct was intentional and/or outrageous and beyond the bounds of reasonableness and was in reckless disregard for the safety and well-being of Plaintiffs and the Class.  Plaintiffs and the Class are therefore entitled to punitive and exemplary damages .

## FOURTH CLAIM FOR RELIEF
( Negligence, negligent Infliction of Emotional Distress]

(43).    Plaintiffs on behalf of themselves and all others similarly situated, realleges, as if fully set forth, each and every allegation contained in paragraphs 1 through 42 hereof ;

and further alleges:

(44).    Defendants had a duty to Plaintiffs and members of the Class to provide a reasonably safe, and sanitary prison facility in which to house inmates/Plaintiffs and Class; As well as, a non-discriminatory Staff of workers, whose minds were set to treat inmates humanely.

(45).    Defendants breached their duty of reasonable care to Plaintiffs and members of the Class, by the acts and omissions set forth in ( but not limited to] paragraphs 14 through 30; And, realleged herein as if fully set forth; And, otherwise failing to exercise due care under the circumstances.

(46).    As a direct and proximate result of the carelessness and negligence of Defendants, Plaintiffs and members of the Class have suffered reasonably and especially foreseeable damages in an amount to be proven at trial including, without limitation, economic injury and severe emotional distress.

## FIFTH CLAIM FOR RELIEF
### [ Equitable ( Injunctive and /or Declaratory) Relief ]

(47).  Plaintiffs, on behalf of themselves and all others similarly situate, reallege, as if fully set forth, each and every allegation contained in paragraphs 1 through 45 above, and further allege:

(48)   The Class members have no adequate remedy at law, rendering injunctive and other equitable relief appropriate in that damages cannot adequately compensate Plaintiffs and Class Members for the injuries suffered and threatened.

(49).   Accordingly, Plaintiffs, on behalf of themselves, and all others similarly situated, request the following equitable relief:

(a) that a judicial determination and declaration be made of the rights of Plaintiffs and the Class Members, and the corresponding responsibilities of Defendants.

(b)   That defendants be declared to be financially responsible to Plaintiffs and Class Members for restitution and refunds of all or part of the sum paid by them,  for Co-Pay illegally charged against Plaintiffs and Members of the Class, when such medicine should have freely prescribed and given, in accord with medical follow-up prescription rules/procedures.

(c)   That Defendants be ordered to create a medical monitoring fund, under the continuing jurisdiction and supervision of the Court, to monitor the health of the Plaintiffs and Class Members, and to pay or reimburse Class members for all medical expenses, and/or out-of-pocket expenses caused  by Defendants wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE,  Plaintiffs on behalf of themselves and all others similarly situated pray for Judgement against Defendants and each of them,  jointly and severally as follows:

1.      an Order certifying the Class and any appropriate subclass thereof under the appropriates provisions of Fed. R.Civ. P. 23, and appointing Plaintiffs Counsel, and requested Investigator to represent the Class;

2.      for the equitable relief requested tin the Fifth Claim for relief;3.      For compensatory damages as alleged herein;

4.      For punitive or exemplary damages against defendant found guilty of oppression, fraud, malice, reckless and/or despicable behavior, in an amount sufficient to punish each such defendant and deter others from similar wrongdoing;

5.      for all applicable statutory damages (including multiple damages and punitive damages)  under the Federal and State Constitutions , and protection Statutes;

6.      For Medical Monitoring  whether denominated as damages or in the form of equitable damages;

7.      For Attorney's Fees;

8.      For prejudgment interests;

47

9.    For cost of suit;  and

10.    For such other and further relief as this Court may deem just and proper.

### JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

RESPECTFULLY SUBMITTED,

/s/ *John D. Carter*

JOHN CARTER [CN-1404]

/s/ *Jimmy McWhirter*

JIMMY McWhirter[CC-8387]

/s/ *Mariano Pellot*

MARIANO PELLOT[BE-2490]

/s/ *David Campbell*

DAVID CAMPBELL[DJ-0505]

/s/ *Arthur Carmichael*

ARTHUR CARMICHAEL[DD-0875]

PLAINTIFFS" ADDRESS:

SCI - WAYMART

P.O. BOX 256

WAYMART, PA.  18472-0256

DATED: *Dec 20th*, 1999 c.e.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN CARTER [ CN - 1404 ],Et al., : | CIVIL ACTION |
| Plaintiffs : | |
| VS. : | NO. |
| : | |
| MARTIN HORN,[Commissioner,DOC] : | CLASS ACTION COMPLAINT |
| Defendants : | JURY TRIAL DEMAND |
| : | |

### VERIFICATION

WE THE UNDERSIGNED, hereby verify that the foregoing
CIVIL RIGHTS COMPLAINT is true and correct to the best
of our knowledge, information,and belief; And, as to our
belief, we believe that also to be true.

/s/ _John D. Carter_

_Jimmy M Whistler_

_Mariano Pellot_

_David L Campbell_

_Arthur Carmichael_

Pro. Per.
SCI-Waymart
P.O. Box 256
Waymart, Pa. 18472

DATED: _Dec 20th_, 1999 o.e.

-49-



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT O F PENNSYLVANIA

JOHN CARTER, et al.,

       Plaintiffs            CIVIL ACTION

      VS.

                             NO. 99-CV-6517

MARTIN HORN, et al.,

       Defendants   :   JURY TRIAL DEMAND

                   :   CLASS ACTION COMPLAINT

**FILED**

JAN 20 2000

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

---

MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS

AND FOR APPOINTMENT OF COUNSEL

    Plaintiffs move this Court for an Order permitting them to proceed in forma pauperis without prepayment of fees and costs of security therefor, and appointing _____, a Member of the Pennsylvania Bar, to represent Plaintiffs as provided in 28 U.S.C. § 1915(d) and 18 U.S.C. § 3006A (g), because as the attached affidavit, and **financial statements** indicate, Plaintiffs are unable to pay such costs or give security therefor, and they cannot afford to employ an Attorney.

MR. JOHN CARTER
# CN-1404
P.O. BOX 256
WAYMART, PA  18472-0256

TO:  Michael E. Kunz, [ Clerk ]
     United States District Court
     2609 U.S. Courthouse
     601 Market Street
Philadelphia, PA   19106

Dear Sir:
     Enclosed please find an **Original** and  **one copy**  of
Plaintiffs'   Motion For Leave To Proceed In Forma Pauperis/ and
For Appointment Of Counsel, Affidavit in Support thereof;  As well
as, each Plaintiffs' certified financial statement for the past
six months.

     Plaintiffs thank you very much for your consideration and
cooperation as it relates to the foregoing matter/s/.

Respectfully submitted,

_John D Carter_
John Carter /Pro. Per.

DATED: _January 14_ ,2000 c.e.

--------------------------------------------------------------

▓▓▓▓   PLEASE NOTE:


     Plaintiff, Mr. McWhirter,  is presently inthe  hospital

in serious medical condition, and is unable to make contact with

plaintiffs, so as to be able to obtain his financial statement.

     He will do so as soon as possible.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, et al.,                     :            CIVIL ACTION

            Plaintiffs               :

                        :            NO. 99-CV-6517

MARTIN HORN, et al.,                     :

            Defendants               :            JURY TRIAL DEMAND

                        :

                        :            CLASS ACTION COMPLAINT

---

AFFIDAVIT IN SUPPORT OF MOTION

TO PROCEED IN FORMA PAUPERIS/AND

FOR APPOINTMENT OF COUNSEL

**F I L E D**

JAN 2 0 2000

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

    **WE THE BELOW NAMED PLAINTIFFS DECLARE:**

1.   We are the Plaintiffs in the above-titled action.

2.   We believe we are entitled and have filed this action in the
United States District Court for the eastern district of
Pennsylvania against the above-named Defendants.

3.   The motion seeks to enjoin those Defendants from violating
Plaintiffs civil and equal rights under both State and Federal
constitutions as set forth in the  original Complaint;  And, seeks
equitable relief: compensatory, exemplary, injunctive/and or
declaratory relief, in the amount to be set according to proof
following a trial of all issues triable by a jury.

4.   We believe that we are entitled to the redress sought in this
action.

5.   We have read and know the contents of the Complaint and
believe then to be true.

6.   We have assets of only the amount stated on the attached
certified inmate financial statement; And, we are without any
other income or assets.

7.    the meagre income we do have, we need for our personal maintenance.

8.    Because of our poverty we are unable to pay the costs of this action, or give security therefor, or to employ an Attorney.

WE DECLARE under penalty of perjury that the above statements are true and correct.

DATED: _January 14_____, 2000 c.e.

PLAINTIFFS PRO. PER.:  ___John Carter___
                          John   Carter

                       _____
                          Jimmy McWhirter

                       ___David Campbell___
                          Da vid  Campbell

                       ___Mariano Pellot___
                          Mariano Pellot

                       ___Arthur Carmichael___
                          Arthur Carmichael

PLAINTIFFS" ADDRESS:

P.O.  Box  256
Waymart, PA  18472-0256

- 2 -

PA DEPT. OF CORRECTIONS          INMATE ACCOUNTS SYSTEM          RUN    IAS365
BUREAU OF COMPUTER SERVICES      PARTIAL ACCOUNT LISTING         DATE   1/13/2000
REMOTE PRINT TIME   8:55            FROM ACTIVE FILE             PAGE        2

        INMATE    NAME
        NUMBER    LAST              FIRST        MI
        CN1404    CARTER            JOHN

| BATCH # | DATE MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|---|---|---|---|---|---|
| 7102 | 11-22-1999 | 30 | PERSONAL GIFT TO BROWN, DENISE | -50.00 | 654.81 |
| 8327 | 11-23-1999 | 32 | WAM COMMISSARY FOR 11/24/1999 | -44.78 | 610.03 |
| 7132 | 11-29-1999 | 30 | PERSONAL GIFT TO BROWN, DENISE | -50.00 | 560.03 |
| 8335 | 12-01-1999 | 32 | WAM COMMISSARY FOR 12/02/1999 | -42.00 | 518.03 |
| 7179 | 12-06-1999 | 10 | MAINTENANCE PAYROLL FOR: NOVEMBER 1999 | 13.68 | 531.71 |
| 8342 | 12-08-1999 | 32 | WAM COMMISSARY FOR 12/09/1999 | -52.04 | 479.67 |
| 7256 | 12-15-1999 | 37 | POSTAGE | -1.21 | 478.46 |
| 8349 | 12-15-1999 | 32 | WAM COMMISSARY FOR 12/16/1999 | -54.90 | 423.56 |
| 9912 | 12-16-1999 | 34 | RADIO/TV BASIC/HBO | -33.76 | 389.80 |
| 7289 | 12-20-1999 | 37 | POSTAGE | -7.40 | 382.40 |
| 7292 | 12-20-1999 | 30 | PERSONAL GIFT TO BROWN, DENISE | -50.00 | 332.40 |
| 7292 | 12-20-1999 | 39 | LEGAL FEES MICHAEL KUNZ | -150.00 | 182.40 |
| 8355 | 12-21-1999 | 32 | WAM COMMISSARY FOR 12/21/1999 | -22.89 | 159.51 |
| 7330 | 12-27-1999 | 14 | MISCELLANEOUS VOID CHECK - MICHAEL KUNZ | 150.00 | 309.51 |
| 8362 | 12-28-1999 | 32 | WAM COMMISSARY FOR 12/29/1999 | -12.67 | 296.84 |
| 7345 | 12-29-1999 | 39 | LEGAL FEES FOR: CLERK, US DISTRICT COURT | -150.00 | 146.84 |
| 8005 | 01-05-2000 | 32 | WAM COMMISSARY FOR  1/06/2000 | -45.81 | 101.03 |
| 7402 | 01-07-2000 | 10 | MAINTENANCE PAYROLL FOR: DECEMBER 1999 | 15.84 | 116.87 |
| 7417 | 01-10-2000 | 37 | POSTAGE | -9.14 | 107.73 |
| 8012 | 01-12-2000 | 32 | WAM COMMISSARY FOR  1/13/2000 | -22.40 | 85.33 |

               BALANCE AFTER THESE TRANSACTIONS------>          85.33

*Walter Williams*   1/13/00



Sworn to and subscribed before me
this 13th day of Jan AD 2000

*Susan Dovin*

NOTARIAL SEAL
SUSAN DOVIN, Notary Public
Canaan Twp., Wayne County
My Commission Expires Jan. 22, 2000

```
PA DEPT. OF CORRECTIONS          INMATE ACCOUNTS SYSTEM          RUN     IAS365
BUREAU OF COMPUTER SERVICES     PARTIAL ACCOUNT LISTING          DATE   1/13/2000
REMOTE PRINT TIME  8:55              FROM ACTIVE FILE            PAGE          1
```

| INMATE | NAME | | | | |
|--------|------|--|--|--|--|
| NUMBER | LAST | | FIRST | MI | STARTING BALANCE |
| CN1404 | CARTER | | JOHN | | 1,223.80 |

| BATCH # | DATE MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|---------|-----------------|--|-------------------------|--------------------|---------------------------|
| 6778 | 10-07-1999 | 30 | PERSONAL GIFT TO | | |
| | | | BROWN, DENISE | -50.00 | 1,173.80 |
| 6779 | 10-07-1999 | 37 | POSTAGE | | |
| | | | | -4.96 | 1,168.84 |
| 8279 | 10-06-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 10/07/1999 | -44.79 | 1,124.05 |
| 6793 | 10-08-1999 | 14 | MISCELLANEOUS | | |
| | | | VOID CHECK - MUSIC BY MAIL | 173.95 | 1,298.00 |
| 6810 | 10-13-1999 | 31 | OUTSIDE PURCHASES | | |
| | | | FOR: M&P SALES | -107.99 | 1,190.01 |
| 8286 | 10-13-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 10/15/1999 | -43.03 | 1,146.98 |
| 9910 | 10-18-1999 | 34 | RADIO/TV | | |
| | | | BASIC/HBO | -33.76 | 1,113.22 |
| 6857 | 10-20-1999 | 14 | MISCELLANEOUS | | |
| | | | M&P WHOLESALERS/REF  D661188 | 9.00 | 1,122.22 |
| 8293 | 10-20-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 10/21/1999 | -33.70 | 1,088.52 |
| 6903 | 10-26-1999 | 30 | PERSONAL GIFT TO | | |
| | | | BROWN, DENISE | -50.00 | 1,038.52 |
| 8300 | 10-27-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 10/28/1999 | -43.68 | 994.84 |
| 6950 | 11-01-1999 | 31 | OUTSIDE PURCHASES | | |
| | | | FOR: M&P SALES | -100.00 | 894.84 |
| 6958 | 11-03-1999 | 37 | POSTAGE | | |
| | | | UPS | -3.99 | 890.85 |
| 6965 | 11-03-1999 | 10 | MAINTENANCE PAYROLL | | |
| | | | FOR: OCTOBER 1999 | 27.60 | 918.45 |
| 8307 | 11-03-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 11/04/1999 | -40.61 | 877.84 |
| 8307 | 11-03-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 11/04/1999 | -3.82 | 874.02 |
| 7018 | 11-10-1999 | 14 | MISCELLANEOUS | | |
| | | | REF/M & P WHOLESALERS D679701 | 1.01 | 875.03 |
| 8314 | 11-10-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 11/12/1999 | -44.40 | 830.63 |
| 7070 | 11-17-1999 | 37 | POSTAGE | | |
| | | | UPS | -3.93 | 826.70 |
| 7072 | 11-17-1999 | 38 | INSIDE PURCHASES | | |
| | | | FOR: VENDACARD #92 | -50.00 | 776.70 |
| 8321 | 11-17-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 11/18/1999 | -38.13 | 738.57 |
| 9911 | 11-18-1999 | 34 | RADIO/TV | | |
| | | | BASIC/HBO | -33.76 | 704.81 |

```
PA DEPT. OF CORRECTIONS        INMATE ACCOUNTS SYSTEM        RUN      IAS365
BUREAU OF COMPUTER SERVICES    PARTIAL ACCOUNT LISTING       DATE  1/13/2000
REMOTE PRINT TIME   8:55          FROM PURGE FILE            PAGE        2
```

```
INMATE     NAME
NUMBER     LAST              FIRST        MI
CN1404     CARTER           JOHN
```

| BATCH # | DATE MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|---|---|---|---|---|---|
| 6484 | 08-26-1999 | 32 | COMMISSARY | | |
| | | | FOR: AUGUST 25, 1999 | -33.67 | 1,945.39 |
| 6488 | 08-26-1999 | 42 | SAVINGS | | |
| | | | BROWN, DENISE | -50.00 | 1,895.39 |
| 6488 | 08-26-1999 | 86 | ADJUST PAYMENT | | |
| | | 42 | WRONG TRANSACTION CODE | 50.00 | 1,945.39 |
| 6488 | 08-26-1999 | 30 | PERSONAL GIFT TO | | |
| | | | BROWN, DENISE | -50.00 | 1,895.39 |
| 6493 | 08-26-1999 | 41 | MEDICAL | | |
| | | | SICK CALL/(2) RX | -6.00 | 1,889.39 |
| 6538 | 09-02-1999 | 32 | COMMISSARY | | |
| | | | FOR: SEPTEMBER 1, 1999 | -44.77 | 1,844.62 |
| 6542 | 08-02-1999 | 30 | PERSONAL GIFT TO | | |
| | | | BROWN, DENISE | -75.00 | 1,769.62 |
| 6557 | 09-03-1999 | 31 | OUTSIDE PURCHASES | | |
| | | | SMITH CORONA DIRECT | -112.90 | 1,656.72 |
| 6587 | 09-09-1999 | 32 | COMMISSARY | | |
| | | | FOR: SEPTEMBER 8, 1999 | -43.08 | 1,613.64 |
| 8258 | 09-15-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR  9/15/1999 | -43.50 | 1,570.14 |
| 9909 | 09-20-1999 | 34 | RADIO/TV | | |
| | | | BASIC/HBO | -33.76 | 1,536.38 |
| 8264 | 09-21-1999 | 86 | WAM COMMISSARY CR | | |
| | | 32 | FOR  9/21/1999 | 1.58 | 1,537.96 |
| 8265 | 09-22-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR  9/22/1999 | -44.75 | 1,493.21 |
| 6685 | 09-23-1999 | 41 | MEDICAL | | |
| | | | SICK CALL/(1) RX | -4.00 | 1,489.21 |
| 6704 | 09-27-1999 | 30 | PERSONAL GIFT TO | | |
| | | | BROWN, DENISE | -50.00 | 1,439.21 |
| 8272 | 09-29-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR  9/29/1999 | -33.36 | 1,405.85 |
| 8272 | 09-29-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR  9/29/1999 | -1.72 | 1,404.13 |
| 8272 | 09-29-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR  9/29/1999 | -6.38 | 1,397.75 |
| 6725 | 09-30-1999 | 31 | OUTSIDE PURCHASES | | |
| | | | FOR: MUSIC BY MAIL | -173.95 | 1,223.80 |

```
                    BALANCE AFTER THESE TRANSACTIONS------>        1,223.80
```

```
PA DEPT. OF CORRECTIONS        INMATE ACCOUNTS SYSTEM        RUN      IAS365
BUREAU OF COMPUTER SERVICES    PARTIAL ACCOUNT LISTING       DATE  1/13/2000
REMOTE PRINT TIME   8:55           FROM PURGE FILE            PAGE         1
```

| INMATE | NAME | | | | |
|--------|------|---|---|---|---|
| NUMBER | LAST | | FIRST | MI | STARTING BALANCE |
| CN1404 | CARTER | | JOHN | | 2,660.65 |

| BATCH # | DATE MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|---------|-----------------|---|-------------------------|--------------------|---------------------------|
| 6018 | 07-01-1999 | 32 | COMMISSARY | | |
| | | | FOR: JUNE 30, 1999 | -44.38 | 2,616.27 |
| 6054 | 07-06-1999 | 10 | MAINTENANCE PAYROLL | | |
| | | | FOR: JUNE 1999 | 11.12 | 2,627.39 |
| 6072 | 07-07-1999 | 31 | OUTSIDE PURCHASES | | |
| | | | UNION SUPPLY CO | -85.99 | 2,541.40 |
| 6080 | 07-08-1999 | 32 | COMMISSARY | | |
| | | | FOR: JULY 7, 1999 | -43.87 | 2,497.53 |
| 6085 | 07-08-1999 | 30 | PERSONAL GIFT TO | | |
| | | | BROWN, DENISE | -50.00 | 2,447.53 |
| 6093 | 07-09-1999 | 37 | POSTAGE | | |
| | | | | -.99 | 2,446.54 |
| 6140 | 07-15-1999 | 32 | COMMISSARY | | |
| | | | FOR: JULY 14, 1999 | -44.74 | 2,401.80 |
| 6160 | 07-16-1999 | 30 | PERSONAL GIFT TO | | |
| | | | BROWN DENISE | -50.00 | 2,351.80 |
| 9907 | 07-19-1999 | 34 | RADIO/TV | | |
| | | | BASIC/HBO | -33.76 | 2,318.04 |
| 6180 | 07-20-1999 | 37 | POSTAGE | | |
| | | | | -1.21 | 2,316.83 |
| 6198 | 07-22-1999 | 32 | COMMISSARY | | |
| | | | FOR: JULY 21, 1999 | -44.83 | 2,272.00 |
| 6228 | 07-26-1999 | 30 | PERSONAL GIFT TO | | |
| | | | BROWN, DENISE | -50.00 | 2,222.00 |
| 6227 | 07-26-1999 | 37 | POSTAGE | | |
| | | | | -3.20 | 2,218.80 |
| 6257 | 07-29-1999 | 32 | COMMISSARY | | |
| | | | FOR: JULY 28, 1999 | -44.65 | 2,174.15 |
| 6316 | 08-04-1999 | 14 | MISCELLANEOUS | | |
| | | | REFUND/UNION SUPPLY CO D688712 | 85.99 | 2,260.14 |
| 6320 | 08-04-1999 | 31 | OUTSIDE PURCHASES | | |
| | | | HOLABIRD SPORTS | -85.00 | 2,175.14 |
| 6329 | 08-05-1999 | 32 | COMMISSARY | | |
| | | | FOR: AUGUST 4, 1999 | -44.65 | 2,130.49 |
| 6367 | 08-10-1999 | 30 | PERSONAL GIFT TO | | |
| | | | BROWN, DENISE | -50.00 | 2,080.49 |
| 6384 | 08-12-1999 | 32 | COMMISSARY | | |
| | | | FOR: AUGUST 11, 1999 | -45.11 | 2,035.38 |
| 6435 | 08-19-1999 | 32 | COMMISSARY | | |
| | | | FOR: AUGUST 18, 1999 | -43.41 | 1,991.97 |
| 9908 | 08-19-1999 | 34 | RADIO/TV | | |
| | | | BASIC/HBO | -33.76 | 1,958.21 |
| 6473 | 08-24-1999 | 14 | MISCELLANEOUS | | |
| | | | REFUND/HOLABIRD  D687043 | 20.85 | 1,979.06 |

```
PA DEPT. OF CORRECTIONS          INMATE ACCOUNTS SYSTEM         RUN      IAS365
BUREAU OF COMPUTER SERVICES      PARTIAL ACCOUNT LISTING        DATE  1/13/2000
REMOTE PRINT TIME  8:55               FROM ACTIVE FILE          PAGE        2
```

```
      INMATE   NAME
      NUMBER   LAST                   FIRST           MI
      BE2490   PELLOT                 MARINO
```

| BATCH # | DATE MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|---|---|---|---|---|---|
| 8335 | 12-01-1999 | 32 | WAM COMMISSARY FOR 12/02/1999 | -42.37 | 16.12 |
| 8335 | 12-01-1999 | 32 | WAM COMMISSARY FOR 12/02/1999 | -2.65 | 13.47 |
| 7178 | 12-06-1999 | 10 | MAINTENANCE PAYROLL FOR: NOVEMBER 1999 | 26.22 | 39.69 |
| 7205 | 12-08-1999 | 13 | PERSONAL GIFT FROM PELLOT, MARIANO   D829721 | 150.00 | 189.69 |
| 8342 | 12-08-1999 | 32 | WAM COMMISSARY FOR 12/09/1999 | -39.59 | 150.10 |
| 8349 | 12-15-1999 | 32 | WAM COMMISSARY FOR 12/16/1999 | -30.37 | 119.73 |
| 9912 | 12-16-1999 | 34 | RADIO/TV BASIC/HBO | -33.76 | 85.97 |
| 7295 | 12-21-1999 | 13 | PERSONAL GIFT FROM PELLOT, MARIANO   D676292 | 20.00 | 105.97 |
| 8355 | 12-21-1999 | 32 | WAM COMMISSARY FOR 12/21/1999 | -33.99 | 71.98 |
| 8362 | 12-28-1999 | 32 | WAM COMMISSARY FOR 12/29/1999 | -33.49 | 38.49 |
| 7367 | 12-31-1999 | 13 | PERSONAL GIFT FROM PELLOT, MARIANO   D673865 | 100.00 | 138.49 |
| 8005 | 01-05-2000 | 32 | WAM COMMISSARY FOR 1/06/2000 | -28.27 | 110.22 |
| 7401 | 01-07-2000 | 10 | MAINTENANCE PAYROLL FOR: DECEMBER 1999 | 57.96 | 168.18 |
| 7417 | 01-10-2000 | 37 | POSTAGE | -.88 | 167.30 |
| 7417 | 01-10-2000 | 37 | POSTAGE | -7.48 | 159.82 |
| 8012 | 01-12-2000 | 32 | WAM COMMISSARY FOR 1/13/2000 | -41.34 | 118.48 |
| 8012 | 01-12-2000 | 32 | WAM COMMISSARY FOR 1/13/2000 | -1.17 | 117.31 |

```
              BALANCE AFTER THESE TRANSACTIONS------>          117.31
```

Walter Williams, Accountant
1/13/00

Sworn to and subscribed before me
this 13th day of _____ 2000

Susan Dovin

NOTARIAL SEAL
SUSAN DOVIN, Notary Public
Canaan Twp., Wayne County
My Commission Expires Jan. 22, 2000

```
PA DEPT. OF CORRECTIONS        INMATE ACCOUNTS SYSTEM         RUN    IAS365
BUREAU OF COMPUTER SERVICES    PARTIAL ACCOUNT LISTING        DATE  1/13/2000
REMOTE PRINT TIME  8:55            FROM ACTIVE FILE           PAGE        1

        INMATE   NAME
        NUMBER   LAST              FIRST        MI        STARTING BALANCE
        BE2490   PELLOT            MARIANO                        51.49
```

| BATCH # | MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|---|---|---|---|---|---|
| 6759 | 10-05-1999 | 10 | MAINTENANCE PAYROLL | | |
| | | | FOR: SEPTEMBER 1999 | 80.96 | 132.45 |
| 8279 | 10-06-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 10/07/1999 | -24.98 | 107.47 |
| 6794 | 10-08-1999 | 37 | POSTAGE | | |
| | | | | -.33 | 107.14 |
| 8286 | 10-13-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 10/15/1999 | -38.53 | 68.61 |
| 6828 | 10-15-1999 | 37 | POSTAGE | | |
| | | | | -.33 | 68.28 |
| 9910 | 10-18-1999 | 34 | RADIO/TV | | |
| | | | BASIC/HBO | -33.76 | 34.52 |
| 6851 | 10-19-1999 | 13 | PERSONAL GIFT FROM | | |
| | | | PELLOT, MARIANO  D691699 | 50.00 | 84.52 |
| 8293 | 10-20-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 10/21/1999 | -22.25 | 62.27 |
| 6909 | 10-27-1999 | 39 | LEGAL FEES | | |
| | | | PLRA/INITIAL FEE/CV-01758 | -35.32 | 26.95 |
| 8300 | 10-27-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 10/28/1999 | -26.67 | .28 |
| 6973 | 11-04-1999 | 13 | PERSONAL GIFT FROM | | |
| | | | PELLOT, MARIANO  D673723 | 300.00 | 300.28 |
| 6979 | 11-04-1999 | 39 | LEGAL FEES | | |
| | | | PLRA/FINAL PMT/CV-01758 | -114.68 | 185.60 |
| 8309 | 11-05-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 11/09/1999 | -43.79 | 141.81 |
| 8314 | 11-10-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 11/12/1999 | -41.41 | 100.40 |
| 8314 | 11-10-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 11/12/1999 | -.78 | 99.62 |
| 7068 | 11-17-1999 | 13 | PERSONAL GIFT FROM | | |
| | | | PELLOT, MARIANO  D826523 | 250.00 | 349.62 |
| 7071 | 11-17-1999 | 32 | COMMISSARY | | |
| | | | TELEVISION ORDER | -191.44 | 158.18 |
| 8321 | 11-17-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 11/18/1999 | -40.88 | 117.30 |
| 8321 | 11-17-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 11/18/1999 | -1.24 | 116.06 |
| 9911 | 11-18-1999 | 34 | RADIO/TV | | |
| | | | BASIC/HBO | -33.76 | 82.30 |
| 8327 | 11-23-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 11/24/1999 | -17.25 | 65.05 |
| 7147 | 12-01-1999 | 37 | POSTAGE | | |
| | | | UPS | -6.56 | 58.49 |

```
PA DEPT. OF CORRECTIONS        INMATE ACCOUNTS SYSTEM        RUN    IAS365
BUREAU OF COMPUTER SERVICES    PARTIAL ACCOUNT LISTING       DATE   1/13/2000
REMOTE PRINT TIME  8:55              FROM PURGE FILE          PAGE       2

        INMATE    NAME
        NUMBER    LAST                 FIRST        MI
        BE2490    PELLOT               MARINO
```

| BATCH # | DATE MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|---|---|---|---|---|---|
| 6587 | 09-09-1999 | 32 | COMMISSARY | | |
| | | | FOR: SEPTEMBER 8, 1999 | -25.44 | 60.66 |
| 6609 | 09-13-1999 | 13 | PERSONAL GIFT FROM | | |
| | | | PELLOT, MARIANO  D675345 | 100.00 | 160.66 |
| 8258 | 09-15-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR  9/15/1999 | -36.19 | 124.47 |
| 9909 | 09-20-1999 | 34 | RADIO/TV | | |
| | | | BASIC/HBO | -33.76 | 90.71 |
| 8265 | 09-22-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR  9/22/1999 | -32.76 | 57.95 |
| 6706 | 09-28-1999 | 37 | POSTAGE | | |
| | | | | -2.53 | 55.42 |
| 6723 | 09-30-1999 | 37 | POSTAGE | | |
| | | | UPS | -3.93 | 51.49 |

```
                    BALANCE AFTER THESE TRANSACTIONS------>        51.49
```

```
PA DEPT. OF CORRECTIONS          INMATE ACCOUNTS SYSTEM        RUN    IAS365
BUREAU OF COMPUTER SERVICES       PARTIAL ACCOUNT LISTING       DATE  1/13/2000
REMOTE PRINT TIME  8:55              FROM PURGE FILE.            PAGE      1
```

|  | INMATE | NAME |  |  |  |  |
|---|---|---|---|---|---|---|
|  | NUMBER | LAST |  |  |  |  |
|  | BE2490 | PELLOT |  | FIRST | MI |  |
|  |  |  |  | MARINO |  | STARTING BALANCE |
|  |  |  |  |  |  | 150.74 |

| BATCH # | DATE MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|---|---|---|---|---|---|
| 6018 | 07-01-1999 | 32 | COMMISSARY | | |
|  |  |  | FOR: JUNE 30, 1999 | -40.08 | 110.66 |
| 6055 | 07-06-1999 | 10 | MAINTENANCE PAYROLL | | |
|  |  |  | FOR: JUNE 1 TO JUNE 30, 1999 | 30.36 | 141.02 |
| 6080 | 07-08-1999 | 32 | COMMISSARY | | |
|  |  |  | FOR: JULY 7, 1999 | -41.39 | 99.63 |
| 6110 | 07-12-1999 | 37 | POSTAGE | | |
|  |  |  |  | -1.87 | 97.76 |
| 6140 | 07-15-1999 | 32 | COMMISSARY | | |
|  |  |  | FOR: JULY 14, 1999 | -37.71 | 60.05 |
| 6168 | 07-19-1999 | 13 | PERSONAL GIFT FROM | | |
|  |  |  | PELLOT, MARIANO  D678512 | 150.00 | 210.05 |
| 9907 | 07-19-1999 | 34 | RADIO/TV | | |
|  |  |  | BASIC/HBO | -33.76 | 176.29 |
| 6198 | 07-22-1999 | 32 | COMMISSARY | | |
|  |  |  | FOR: JULY 21, 1999 | -40.06 | 136.23 |
| 6257 | 07-29-1999 | 32 | COMMISSARY | | |
|  |  |  | FOR: JULY 28, 1999 | -31.42 | 104.81 |
| 6324 | 08-04-1999 | 10 | MAINTENANCE PAYROLL | | |
|  |  |  | FOR:  JULY 1999 | 26.22 | 131.03 |
| 6329 | 08-05-1999 | 32 | COMMISSARY | | |
|  |  |  | FOR: AUGUST 4, 1999 | -32.56 | 98.47 |
| 6384 | 08-12-1999 | 32 | COMMISSARY | | |
|  |  |  | FOR: AUGUST 11, 1999 | -37.76 | 60.71 |
| 6414 | 08-16-1999 | 37 | POSTAGE | | |
|  |  |  |  | -1.21 | 59.50 |
| 6414 | 08-16-1999 | 37 | POSTAGE | | |
|  |  |  |  | -.55 | 58.95 |
| 6421 | 08-17-1999 | 13 | PERSONAL GIFT FROM | | |
|  |  |  | PELLOTT, MARIANO  D685434 | 150.00 | 208.95 |
| 6435 | 08-19-1999 | 32 | COMMISSARY | | |
|  |  |  | FOR: AUGUST 18, 1999 | -43.65 | 165.30 |
| 6447 | 08-19-1999 | 37 | POSTAGE | | |
|  |  |  |  | -.55 | 164.75 |
| 6457 | 08-20-1999 | 34 | RADIO/TV | | |
|  |  |  | BASIC/HBO FOR AUGUST 1999 | -32.12 | 132.63 |
| 6484 | 08-26-1999 | 32 | COMMISSARY | | |
|  |  |  | FOR: AUGUST 25, 1999 | -31.72 | 100.91 |
| 6538 | 09-02-1999 | 32 | COMMISSARY | | |
|  |  |  | FOR: SEPTEMBER 1, 1999 | -25.09 | 75.82 |
| 6567 | 09-07-1999 | 10 | MAINTENANCE PAYROLL | | |
|  |  |  | FOR: AUGUST 1999 | 8.28 | 84.10 |
| 6585 | 09-09-1999 | 14 | MISCELLANEOUS | | |
|  |  |  | REFUND/ACCESS  D665107 | 2.00 | 86.10 |

```
PA DEPT. OF CORRECTIONS          INMATE ACCOUNTS SYSTEM        RUN     IAS365
BUREAU OF COMPUTER SERVICES      PARTIAL ACCOUNT LISTING       DATE  1/13/2000
REMOTE PRINT TIME  8:55              FROM ACTIVE FILE          PAGE        1


      INMATE    NAME
      NUMBER    LAST              FIRST          MI              STARTING BALANCE
      DD0875    CARMICHAEL        ARTHUR                                 -.12
```

| BATCH # | DATE MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|---|---|---|---|---|---|
| 6761 | 10-05-1999 | 10 | MAINTENANCE PAYROLL | | |
| | | | FOR: SEPTEMBER 1999 | 19.32 | 19.20 |
| 8279 | 10-06-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 10/07/1999 | -15.81 | 3.39 |
| 6858 | 10-20-1999 | 41 | MEDICAL | | |
| | | | SICK CALL/RX (1) | -4.00 | -.61 |
| 6966 | 11-03-1999 | 10 | MAINTENANCE PAYROLL | | |
| | | | FOR: OCTOBER 1999 | 14.40 | 13.79 |
| 6975 | 11-04-1999 | 37 | POSTAGE | | |
| | | | | -1.87 | 11.92 |
| 8314 | 11-10-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 11/12/1999 | -11.88 | .04 |
| 7180 | 12-06-1999 | 10 | MAINTENANCE PAYROLL | | |
| | | | FOR: NOVEMBER 1999 | 13.68 | 13.72 |
| 8342 | 12-08-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 12/09/1999 | -12.70 | 1.02 |
| 7402 | 01-07-2000 | 10 | MAINTENANCE PAYROLL | | |
| | | | FOR: DECEMBER 1999 | 15.84 | 16.86 |
| 7417 | 01-10-2000 | 37 | POSTAGE | | |
| | | | | -8.36 | 8.50 |
| 8012 | 01-12-2000 | 32 | WAM COMMISSARY | | |
| | | | FOR  1/13/2000 | -6.71 | 1.79 |

```
                   BALANCE AFTER THESE TRANSACTIONS------>        1.79
```

Sworn to and subscribed before me
this 13th day of Jan 19 2000

*Walter Williams, Accountant*

1/13/00

*Susan Dovin*



NOTARIAL SEAL
SUSAN DOVIN, Notary Public
Canaan Twp., Wayne County
My Commission Expires Jan. 22, 2000

```
PA DEPT. OF CORRECTIONS         INMATE ACCOUNTS SYSTEM         RUN     IAS365
BUREAU OF COMPUTER SERVICES      PARTIAL ACCOUNT LISTING        DATE  1/13/2000
REMOTE PRINT TIME  8:55              FROM PURGE FILE            PAGE        1


        INMATE   NAME
        NUMBER   LAST              FIRST        MI        STARTING BALANCE
        DD0875   CARMICHAEL        ARTHUR                        .21

   BATCH     DATE                                    TRANSACTION  BALANCE AFTER
    #     MO DY YEAR    TRANSACTION DESCRIPTION        AMOUNT     TRANSACTION

   6053   07-06-1999  10  MAINTENANCE PAYROLL
                          FOR:   JUNE 1999                15.84        16.05
   6140   07-15-1999  32  COMMISSARY
                          FOR: JULY 14, 1999            -15.33          .72
   6326   08-04-1999  10  MAINTENANCE PAYROLL
                          FOR:JULY 1 TO JULY 31, 1999     6.84         7.56
   6384   08-12-1999  32  COMMISSARY
                          FOR: AUGUST 11, 1999           -7.68         -.12

                 BALANCE AFTER THESE TRANSACTIONS------>              -.12
```

```
PA DEPT. OF CORRECTIONS        INMATE ACCOUNTS SYSTEM        RUN     IAS365
BUREAU OF COMPUTER SERVICES    PARTIAL ACCOUNT LISTING       DATE  1/14/2000
REMOTE PRINT TIME   9:12           FROM ACTIVE FILE          PAGE        1


     INMATE    NAME
     NUMBER    LAST              FIRST         MI          STARTING BALANCE
     DJ0505    CAMPBELL          DAVID         L                      .30

  BATCH      DATE                                  TRANSACTION BALANCE AFTER
    #      MO DY YEAR     TRANSACTION DESCRIPTION       AMOUNT    TRANSACTION

   6761    10-05-1999  10  MAINTENANCE PAYROLL
                           FOR: SEPTEMBER 1999              15.12        15.42
   8286    10-13-1999  32  WAM COMMISSARY
                           FOR 10/15/1999                  -14.95          .47
   9910    10-18-1999  34  RADIO/TV
                           BASIC ONLY                      -21.04       -20.57
   6851    10-19-1999  13  PERSONAL GIFT FROM
                           HOUCK, MARIA  D661144            25.00         4.43
   8300    10-27-1999  32  WAM COMMISSARY
                           FOR 10/28/1999                   -4.15          .28
   6966    11-03-1999  10  MAINTENANCE PAYROLL
                           FOR: OCTOBER 1999               14.40        14.68
   6975    11-04-1999  37  POSTAGE
                           UPS                              -4.60        10.08
   7008    11-09-1999  13  PERSONAL GIFT FROM
                           HOUCK, MARY  D677743             25.00        35.08
   8314    11-10-1999  32  WAM COMMISSARY
                           FOR 11/12/1999                  -14.17        20.91
   9911    11-18-1999  34  RADIO/TV
                           BASIC ONLY                      -21.04         -.13
   7148    12-01-1999  41  MEDICAL
                           SICK CALL/(2) RX                 -6.00        -6.13
   7180    12-06-1999  10  MAINTENANCE PAYROLL
                           FOR: NOVEMBER 1999              13.68         7.55
   8342    12-08-1999  32  WAM COMMISSARY
                           FOR 12/09/1999                   -7.39          .16
   7260    12-16-1999  13  PERSONAL GIFT FROM
                           HOUCK, M B  D827456              50.00        50.16
   9912    12-16-1999  34  RADIO/TV
                           BASIC ONLY                      -21.04        29.12
   8355    12-21-1999  32  WAM COMMISSARY
                           FOR 12/21/1999                  -24.09         5.03
   7402    01-07-2000  10  MAINTENANCE PAYROLL
                           FOR: DECEMBER 1999              15.84        20.87
   7417    01-10-2000  37  POSTAGE
                                                            -3.74        17.13
   8012    01-12-2000  32  WAM COMMISSARY
                           FOR  1/13/2000                  -15.19         1.94

               BALANCE AFTER THESE TRANSACTIONS------>                    1.94
```

Sworn to and subscribed before me
this 14th day of _Jan_ 19 2000

_Susan Dovin_

NOTARIAL SEAL
SUSAN DOVIN, Notary Public
Canaan Twp., Wayne County
My Commission Expires Jan. 22, 2000

Jimmy Lee McWhirter
# CC - 8387
P.O. Box 256
Waymart, Pa.  18472-0256

TO: Clerk Of The Court
United States District Court
2609 U.S. Courthouse
601 Market Street
Philadelphia, PA.  19106

RE: Carter et al. V. Horn et al.
Case No. 99-CV-6517

Dear Clerk:

Please find enclosed a notorized copy of the Statement for the past six months of my Institutional Account.

The Authorization Form, and attached **notorized account statement is forwarded in connection with Plaintiffs' Motion to Proceed in Forma Pauperis/ and for Appointment of Counsel** in the above-titled case.

The reason my copy was not forwarded along with the other plaintiffs, was due to the fact that I was hospitalized at the time.

Sir/Ms.  I do thank you for your understanding and cooperation as it relates to the foregoing matter.

Respectfully submitted,

Jimmy Lee McWhirter pro. per.

DATED:  January 24, 2000





# AUTHORIZATION
(Prisoner's Account Only)

FILED

JAN 27 2000    Case No.    99-CV-6517

MICHAEL A. KUNZ, Clerk

By _____ Dep. Clerk

NOTE: Completing this authorization form satisfies your obligation under 28 U.S.C. § 1915(a)(2) to submit a certified copy of your trust fund account.

I, ___JIMMY McWHIRTER [ CC-8387 ]___, request and authorize the agency holding me in

custody to send to the Clerk of Court, United States District Court for Eastern District of Pennsylvania,

a certified copy of the statement for the past six months of my trust fund account (or institutional

equivalent) at the institution where I am incarcerated. I further request and authorize the agency holding

me in custody to calculate and disburse funds from my trust account (or institutional equivalent) in the

amounts specified by 28 U.S.C § 1915(b).

This authorization is furnished in connection with the filing of a civil action, and I understand that

the filing fee for the complaint is $150.00. I also understand that the entire filing fee will be deducted from

my account regardless of the outcome of my civil action. This authorization shall apply to any other

agency into whose custody I may be transferred.

Date: ___January 24___, ___2000 c.e.___

_Jimmy Lee McWhirter_
Signature of Prisoner

```
PA DEPT. OF CORRECTIONS        INMATE ACCOUNTS SYSTEM      RUN      IAS365
BUREAU OF COMPUTER SERVICES    PARTIAL ACCOUNT LISTING     DATE  1/24/2000
REMOTE PRINT TIME 10:05            FROM PURGE FILE          PAGE        1
```

| INMATE | NAME | | | | |
|--------|------|-----|-----|----|----|
| NUMBER | LAST | | FIRST | MI | STARTING BALANCE |
| CC8387 | MCWHIRTER | | JIMMY | L | 21.35 |

| BATCH # | DATE MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|---------|-----------------|----|-------------------------|-------------------|---------------------------|
| 6018 | 07-01-1999 | 32 | COMMISSARY | | |
| | | | FOR: JUNE 30, 1999 | -10.76 | 10.59 |
| 6054 | 07-06-1999 | 10 | MAINTENANCE PAYROLL | | |
| | | | FOR: JUNE 1999 | 15.84 | 26.43 |
| 6062 | 07-07-1999 | 13 | PERSONAL GIFT FROM | | |
| | | | MCWHIRTER, DAISY  D679391 | 20.00 | 46.43 |
| 6080 | 07-08-1999 | 32 | COMMISSARY | | |
| | | | FOR: JULY 7, 1999 | -8.22 | 38.21 |
| 6140 | 07-15-1999 | 32 | COMMISSARY | | |
| | | | FOR: JULY 14, 1999 | -26.84 | 11.37 |
| 6190 | 07-21-1999 | 13 | PERSONAL GIFT FROM | | |
| | | | MCWHIRTER, DAISY  D684835 | 20.00 | 31.37 |
| 6198 | 07-22-1999 | 32 | COMMISSARY | | |
| | | | FOR: JULY 21, 1999 | -8.12 | 23.25 |
| 6257 | 07-29-1999 | 32 | COMMISSARY | | |
| | | | FOR: JULY 28, 1999 | -16.70 | 6.55 |
| 6325 | 08-04-1999 | 10 | MAINTENANCE PAYROLL | | |
| | | | FOR: JULY 1999 | 15.12 | 21.67 |
| 6329 | 08-05-1999 | 32 | COMMISSARY | | |
| | | | FOR: AUGUST 4, 1999 | -6.68 | 14.99 |
| 6365 | 08-10-1999 | 13 | PERSONAL GIFT FROM | | |
| | | | MCWHIRTER, DAISY  D690741 | 40.00 | 54.99 |
| 6368 | 08-10-1999 | 37 | POSTAGE | | |
| | | | | -.77 | 54.22 |
| 6384 | 08-12-1999 | 32 | COMMISSARY | | |
| | | | FOR: AUGUST 11, 1999 | -13.14 | 41.08 |
| 6401 | 08-13-1999 | 38 | INSIDE PURCHASES | | |
| | | | FOR: VENDACARD - #230 | -10.00 | 31.08 |
| 6421 | 08-17-1999 | 13 | PERSONAL GIFT FROM | | |
| | | | MCWHIRTER, DAISY  D685481 | 150.00 | 181.08 |
| 6423 | 08-17-1999 | 37 | POSTAGE | | |
| | | | | -.55 | 180.53 |
| 6435 | 08-19-1999 | 32 | COMMISSARY | | |
| | | | FOR: AUGUST 18, 1999 | -28.41 | 152.12 |
| 6447 | 08-19-1999 | 37 | POSTAGE | -3.16 | 148.96 |
| 6465 | 08-23-1999 | 36 | PRINTED MATERIALS | | |
| | | | GRATERFRIENDS INC | -2.00 | 146.96 |
| 6468 | 08-23-1999 | 37 | POSTAGE | | |
| | | | | -.33 | 146.63 |
| 6468 | 08-23-1999 | 37 | POSTAGE | | |
| | | | | -.01 | 146.62 |
| 6468 | 08-23-1999 | 37 | POSTAGE | | |
| | | | | -1.58 | 145.04 |

```
PA DEPT. OF CORRECTIONS        INMATE ACCOUNTS SYSTEM        RUN      IAS365
BUREAU OF COMPUTER SERVICES    PARTIAL ACCOUNT LISTING       DATE  1/24/2000
REMOTE PRINT TIME 10:05             FROM PURGE FILE          PAGE        2


     INMATE    NAME
     NUMBER    LAST                  FIRST        MI
     CC8387    MCWHIRTER             JIMMY        L
```

| BATCH # | DATE MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|---|---|---|---|---|---|
| 6476 | 08-24-1999 | 37 | POSTAGE | | |
| | | | | -.33 | 144.71 |
| 6484 | 08-26-1999 | 32 | COMMISSARY | | |
| | | | FOR: AUGUST 25, 1999 | -18.47 | 126.24 |
| 6538 | 09-02-1999 | 32 | COMMISSARY | | |
| | | | FOR: SEPTEMBER 1, 1999 | -31.19 | 95.05 |
| 6552 | 09-03-1999 | 38 | INSIDE PURCHASES | | |
| | | | FOR: VENDACARD #66 | -5.00 | 90.05 |
| 6561 | 09-07-1999 | 37 | POSTAGE | | |
| | | | | -.55 | 89.50 |
| 6568 | 09-07-1999 | 10 | MAINTENANCE PAYROLL | | |
| | | | FOR: AUGUST 1999 | 13.68 | 103.18 |
| 6587 | 09-09-1999 | 32 | COMMISSARY | | |
| | | | FOR: SEPTEMBER 8, 1999 | -9.77 | 93.41 |
| 6618 | 09-14-1999 | 13 | PERSONAL GIFT FROM | | |
| | | | MCWHIRTER, DAISY  D680014 | 20.00 | 113.41 |
| 8258 | 09-15-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR  9/15/1999 | -17.53 | 95.88 |
| 8265 | 09-22-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR  9/22/1999 | -14.18 | 81.70 |
| 8272 | 09-29-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR  9/29/1999 | -12.13 | 69.57 |

```
               BALANCE AFTER THESE TRANSACTIONS------>        69.57
```

```
PA. DEPT. OF CORRECTIONS        INMATE ACCOUNTS SYSTEM        RUN      IAS365
BUREAU OF COMPUTER SERVICES     PARTIAL ACCOUNT LISTING       DATE  1/24/2000
REMOTE PRINT TIME 10:05            FROM ACTIVE FILE           PAGE         1
```

| INMATE | NAME | | | | |
|--------|------|-----|----|--|------------------|
| NUMBER | LAST | | FIRST | MI | STARTING BALANCE |
| CC8387 | MCWHIRTER | | JIMMY | L | 69.57 |

| BATCH # | DATE MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|------|------------|----|---------------------------|---------|---------|
| 6760 | 10-05-1999 | 10 | MAINTENANCE PAYROLL |  |  |
|      |            |    | FOR:   SEPTEMBER 1999 | 15.12 | 84.69 |
| 8279 | 10-06-1999 | 32 | WAM COMMISSARY |  |  |
|      |            |    | FOR 10/07/1999 | -24.00 | 60.69 |
| 6787 | 10-08-1999 | 13 | PERSONAL GIFT FROM |  |  |
|      |            |    | MCWHIRTER, DAISY  D687463 | 40.00 | 100.69 |
| 8286 | 10-13-1999 | 32 | WAM COMMISSARY |  |  |
|      |            |    | FOR 10/15/1999 | -26.43 | 74.26 |
| 8293 | 10-20-1999 | 32 | WAM COMMISSARY |  |  |
|      |            |    | FOR 10/21/1999 | -22.63 | 51.63 |
| 6906 | 10-27-1999 | 13 | PERSONAL GIFT FROM |  |  |
|      |            |    | MCWHIRTER, DAISY   D681423 | 40.00 | 91.63 |
| 8300 | 10-27-1999 | 32 | WAM COMMISSARY |  |  |
|      |            |    | FOR 10/28/1999 | -31.26 | 60.37 |
| 6920 | 10-28-1999 | 38 | INSIDE PURCHASES |  |  |
|      |            |    | FOR: VENDACARED #168 | -5.00 | 55.37 |
| 6965 | 11-03-1999 | 10 | MAINTENANCE PAYROLL |  |  |
|      |            |    | FOR: OCTOBER 1999 | 14.40 | 69.77 |
| 8307 | 11-03-1999 | 32 | WAM COMMISSARY |  |  |
|      |            |    | FOR 11/04/1999 | -33.05 | 36.72 |
| 7014 | 11-09-1999 | 38 | INSIDE PURCHASES |  |  |
|      |            |    | FOR: VENDACARD - #72 | -3.00 | 33.72 |
| 7035 | 11-12-1999 | 37 | POSTAGE |  |  |
|      |            |    | | -2.64 | 31.08 |
| 8314 | 11-10-1999 | 32 | WAM COMMISSARY |  |  |
|      |            |    | FOR 11/12/1999 | -23.55 | 7.53 |
| 7048 | 11-15-1999 | 13 | PERSONAL GIFT FROM |  |  |
|      |            |    | MCWHIRTER, DAISY  D679793 | 25.00 | 32.53 |
| 8321 | 11-17-1999 | 32 | WAM COMMISSARY |  |  |
|      |            |    | FOR 11/18/1999 | -15.09 | 17.44 |
| 7100 | 11-22-1999 | 38 | INSIDE PURCHASES |  |  |
|      |            |    | FOR: VENDACARD - #169 | -4.00 | 13.44 |
| 7099 | 11-22-1999 | 37 | POSTAGE |  |  |
|      |            |    | | -.66 | 12.78 |
| 8327 | 11-23-1999 | 32 | WAM COMMISSARY |  |  |
|      |            |    | FOR 11/24/1999 | -9.53 | 3.25 |
| 7111 | 11-24-1999 | 37 | POSTAGE |  |  |
|      |            |    | | -.77 | 2.48 |
| 7111 | 11-24-1999 | 37 | POSTAGE |  |  |
|      |            |    | | -.99 | 1.49 |
| 7136 | 11-30-1999 | 13 | PERSONAL GIFT FROM |  |  |
|      |            |    | MCWHIRTER, DAISY  D687682 | 25.00 | 26.49 |
| 7136 | 11-30-1999 | 13 | PERSONAL GIFT FROM |  |  |
|      |            |    | MCWHIRTER, DAISY  D687617 | 75.00 | 101.49 |

```
PA DEPT. OF CORRECTIONS         INMATE ACCOUNTS SYSTEM        RUN       IAS365
BUREAU OF COMPUTER SERVICES     PARTIAL ACCOUNT LISTING       DATE  1/24/2000
REMOTE PRINT TIME 10:05              FROM ACTIVE FILE         PAGE         2
```

| INMATE | NAME | | | |
|---|---|---|---|---|
| NUMBER | LAST | | FIRST | MI |
| CC8387 | MCWHIRTER | | JIMMY | L |

| BATCH # | DATE MO DY YEAR | | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | BALANCE AFTER TRANSACTION |
|---|---|---|---|---|---|
| 8337 | 12-03-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 12/06/1999 | -16.09 | 85.40 |
| 7179 | 12-06-1999 | 10 | MAINTENANCE PAYROLL | | |
| | | | FOR: NOVEMBER 1999 | 12.24 | 97.64 |
| 7186 | 12-06-1999 | 37 | POSTAGE | | |
| | | | | -1.58 | 96.06 |
| 7186 | 12-06-1999 | 37 | POSTAGE | | |
| | | | | -2.03 | 94.03 |
| 8342 | 12-08-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 12/09/1999 | -31.83 | 62.20 |
| 7256 | 12-15-1999 | 37 | POSTAGE | | |
| | | | UPS | -5.98 | 56.22 |
| 8349 | 12-15-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 12/16/1999 | -16.17 | 40.05 |
| 8355 | 12-21-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 12/21/1999 | -9.61 | 30.44 |
| 7302 | 12-22-1999 | 37 | POSTAGE | | |
| | | | | -1.21 | 29.23 |
| 7333 | 12-28-1999 | 13 | PERSONAL GIFT FROM | | |
| | | | MCWHIRTER, DAISY  D680996 | 20.00 | 49.23 |
| 8362 | 12-28-1999 | 32 | WAM COMMISSARY | | |
| | | | FOR 12/29/1999 | -14.68 | 34.55 |
| 7371 | 12-31-1999 | 31 | OUTSIDE PURCHASES | | |
| | | | SUPT OF DOCUMENTS | -1.00 | 33.55 |
| 7377 | 01-04-2000 | 38 | INSIDE PURCHASES | | |
| | | | FOR: VENDERCARD - #29 | -3.00 | 30.55 |
| 8005 | 01-05-2000 | 32 | WAM COMMISSARY | | |
| | | | FOR  1/06/2000 | -17.01 | 13.54 |
| 7387 | 01-06-2000 | 13 | PERSONAL GIFT FROM | | |
| | | | MCWHIRTER, DAISY  D123888 | 40.00 | 53.54 |
| 7401 | 01-07-2000 | 10 | MAINTENANCE PAYROLL | | |
| | | | FOR: DECEMBER 1999 | 14.40 | 67.94 |
| 7417 | 01-10-2000 | 37 | POSTAGE | | |
| | | | | -7.48 | 60.46 |
| 7458 | 01-14-2000 | 14 | MISCELLANEOUS | | |
| | | | VOID CHECK:SUPT OF DOCUMENTS | 1.00 | 61.46 |
| 8018 | 01-18-2000 | 32 | WAM COMMISSARY | | |
| | | | FOR  1/18/2000 | -16.04 | 45.42 |

```
                         BALANCE AFTER THESE TRANSACTIONS------>        45.42
```

*Walter Williams* 1/24/00
*Accountant*

NOTARIAL SEAL
ROBERT ANDREWS, Notary Public
Canaan Twp., Wayne County
My Commission Expires May 15, 2000

*Robert P. Andrews*
*Notary Public*
*1/24/00*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER  et al., :          CIVIL ACTION
                Plaintiffs :
        VS. :            NO. 99-CV-6517
                          :
MARTIN  HORN et al., :
                Defendant :

O R D E R

AND NOW,  to wit, this_____ day of_____ , 2000
upon consideration of Plaintiff's **Motion For Sanctions**, it is hereby
**ORDERED** and **Decreed** that a Rule be granted upon  Defendant Janan
Loomis and /or her Attorney to show cause why the prayer of the within
motion should not be granted.

n RULE RETURNABLE THE _____ DAY OF _____ ,2000,
AT_____ O'CLOCK____ M.   IN COURT ROOM _____,
AT  601 MARKET STREET, PHILADELPHIA, PA  19106

BY THE COURT

_____
                          J.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER  et al.,          :          CIVIL ACTION
              Plaintiffs      :
         VS.                  :          NO. 99-CV-6517
                              :
MARTIN  HORN et al.,          :          RULE 11 MOTION
                              :
              Defendants      :

_____

MOTION FOR SANCTIONS

NOW COMES, Jimmy McWhirter, Plaintiff in the above-titled
action, and moves the Court to impose sanctions upon
Defendant, Janan Loomis;  And, in support of this motion
Plaintiff avers the following:

1.    This Court has jurisdiction to act on this motion
pursuant to Fed. Rules Civ. P.  **Rule 11(b),(b)(1)(2)(3)
and (4)(c).**

2.    This motion seeks imposition of sanctions upon
Defendant Janan Loomis,[ P.A. ]  **for failure to accept
summons (Hand Served) upon her by Plaintiff Jimmy
McWhirter.**

3.    **On January 7, 2000 c.e.,** Plaintiff McWhirter made
service of summons upon Defendant Loomis, by placing
within an envelope a copy of Plaintiffs' Complaint, along
with a summons/ and Instruction Sheet;  And same was
sealed an noted as FIRST CLASS MAIL. Attached to the legal
envelope was a request that the cost of postage for First
Class Mail be deducted from Plaintiff's Account. This mail
was placed into the Institution's Mail Collecting
Official.

4.    Subsequently, on or about 1-13-00, the summons
mailed to Defendant Loomis was returned to Plaintiff, with
notice that Defendant Loomis was not at the Institution

presently; Therefore,

5.   Plaintiff held onto the sealed legal mail, while awaiting the return of Defendant Loomis to the Institution.

6.   On 1-31-00, Defendant Loomis returned to duty in SCI-Waymart's Medical Department; Whereafter,

7.   On 1-31-00, Plaintiff McWhirter, along with Plaintiff Carmichael,[ to act as witness of service by Plaintiff McWhirter of the summons by hand upon Defendant Loomis; And Plaintiff McWhirter in fact served Defendant Loomis just so.

8.   On 2-1-00, I, Plaintiff McWhirter, and Plaintiff Carmichael, were summoned to the Medical Department on sick-call; And, when Plaintiff McWhirter was called into the room, by Defendant Loomis, I presented her with the envelope containing the summons, Complaint, and Instruction Sheet; Whereafter, she asked me, " What is this?" I replied that 'this is a summons issued upon you as a Defendant in a Class Action Complaint, which has been filed with the Court'. Thereafter,

Defendant Loomis opened the envelope, and extracted the summons and Complaint. She read the summons; Then, she immediately got up, and proceeded down the hall to where the Receptionist, C/O was seated; And, after a brief talk with him, she returned to me, and with anger and sarcastic attitude: pushed the papers and envelope at me, and said, " Mail it to me ". All of this was witnessed to by Plaintiff Arthur Carmichael.

9.   Subsequently, I and Plaintiff Carmichael returned to confer with the other Plaintiffs; Whereafter, it was decided that the best course would be to re-mail the summons and accompanyig papers to Defendant Loomis again; And, to subsequently File for sanctions against her; Thus, comes this Motion For Sanctions against Defendant Loomis, for her show of bad faith, acting upon the advice of a

- 2 -

C/O, rather than take the matter up (if she doubted the authority vested in Plaintiff by the Court to serve the summons) with her superior/s/, which she did not; Instead, showing disdain for the legal document/s/, bias and anger she has always exhibited against Plaintiff, she maliciously went to the C/O with mind set upon getting Plaintiff sanctioned for bringing the summons to the Medical Department to serve upon her. (which was the only means of access to her Plaintiff was aware of).

Plaintiff makes the above assertion based upon what he was told by the C/O, when he approached him to get his Inmate Pass. There, Plaintiff was told by the C/O, " You are not supposed to bring any personal papers down with you to the Medical department; Whereafter Plaintiff responded that they were not personal papers, but legal documents with summons to be served upon Ms. Loomis, a Defendant in Plaintiffs' suit against the Prison; Then Plaintiff picked up his Pass and left.

10.    Plaintiff maintains that Defendant Loomis' actions was not only a show of bad faith: but that her actions with regard to the summons was done with intent to forestall Plaintiffs' being able to effectively serve all Defendants in this case; Whereafter, they would be able to put into play the Discovery Process which is necessary for Plaintiffs to be able to get names and other related evidence to support their claims set forth in their Complaint; Moreover, Plaintiff suggests that her actions constitutes a ploy in concert with all other Defendants to stall for time in which to endeavor to remedy the claims as set forth in Plaintiffs Complaint.

WHEREFORE, for the reasons  set forth above, Plaintiffs  respectfully request that the Court declare that Defendant Janan Loomis has violated  Subdivision (b) et seq. with malice aforethought; And, thereafter, impose appropriate sanctions to include, but not limited to the costs to Plaintiff for the finance required to mail, and then be caused to remail the summons/with accompaning

related papers; As well as, for the mental anguish,
distress, and delay, which has been caused by Defendant
Loomis, as a deterrent to her and/or other Defendants
included in Plaintiffs' Complaint.

Respectfully submitted

PLAINTIFFS PRO.PER *Jimmy Lee McWhirter*

Jimmy Lee McWhirter

*Arthur Carmichael*

Arthur Carmichael

DATED: 2-4- ,2000 c.e.     PLAINTIFFS' ADDRESS:

P.O. Box 256

Waymart, Pa. 18472-0256

4

## C E R T I F I C A T I O N

We the undersigned, certify that the foregoing **Motion For Sanctions** is true and correct to the best of our knowledge, information and belief; And, as to our belief, we believe that to also be true.

/s/ *Jimmy Lee McWhister*
Jimmy Lee McWhirter

*Arthur Carmichael*
Arthur Carmichael
P.O. Box 256
Waymart, PA 18472-0256

DATED: 2 — 4 — ,2000 c.e.

FILED

FEB 7 2000
MICHAEL ... UNZ, Clerk
... Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER et al.,          :          CIVIL ACTION
              Plaintiffs     :
         vs.                 :          NO.99-CV-6517
                             :
MARTIN  HORN et al.,         :          JURY TRIAL DEMAND
              Defendants     :
                             :          CLASS ACTION
                             :          COMPLAINT

PROOF OF SERVICE

     The below named Plaintiffs hereby certify that a
copy of the within Motion For Sanctions was served upon
the person/s/ by First Class Mail in the manner indicated
below:

     MARTIN HORN,(Secretary)    :    MIKE FISHER
     of Department of Corrections:    Attorney General
     2520 Lisburn Road          :    15th Fl. Strawberry Sq.
     P.O. Box 598               :    Harrisburg, Pa. 17120
     Camp Hill, Pa. 17001-0598  :
                                :

DATED: 2-4-  , 2000 c.c.


          PLAINTIFFS PRO.PER

                              _Jimmy Lee McWhirter_
                              Jimmy lee McWhirter

                              _Arthur Carmichael_
                              Arthur Carmichael
          ADDRESS:    P.O. box 256
                      Waymart, Pa. 18472-0256

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER et al.,                    :         CIVIL ACTION
                    Plaintiffs         :
          VS.                          :         NO.99-CV-6517
                                       :
MARTIN HORN et al.,                    :
                    Defendant          :

O R D E R

        AND NOW, to wit, this_____ day of_____, 2000
upon consideration of Plaintiff's Motion For Sanctions, it is hereby
ORDERED and Decreed that a Rule be granted upon Defendant Janan
Loomis and /or her Attorney to show cause why the prayer of the within
motion should not be granted.

        n RULE RETURNABLE THE _____ DAY OF _____,2000,
AT_____ O'CLOCK____ M.   IN COURT ROOM _____,
AT  601 MARKET STREET, PHILADELPHIA, PA  19106

                              BY THE COURT

                         _____
                                                  J.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN CARTER et al., | : | CIVIL ACTION |
| Plaintiffs | : | |
| vs. | : | NO. 99-CV-6517 |
| | : | |
| MARTIN HORN et al., | : | RULE 11 MOTION |
| | : | |
| Defendants | : | |

MOTION FOR SANCTIONS

NOW COMES, Jimmy McWhirter, Plaintiff in the above-titled
action, and moves the Court to impose sanctions upon
Defendant, Janan Loomis;  And, in support of this motion
Plaintiff avers the following:

1.    This Court has jurisdiction to act on this motion
pursuant to Fed. Rules Civ. P.  Rule 11(b),(b)(1)(2)(3)
and (4)(c).

2.    This motion seeks imposition of sanctions upon
Defendant Janan Loomis,[ P.A. ]  for failure to accept
summons (Hand Served) upon her by Plaintiff Jimmy
McWhirter.

3.    On January 7, 2000 c.e., Plaintiff McWhirter made
service of summons upon Defendant Loomis, by placing
within an envelope a copy of Plaintiffs' Complaint, along
with a summons/ and Instruction Sheet;  And same was
sealed an noted as FIRST CLASS MAIL. Attached to the legal
envelope was a request that the cost of postage for First
Class Mail be deducted from Plaintiff's Account. This mail
was placed into the Institution's Mail Collecting
Official.

4.    Subsequently, on or about 1-13-00, the summons
mailed to Defendant Loomis was returned to Plaintiff, with
notice that Defendant Loomis was not at the Institution

presently; Therefore,

5.    Plaintiff held onto the sealed legal mail, while awaiting the return of Defendant Loomis to the Institution.

6.    On 1-31-00, Defendant Loomis returned to duty in SCI-Waymart's Medical Department; Whereafter,

7.    On 1-31-00, Plaintiff McWhirter, along with Plaintiff Carmichael,[ to act as witness of service by Plaintiff McWhirter of the summons by hand upon Defendant Loomis; And Plaintiff McWhirter in fact served Defendant Lommis just so.

8.    On 2-1-00, I, Plaintiff McWhirter, and Plaintiff Carmichael, were summoned to the Medical Department on sick-call; And, when Plaintiff McWhirter was called into the room, by Defendant Loomis, I presented her with the envelope containing the summons, Complaint, and Instruction Sheet; Whereafter, she asked me, " What is this?" I replied that 'this is a summoned issued upon you as a Defendant in a Class Action Complaint, which has been filed with the Court'. Thereafter,

Defendant Loomis opened the envelope, and extracted the summons and Complaint. She read the summons; Then, she immediately got up, and proceeded down the hall to where the Receptionist, C/O was seated; And, after a brief talk with him, she returned to me, and with anger and sarcastic attitude: pushed the papers and envelope at me, and said, " Mail it to me ". All of this was witnessed to by Plaintiff Arthur Carmichael.

9.    Subsequently, I and Plaintiff Carmichael returned to confer with the other Plaintiffs; Whereafter, it was decided that the best course would be to re-mail the summons and accompanyig papers to Defendant Loomis again; And, to subsequently file for sanctions against her; Thus, comes this Motion For Sanctions against Defendant Loomis, for her show of bad faith, acting upon the advice of a

C/O, rather than take the matter up (if she doubted the
authority vested in Plaintiff by the Court to serve the
summons) with her superior/s/, which she did not;
Instead, showing disdain for the legal document/s/, bias
and anger she has always exhibited against Plaintiff, she
maliciously went to the C/O with mind set upon getting
Plaintiff sanctioned for bringing the summons to the
Medical Department to serve upon her. (which was the only
means of access to her Plaintiff was aware of).

   Plaintiff makes the above assertion based upon what
he was told by the C/O, when he approached him to get his
Inmate Pass.  There, Plaintiff was told by the C/O, " You
are not supposed to bring any personal papers down with
you to the Medical department; Whereafter Plaintiff
responded that they were not personal papers, but legal
documents with summons to be served upon Ms. Loomis, a
Defendant in Plaintiffs' suit against the Prison; Then
Plaintiff picked up his Pass and left.

10.    Plaintiff maintains that Defendant Loomis' actions
was not only a show of bad faith: but that her actions
with regard to the summons was done with intent to
forestall Plaintiffs' being able to effectively serve all
Defendants in this case; Whereafter, they would be able to
put into play the Discovery Process which is necessary for
Plaintiffs to be able to get names and other related
evidence to support their claims set forth in their
Complaint;  Moreover, Plaintiff suggests that her actions
constitutes a ploy in concert with all other Defendants to
stall for time in which to endeavor to remedy the claims
as set forth in Plaintiffs Complaint.

   WHEREFORE, for the reasons  set forth above,
Plaintiffs  respectfully request that the Court declare
that Defendant Janan Loomis has violated  Subdivision (b)
et seq. with malice aforethought; And, thereafter, impose
appropriate sanctions to include, but not limited to the
costs to Plaintiff for the finance required to mail, and
then be caused to remail the summons/with accompanying

related papers; As well as, for the mental anguish,
distress, and delay, which has been caused by Defendant
Loomis, as a deterrent to her and/or other Defendants
included in Plaintiffs' Complaint.

Respectfully submitted

PLAINTIFFS PRO.PER. *Jimmy Lee McWhirter*

Jimmy Lee McWhirter

*Arthur Carmichael*

Arthur Carmichael

DATED: 2-4-____,2000 c.e.       PLAINTIFFS' ADDRESS:

P.O. Box  256

Waymart, Pa. 18472-0256

4

## C E R T I F I C A T I O N

We the undersigned, certify that the foregoing **Motion For Sanctions** is true and correct to the best of our knowledge, information and belief; And, as to our belief, we believe that to also be true.

/s/: *Jimmy Lee McWhirter*
Jimmy Lee McWhirter

*Arthur Carmichael*
Arthur Carmichael

DATED: 2-4-____ ,2000 c.e.
P.O. Box 256
Waymart,PA  18472-0256

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER et al.,           :        CIVIL ACTION
              Plaintiffs      :
        VS.                   :        NO.99-CV-6517
                              :
MARTIN  HORN et al.,          :        JURY TRIAL DEMAND
              Defendants      :
                              :        CLASS ACTION
                              :          COMPLAINT

---

PROOF OF SERVICE

        The below named Plaintiffs hereby certify that a
copy of the within **Motion For Sanctions** was served upon
the person/s/ by First Class Mail in the manner indicated
below:

        MARTIN HORN,(Secretary)    :    MIKE FISHER
        of Department of Corrections:      Attorney General
        2520 Lisburn Road          :    15th Fl. Strawberry Sq.
        P.O. Box 598               :    Harrisburg, Pa. 17120
        Camp Hill, Pa. 17001-0598  :
                                   :

DATED: 2-4- , 2000 c.e.

        PLAINTIFFS PRO.PER :

                              _Jimmy Lee McWhirter_
                              Jimmy lee McWhirter

                              _Arthur Carmichael_
                              Arthur Carmichael
        ADDRESS:              P.O. box 256
                              Waymart, Pa. 18472-0256

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, et al.,                        :
                                            :
      Plaintiffs                        :
                                            :
    v.                                     :      No. 99-6517
                                            :
MARTIN HORN, COMMISSIONER,                  :      (Judge Brody)
DEPT. OF CORRECTIONS, et al.,               :
                                            :
      Defendants                        :

## ORDER

      **AND NOW**, this _____ day of _____, 2000, upon consideration of Commonwealth

defendants' motion to transfer, it is hereby ordered that the motion is **GRANTED**.  The above-

captioned case is transferred to the Middle District of Pennsylvania.  It is further ordered that

Commonwealth defendants shall file an answer or otherwise plead to this complaint within twenty

days following Commonwealth defendants' counsel being notified by the Clerk of Court in the

Middle District that the case has been received and docketed in the Middle District of Pennsylvania.


                            _____

                            Anita B. Brody, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, et al.,                    :
                                        :
        Plaintiffs              :
                                        :
    v.                           :        No. 99-6517
                                        :
MARTIN HORN, COMMISSIONER,              :        (Judge Brody)
DEPT. OF CORRECTIONS, et al.,           :
                                        :
        Defendants              :

## COMMONWEALTH DEFENDANTS' MOTION TO TRANSFER

Commonwealth defendants, Martin Horn, Jeffrey A. Beard, Raymond J. Colleran, James T. Wynder, Jr., John T. Shemo, Thomas B. Patterson, Paul DelRosso, Gerald Sobotor, Bernard Chipego, Milton Friedman, Emanual Patterson, Noel Booth, and Patrick Herbert, by their attorneys and pursuant to 28 U.S.C. § 1404(a), request this Court to transfer the case to the United States District Court for the Middle District of Pennsylvania for the convenience of the parties. In support of this motion, they set forth the following facts:

      1.     Pro se plaintiffs are prisoners at the State Correctional Institution at Waymart, Wayne County, Pennsylvania. Their complaint names thirteen Commonwealth defendants in his complaint. Of these defendants Martin Horn and Jeffrey A. Beard are employed by the Department of Corrections located in Camp Hill, Pennsylvania. Defendants Colleran, Wynder, Shemo, Patterson, DelRosso, Chipego, Friedman, Patterson, Booth, and Herbert are employees of the Department of Corrections and assigned to SCI-Waymart. Defendant Gerald Sobotor is an employee of the

Department of Corrections assigned to the State Correctional Institution at Chester, Delaware County, Pennsylvania.

2.    The complaint alleges unconstitutional conditions of confinement at SCI-Waymart.

3.    But for defendant Sobotor, all other Commonwealth defendants carry out their official duties and reside within the Middle District of Pennsylvania.

4.    All of the events that gave rise to this suit occurred in the Middle District of Pennsylvania.

**WHEREFORE,** this action should be transferred to the United States District Court for the Middle District of Pennsylvania, where venue properly lies since as all defendants, but for one, carry out their official duties within the Middle District and within which the incidents alleged in the complaint were to have occurred are located.

Respectfully submitted,

**D. MICHAEL FISHER**
**Attorney General**

By:    *Seth A. Mendelsohn*
**SETH A. MENDELSOHN**
**Deputy Attorney General**
**Attorney ID# 77063**

**SUSAN J. FORNEY**
**Chief Deputy Attorney General**

**Office of Attorney General**
**15th Floor, Strawberry Square**
**Harrisburg PA 17120**
**(717) 787-1194**
**(717) 772-4526 FAX**
**smendelsohn@attorneygeneral.gov**

**DATE:    FEBRUARY 17, 2000**

-2-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN CARTER, <u>et al.</u>, | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| | : | |
| v. | : | No. 99-6517 |
| | : | |
| MARTIN HORN, COMMISSIONER, | : | (Judge Brody) |
| DEPT. OF CORRECTIONS, <u>et al.</u>, | : | |
| | : | |
| Defendants | : | |

FILED

[FEB?] 0 2000
MICHAEL [?]UNZ, Clerk
[?] Dep. Cler.

### CERTIFICATE OF SERVICE

I, Seth A. Mendelsohn, Deputy Attorney General, hereby certify that on this date I

caused to be served the Foregoing, **Commonwealth Defendants' Motion to Transfer** by depositing

a copy of the same in the United States mail, postage prepaid, in Harrisburg, PA., addressed to the

following:

John Carter #CN-1404
SCI-Waymart
Box 256
Waymart, PA 18472

*Seth A. Mendelsohn*
**SETH A. MENDELSOHN**
**DEPUTY ATTORNEY GENERAL**

**DATE: February 17, 2000**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JOHN CARTER, et al.,                           :

      Plaintiffs                           :

                                  :

      v.                           :          No. 99-6517

                                  :

MARTIN HORN, COMMISSIONER,     :          (Judge Brody)
DEPT. OF CORRECTIONS, et al.,            :

                                  :

      Defendants                           :

F I L E D

FEB ?8 2000

MICHAEL ... Z, Clerk
... D. Clerk

**BRIEF IN SUPPORT OF COMMONWEALTH
DEFENDANTS' MOTION TO TRANSFER**

**STATEMENT OF THE CASE**

      This is civil rights case for damages and injunctive relief brought pursuant to 42 U.S.C.

§1983 by pro se prisoners alleging unconstitutional conditions of confinement at the State

Correctional Institution at Waymart, Wayne County, Pennsylvania ("SCI-Waymart"). Plaintiffs seek

class action certification.

      The complaint names thirteen Commonwealth defendants. Of these defendants, Martin Horn

and Jeffrey A. Beard are employed by the Department of Corrections Central Office located in Camp

Hill, Cumberland County, Pennsylvania. Defendants Colleran, Wynder, Shemo, Patterson,

DelRosso, Chipego, Friedman, Patterson, Booth, and Herbert are employees of the Department of

Corrections and assigned to the State Correctional Institution at Waymart, Wayne County,

Pennsylvania ("SCI-Waymart"). Defendant Gerald Sobotor is an employee of the Department of

Corrections assigned to the State Correctional Institution at Chester, Delaware County,

Pennsylvania.

      On February 17, 2000, Commonwealth defendants filed a motion to transfer this case to the

United States District Court for the Middle District of Pennsylvania.  This brief is submitted in support of that motion.

## ARGUMENT

## THIS CASE SHOULD BE TRANSFERRED TO THE MIDDLE DISTRICT OF PENNSYLVANIA

Under 28 U.S.C. §1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice," this Court may transfer an action to any other interest "where it might have been brought." 28 U.S.C. § 1404(a).  Accordingly, a court may transfer an action if (1) the plaintiff could have brought the case in the proposed forum; and (2) the transfer would promote the convenience of the parties' witness and would be in the interest of justice.   Jumara v. State Farms Ins.Co., 55 F.3d 873,878-80 (3d Cir. 1995).

It is clear this action could have been brought in the Middle District.  First, all of the allegations in the complaint arise out of SCI-Waymart.  SCI-Waymart, located in Wayne County, is within the Middle District of Pennsylvania.  See 28 U.S.C. § 118(b).  Cumberland County, where defendants Horn and Beard work, is also within the Middle District.  Id.  All defendants, but for one, are residents and perform their official duties in the Middle District.  The sole defendant (Sobotor) not a resident of the Middle District previously was employed at SCI-Waymart at times relevant to plaintiffs' cause of action.  Venue could be established for Sobotor because the events complained of occurred in the Middle District.  See 28 U.S.C. § 1391(b)(2).

As for the second requirement, Commonwealth defendants suggest the Middle District is the more convenient forum.  In Gulf Oil Corp. V. Gilbert, 330 U.S. 501 (1947),  the Supreme Court identified various factors which should be considered when deciding if a certain action should be

transferred. The private interests which should be considered include the choice of forum of the plaintiff, the ease of access to sources of proof, availability of compulsory process over unwilling witnesses, the cost of attendance of willing witnesses, obstacles to a fair trial and the possibility of a jury view of the premises. Id. at 508. The public interests which should be considered include court congestion and other administrative difficulties, placing the burden of jury duty on those having the closet ties to the action, local interest in having the matter adjudicated at home and familiarity of the forum court with the applicable law. Id. at 508-09. Consideration of these factors shows that this matter should be transferred to the Middle District of Pennsylvania.

First, although plaintiffs' chosen forum was the Eastern District of Pennsylvania, this choice should be given less deference because the Eastern District is not the plaintiffs' "home turf." See Burroughs Wellcome Co. v. Giant Foods, Inc., 392 F. Supp. 761, 763 (D.Del. 1975). As inmates incarcerated in SCI-Waymart, plaintiffs are located in the Middle District.

The other private interests favor the Middle District of Pennsylvania as the more convenient forum. The allegations in the complaint stem from conditions of confinement while they were located in Wayne County. Accordingly, any documents or witnesses from any of these entities are located in the Middle District. Compulsory process would not be available to bring any of these witnesses or documents to the Eastern District for trial. Because SCI-Waymart and the central office of the Department of Corrections are closer to Harrisburg, Scranton or Williamsport, where the Middle District Courts are located, than to Philadelphia, the cost of witnesses to attend trial will be less if it is held in the Middle District. This is particularly true where the Commonwealth would bear the cost of transporting the prisoners to trial. Both requirements are met in this case and the action should be transferred.

The applicable public interests also favor transferring this case to the Middle District. The burden of jury duty will not be placed on the residents of Cumberland and Wayne Counties -- those with the closest ties to the action--if this case is tried in the Eastern District. The local interests in having the matter adjudicated nearer to home would also be better served if the matter is tried in the Middle District, where Cumberland and Wayne counties are located. Accordingly, the Middle District of Pennsylvania is the more appropriate forum for this action.

## CONCLUSION

For the above state reasons, the action should be transferred to the Middle District of Pennsylvania.

Respectfully submitted,

**D. MICHAEL FISHER**
**Attorney General**

By:  *Seth A. Mendelsohn*
**SETH A. MENDELSOHN**
**Deputy Attorney General**

**SUSAN J. FORNEY**
**Chief Deputy Attorney General**
**Chief, Litigation Section**

**Office of Attorney General**
**15th Flr., Strawberry Sq.**
**Harrisburg, PA 17120**
**(717) 787-1194**
**FAX: (717) 772-4526**

**DATE:    February 17, 2000**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, et al.,                    :

      Plaintiffs                    :

      v.                    :          No. 99-6517

                          :

MARTIN HORN, COMMISSIONER,         :          (Judge Brody)
DEPT. OF CORRECTIONS, et al.,      :

      Defendants                    :

FILED

MICHAEL E. ... Z, Clerk
... Cler...

## CERTIFICATE OF SERVICE

    I, Seth A. Mendelsohn, Deputy Attorney General, hereby certify that on this date I

caused to be served the Foregoing, **Brief in Support of Commonwealth Defendants' Motion to**

**Transfer** by depositing a copy of the same in the United States mail, postage prepaid, in Harrisburg,

PA., addressed to the following:

John Carter #CN-1404
SCI-Waymart
Box 256
Waymart, PA 18472

*Seth A. Mendelsohn*
**SETH A. MENDELSOHN**
**DEPUTY ATTORNEY GENERAL**

**DATE: February 17, 2000**



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, et al.                      :

                    v.                   :          CIVIL ACTION NO. 99-6517

MARTIN HORN, Commissioner,               :
Department of Corrections, et al.        :

## O R D E R

AND NOW, this _____ day of _____, 2000 upon consideration of the

Motion of Tamrat Bekele, M.D., Lazslo Kiraly, M.D., Glen Jeffes and Janan Loomis to Dismiss

the Complaint as against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, and the response thereto, if any, it is hereby

ORDERED that the Motion is GRANTED, and it is further

ORDERED that the Complaint as against Bekele, Kiraly, Jeffes and Loomis is

DISMISSED WITH PREJUDICE.

BY THE COURT:

_____
                                                    J.





# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, et al.

     v.                            CIVIL ACTION NO. 99-6517

MARTIN HORN, Commissioner
Department of Corrections, et al.

## MOTION OF TAMRAT BEKELE, M.D., LAZSLO KIRALY, M.D., GLEN JEFFES, AND JANAN LOOMIS TO DISMISS THE COMPLAINT

Defendants Tamrat Bekele, M.D., Lazslo Kiraly, M.D., Glen Jeffes, and Janan Loomis, by their undersigned counsel, hereby move this Court for an Order dismissing the Complaint as against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In further support of this Motion, the moving defendants incorporate by reference the annexed Memorandum of Law.

SILVERMAN BERNHEIM & VOGEL

BY: _____
LAWRENCE M. SILVERMAN, ESQUIRE
JONATHAN J. BART, ESQUIRE

2 Penn Center Plaza
Suite 910
Philadelphia, PA 19102
(215) 569-0000

F:\WPCNET\DOCS\30524\092\PLEADS\MOTION.DIS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

JOHN CARTER, et al.       :

      v.                CIVIL ACTION NO. 99-6517

MARTIN HORN, Commissioner,    :
Department of Corrections, et al.    :

---

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANTS TAMRAT BEKELE, M.D.,**
**LAZSLO KIRALY, M.D., GLEN JEFFES, AND JANAN LOOMIS'**
**MOTION TO DISMISS THE COMPLAINT**
**PURSUANT TO RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Defendants Tamrat Bekele, M.D. ("Dr. Bekele"), Lazslo Kiraly, M.D. ("Dr. Kiraly"),

Glen Jeffes ("Jeffes"), and Janan Loomis, M.A. ("Loomis") (collectively referred to herein as

the "Moving Defendants"), by their undersigned counsel, respectfully submit this Memorandum

of Law in Support of their Motion to Dismiss the Complaint of John Carter, et al as against

them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**I.**      **PRELIMINARY STATEMENT**

This is a pro se prisoner civil rights action brought against a myriad of defendants

alleging violations of the Eighth Amendment right to be free of cruel and unusual punishment

relating to their incarceration. The Moving Defendants are two privately employed doctors

(Drs. Bekele and Kiraly) performing medical services at the State Services Correctional

Institution in Waymart, Pennsylvania ("SCI-Waymart"), a medical administrator (Jeffes) and

a physician's assistant, Ms. Loomis. While the Complaint is a prolix 48-page, single-spaced

dissertation alleging numerous complaints about the alleged conditions at SCI-Waymart, the allegations vis-a-vis Drs. Bekele and Kiraly and Mr. Jeffes and Ms. Loomis are very limited. Indeed, the allegations as against the Moving Defendants tend to be nothing more than a mantra of conclusory recitations (repeated over and over again) of the legal standard of "deliberate indifference" to the plaintiffs' alleged medical needs. As demonstrated below, this pleading is woefully short of meeting the requirements to plead a constitutional claim under the Civil Rights Act for inadequate medical care. Equally insufficient are the class allegations relating to the claims of inadequate medical care. Indeed, there is only one specific allegation in the entire complaint (as opposed to generalized conclusory complaints of the degree of treatment received) concerning alleged inadequate medical care. Even in that allegation, i.e. that of plaintiff McWhirter, there is an acknowledgment that he did in fact receive medical treatment and was referred to a specialist. See, Complaint, ¶ 13(b) at pgs. 9-10. Under the prevailing standards relating to Eighth Amendment medical care claims, disagreements with a prescribed treatment regiment are not actionable under the Civil Rights Act since the Civil Rights Act does not federalize medical malpractice claims.

At best, the plaintiffs have alleged a shaky claim (since there is no allegation of any damage) of medical malpractice. Such claims, as a matter of law, do not constitute a basis for an Eighth Amendment cruel and unusual punishment claim relating to inadequate medical care. Accordingly, the named plaintiffs fail to state a claim for relief, thus mandating dismissal of the entire action against the moving defendants.

Moreover, the class allegations are woefully insufficient. The class allegations are nothing more than conclusory recitations of the criteria set forth in Federal Rule 23 without the

required factual allegations of numerosity, common issues of law and fact, typically or adequate representation.   As such, they cannot survive a Rule 12(b)(6) motion.   Accordingly, the Complaint should be dismissed with prejudice as against Drs. Bekele and Kiraly, Mr. Jeffes and physician assistant Loomis.

## II.   **STANDARDS FOR THIS MOTION**

On a motion to dismiss a complaint for failure to state a claim for relief pursuant to Fed. R. C. P. 12(b)(6), all <u>well-pleaded</u> facts in the Amended Complaint are deemed to be true. <u>McNamara v. County Council of Sussex County</u>, 738 F. Supp. 134, 137 (D. Del.), <u>aff'd</u>, 922 F.2d 832 (3d Cir. 1990); <u>Bethlehem Plaza v. Campbell</u>, 403 F. Supp. 966, 967 (E.D. Pa. 1975). However, unsupported conclusions without a factual basis and sweeping conclusions of law cannot be utilized by a plaintiff to defeat a motion to dismiss.  <u>Schatz v. Rosenberg</u>, 943 F.2d 485, 489 (4th Cir. 1991), <u>cert. denied</u>, 112 S.Ct. 1475 (1992); <u>Randolph County Federal Savings & Loan Assn. v. Sutliffe</u>, 775 F. Supp. 1113, 1115-16 (S.D. Ohio 1991). In order to avoid dismissal, a complaint must contain either direct or inferential allegations respecting <u>all</u> the material elements to sustain a recovery under some viable legal theory.  <u>Car Carriers, Inc. v. Ford Motor Co.</u>, 745 F.2d 1101, 1106 (7th Cir. 1984), <u>cert. denied</u>, 470 U.S. 1054 (1985); <u>In re Plywood Antitrust Litigation</u>, 655 F.2d 627, 641 (5th Cir. 1981) <u>cert. dismissed</u>, 462 U.S. 1125 (1983). As stated by the Sixth Circuit:

> [W]e are not holding the pleader to an impossibly high standard; we recognize the policies behind Rule 8 and the concept of notice pleading. A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed,

> would clearly dominate the case, it seems fair to assume that those facts do not exist.

Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 437 (6th Cir. 1988).

In the consideration of a motion to dismiss pursuant to Rule 12(b)(6), the court must limit itself to facts stated in the Complaint, in documents attached to the Complaint, and matters of which judicial notice may be taken under Fed. R. Evid. 201. Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991); Mack v. South Bay Beer Distributors, Inc., 798 F.2d 1279, 1282 (9th Cir. 1986); Commonwealth of Pennsylvania v. Brown, 373 F.2d 771, 778 (3d Cir. 1967).

A motion to strike class allegations pursuant to Rules 23 and 12(b)(6) of the Federal Rules of Civil Procedure should be granted if plaintiff's pleadings do not comport with Rule 23 in that the plaintiff must plead facts sufficient to show that the four requirements of subdivision (a) are satisfied and that the action falls within one of the three categories of subdivision (b).[1] Perrusquia v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 1989 W.L. 121208 (N.D. Ill. 1989) (at *6). "The mere allegation that a proceeding is a class action does not conclusively make it so." Cross v. Oneida Paper Products Co., 117 F.Supp. 919, 921 (D.N.J. 1954); 7 B. Wright &

---

[1]The four criteria for determining whether a class action may proceed are:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims on defenses of the representative parties are typical of the claims or defenses of the class, and

(4)    the representative parties will fairly and adequately protect the interest of the class.

R. 23(a), F.R.C.P.

Miller, Federal Practice & Procedure, §1798 (1986). To justify maintenance of an action as a class action, more is required than merely conclusory allegations in the complaint which parrot the language of the federal rules governing class certification. <u>Ahrene v. Bowen</u>, 646 F. Supp. 1041, 1047 (E.D. N.Y. 1986) (and cases cited therein). In addition, where the named plaintiffs' claims do not state a claim for relief, the class allegations must also be dismissed. <u>Koch v. Stanard</u>, 962 F.2d 605, 607 (7th Cir. 1992).

Under these applicable standards, it is clear that plaintiff's claims purported arising under the Eighth Amendment and 42 U.S.C. §1983 must be dismissed as against Drs. Bekele and Kiraly and Physician Assistant Loomis.

### III. FACTUAL ALLEGATIONS OF THE COMPLAINT AS AGAINST THE MOVING DEFENDANTS

#### A. Factual Allegations Relating To The Named Plaintiffs.

Despite the length of the Complaint, the specific allegations of <u>fact</u> relating to the alleged medical treatment claims are extremely sparse in the Complaint. A review of the Complaint indicates only the following allegations relating to the medical treatment claims which contain any specifics whatsoever:

1. At paragraph 14(b) of the Complaint (at page 9), plaintiffs allege that on September 14, 1999, plaintiff McWhirter began to urinate blood. <u>It is further alleged that he requested and was sent to the medical department where he was seen by a physician and examined.</u> Plaintiff McWhirter was then told that he was referred to a urologist for a subsequent

examination in the latter part of the month to further look into this problem;

2.     At paragraph 17(g) of the Complaint (at page 17), plaintiff Carter alleges that he had a previous back injury for which he had been given extra mattresses and pillows at his prior place of incarceration, but was denied those things initially at SCI-Waymart. However, it is alleged that prior to the filing of this Complaint, <u>plaintiff Carter did in fact receive an extra mattress and pillow</u>;

3.     At paragraph 32 of the Complaint (at page 38), plaintiff complained that another inmate, who was being treated for AIDS, Hepatitis and Herpes was housed with plaintiffs Carter and Carmichael prior to his parole and this inmate frequently was "harking and spitting up sputum...", and that this inmate stayed with plaintiffs Carter and Carmichael <u>until he was sent to the hospital</u>. It further is alleged that this other inmate no longer is housed with Carter and Carmichael;

4.     Plaintiff Campbell alleges that Dr. Bekele, <u>after an examination of Mr. Campbell</u>, refused to permit him to have a series of nerve block injections on the basis that they had previously been ineffective (Complaint, ¶34(b) at p. 40); and

5.     Plaintiff Carmichael alleges that he was examined by Physician Assistant Loomis when he complained of chest pains and arthritic bodily

pain, was given an examination and then given Motrin (Complaint, ¶34(c)). He alleges no further complications.

These allegations are the sum and total of <u>all</u> the specific allegations relating to the medical treatment of the named plaintiffs. The common thread that runs through each of these five allegations is that <u>on each of the occasions complained of plaintiffs were examined and received treatment.</u> While they may not agree with the treatment prescribed, the Complaint merely objects to the prescribed treatment -- not any categorical refusal to examine and treat them. None of the ailments are alleged to be in any way life threatening or anything close to it, but rather consist primarily of minor aches and pains. In the one example of a potentially more serious ailment, i.e., the passing of urinary blood by plaintiff McWhirter, plaintiffs concede that he was seen by a physician, treated and then referred to a urologist. As demonstrated below, these allegations do not even come close to a claim for violation of Eighth Amendment rights for deliberate and wilful indifference to a medical condition despite knowledge of a substantial risk of serious harm. Accordingly, the specific allegations of Eighth Amendment violations by the moving defendants are frivolous and should be dismissed.

**B.    Factual Allegations Relating To Class Status.**

Class allegations are contained in paragraphs 4 through 10 of the Complaint at pages 3-7. Plaintiffs allege that there are an estimated 1,600 inmates who have "suffer[ed] inhumane conditions of confinement and treatment since 1993." (Complaint, ¶6). There is <u>no</u> allegation of how many of the 1600 allegedly received improper medical care. The remaining allegations are <u>purely</u> conclusory, and simply recite the various qualifying criteria of Rule 23 of the Federal Rules of Civil Procedure without any allegations of fact. All of the allegations of satisfaction

of class criteria are thus suspect, including the even numerosity allegation, which is suspect in light of the fact that there is no allegation that this number pertains in any way to persons whose Eighth Amendment right to receive medical treatment has been violated during the class period (allegedly 1993 through the present). There similarly is no allegation of specific facts relating to typicality, since it is clear that any complaints about medical care would be specific to the individual patient unless there is a generalized refusal to treat <u>any</u> ailment -- and that is <u>not</u> alleged in the Complaint. Indeed, the same defect can be said about the allegations of adequacy of representation (Complaint, ¶8). While plaintiffs allege that they are adequate representatives of their class, any inmate with a serious medical complaint would presumably not want to be included in a class dominated by plaintiffs with minor ailments such as those alleged by the plaintiffs. There is no allegation that the defendants have established any medical policies to prohibit any specific treatment regimen or surgical procedure. Accordingly, there will not be any questions of law or fact common to the class nor will the claims of the representative parties by typical of the class or defenses since no policies are implicated. Indeed, an examination of the relevant four elements warranting the use of the class action procedure reveals that all four criteria of Rule 23(a) had not been satisfied by the allegations of the Complaint.

## IV.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE EIGHTH AMENDMENT AND 42 U.S.C. §1983 WITH RESPECT TO INADEQUATE MEDICAL CARE.

The medical care provided to incarcerated inmates is subject to scrutiny under the Eighth Amendment's prohibition against cruel and unusual punishment. <u>Wilson v. Seiter</u>, 501 U.S.

294, 297 (1991).  The relevant inquiry in the context of a medical care claim under the Eighth Amendment is two pronged: "It requires <u>deliberate indifference</u> to a prisoner's <u>serious illness or injury</u>."  <u>Estelle v. Gambel</u>, 429 U.S. 97, 105 (1976) (emphasis added).

In determining "deliberate indifference" by a medical professional or organization in an Eighth Amendment claim, the proper inquiry is whether a prison official "acted or failed to act despite his knowledge of the substantial risk of serious harm."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 842 (1994).  This is typically evidenced when "prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or to deny access to a physician capable of evaluating the need for such treatment."  <u>Monmouth County Correctional Institutional Inmates v. Lanzaro</u>, 834 F. 2d 326, 346 (3d Cir. 1987); <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F. 2d 754, 762 (3d Cir. 1979).  To allege deliberate indifference, plaintiff must assert facts establishing either that his access to physicians for necessary serious medical care was unreasonably delayed or denied, or that prescribed medical treatment was withheld by a plaintiff for the sole purpose of causing plaintiff unnecessary pain.  <u>Gill v. Mooney</u>, 824 F.2d 192, 196 (2d Cir. 1987); <u>Nunez v. Horn</u>, 1999 WL 993706 (N.D.N.Y. 1999).  A medical need is serious under this standard if it is one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize and the necessity for a doctor's attention.  <u>Monmouth County Correctional Institutional Inmates</u>, <u>supra</u>, 834 F.2d 347.  <u>Negligence or malpractice in providing medical care cannot establish a claim under Section 1983 or the Eighth Amendment</u>.  <u>Estelle v. Gamble</u>, <u>supra</u>, 429 U.S. at 105-06; <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 195 (5th Cir. 1993).

Under this standard, the named plaintiffs' claims clearly fail to state a claim for relief under the Eighth Amendment and 42 U.S.C. §1983. As previously described, the examples set forth in the Complaint for lack of medical care relate to an inmate (McWhirter) who passed blood in his urine, but was examined and referred to a urologist. In similar circumstances, this Court has held that where a prisoner was examined and referred to a urologist, there is no Eighth Amendment claim stated as a matter of law. Johnstone v. United States, 980 F. Supp. 148, 152-53 (E.D. Pa. 1997). The remaining allegations merely are those of minor aches and pains for which there was a difference of opinion concerning the need for an extra mattress and pillow, but those items were eventually provided (inmate Carter), the refusal to authorize additional nerve block injections for plaintiff Campbell after they had failed to work and there was a subsequent examination, and the treatment of Carmichael when he complained of experienced chest pains and body pains and was examined and given Motrin. There is no allegation that any of these conditions constituted a situation of serious medical need nor that any of these inmates were categorically denied treatment. In short, the two elements required to support "even the most slender inference of deliberate indifference," are completely absent. Johnstone v. United States, supra, 980 F. Supp. at 153, citing, Estelle, supra, 429 U.S. at 105-06. A mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis and the treatment which the inmate receives does not support a claim of cruel and unusual punishment. Johnstone v. United States, supra at 153. Also see, Ramos v. Lamm, 639 F. 2d 559, 575 (10th Cir. 1980); cert. denied, 450 U.S. 1041 (1981). Accordingly, the Eighth Amendment medical maltreatment claims against the moving defendants should be dismissed with prejudice.

## V.    THE CLASS ALLEGATIONS ARE INSUFFICIENT
   TO SURVIVE A MOTION TO DISMISS.

While no greater particularity is necessary for stating a claim for relief in a class action

than in other contexts, the plaintiff's pleadings must comport with Rule 23 and plead <u>facts</u>

sufficient to show that the four requirements of subdivision (a) are satisfied and that the action

falls within one of the three categories of subdivision (b). <u>Perrusquia v. Merrill, Lynch, Pierce,</u>

<u>Fenner & Smith, Inc.</u>, <u>supra</u>; <u>Moore v. Louisville Downs, Inc.</u>, 1973 W.L. 299 (W.D.K.Y.

1973).[2]

The first of the four factors in Rule 23(a) is whether the class is so numerous that joinder

of all members is impracticable.  Plaintiffs allege an estimated 1,600 inmates who have

"suffered inhumane conditions of confinement and treatment since 1993" (Complaint, ¶6), but

there is no allegation as to how many of these inmates allegedly suffered inadequate medical

care warranting an Eighth Amendment scrutiny.  There is no allegation whatsoever of any

official policy to deny treatment, but as with the claims of the individual defendants, the class

allegations reflect nothing more than a conclusory recitation of the elements of a claim.  Indeed,

in the entire section of class action allegations (pages 3-7 of the Complaint), plaintiffs allege

merely that there is an existence of a question of law and fact as to "whether plaintiffs and the

proposed class are being provided proper or adequate medical care and treatment" (Complaint,

¶7(a)), whether the class members are entitled to medical monitoring at defendant's expense

(Complaint, ¶7(u)) and that defendants have allegedly engaged in "a knowing disregard of

---

[2]A determination of the sufficiency of the class allegations is warranted inasmuch as Rule 23 requires that "as soon as practicable after the commencement of an action brought as a class action, the court shall determine whether it is to be so maintained." F.R.C.P. 23(c)(1).

excessive risk to plaintiff's health and safety." (Complaint, ¶3). These conclusory allegations are clearly insufficient to create an issue of any potential issue of fact concerning established policies constituting a deliberate indifference to the prisoner's serious illness or injury. Absent allegations of any policy to deny treatment nor specific allegations of the number of inmates who have been adversely affected by any such policy, the numerosity requirement is insufficient as a matter of law.

The same deficiency applies to question of law or fact common to the class. Indeed, there are no specified issues of law or fact common to the class -- all there is are allegations relating to the alleged medical treatment of four named plaintiffs, none of whom had experienced serious illness or injury. Again, absent the allegations of any established policy to deny treatment to the class, there is nothing by which a court can conclude that there are issues of law or fact common to the class. The conclusory allegations set forth in the Complaint do not meet plaintiff's burden.

The third criterion is whether the claims of the representative parties are typical of the claims of the class. It is impossible to tell whether plaintiffs are representative since their personal claims (which are not sufficient in and of themselves) do not set forth any policy which would affect the class as a whole. Whether the Moving Defendants initially agreed to provide extra pillows and mattresses to one inmate, continue a nerve block injection which had been unsuccessful in the past, set up a urologist appointment for a third inmate which had not occurred apparently at the time of the filing of the pleading, or gave an inmate complaining of body aches Motrin does not lead to any conclusion that these claims are representative of the claims of a much greater class. Thus, the commonality aspect is absent from the Complaint.

Finally, it is almost inconceivable that these plaintiffs can adequately represent the class, since their own complaints are so minor and insufficient to state serious constitutional violations. Accordingly, the class allegations with respect to Eighth Amendment inadequate medical care claims do not meet the standards of Rules 23 and 12(b)(6) and should be dismissed.

## VI.     **CONCLUSION**

For all the reasons set forth herein, it is respectfully requested that the Complaint as against the moving defendants be dismissed with prejudice.

SILVERMAN BERNHEIM & VOGEL

BY: _____

LAWRENCE M. SILVERMAN, ESQUIRE
JONATHAN J. BART, ESQUIRE
2 Penn Center Plaza
Suite 910
Philadelphia, PA 19102
(215) 569-0000

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, et al.,                      :

     Plaintiffs,                          :

     v.                                   :         No. 99-6517

MARTIN HORN, COMMISSIONER,                :         (Judge Brody)

DEPT. OF CORRECTIONS, et al.,        :

     Defendants                           :

---

ORDER

AND NOW, this_____ day of _____, 2000, upon
consideration of Plaintiffs' motion in opposition to Commonwealth
defendants' motion to transfer, it is hereby ordered that the
motion is GRANTED.  It is further ordered that Commonwealth
Defendants shall file an answer or otherwise plead to this
complaint within twenty days following Commonwealth defendants'
counsel being notified by the Clerk of Court in the Eastern
District that the case has been stayed and docketed in the Eastern
District of Pennsylvania.

 

_____

Anita B. Brody,    J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, et al.,
        Plaintiffs

        v.                                          No. 99-CV-6517
                                                    (Judge Brody)
MARTIN HORN,et al.,
DEPT. OF CORRECTIONS, et al.,
        Defendants

_____

PLAINTIFFS' MOTION IN OPPOSITION TO
COMMONWEALTH DEFENDANTS' MOTION TO TRANSFER

        Plaintiffs, John Carter, Jimmy McWhirter, Mariano Pellot,
David Campbell, and Arthur Carmichael, Pro se, and pursuant to 28
U.S.C. § 1331, and § 1391(a)(1),(2), request this Court to deny
Commonwealth defendants' motion to transfer this case to the Middle
District of Pennsylvania;  And, in support of this motion set forth
the following facts:
        1.      Plaintiffs are prisoners at the
State Correctional Institution at Waymart (SCI-Waymart), located in
Wayne County, Pennsylvania. complaint names Eighteen defendants; Of
which, Thirteen are Commonwealth defendants, and five defendants
are contracted via the Corrections Physicians Services, Inc.,
Defendants Martin Horn and Jeffrey A.
 Beard are employed by the Department of Corrections located in
Camp Hill, Pennsylvania.  Defendants Colleran, Wynder, Shemo,
Paterson, DelRosso, Chipego, Friedman, Patterson, Booth and herbert
are employees of the Department of Corrections, and assigned to
SCI-Waymart.  Defendant Sobotor is presently an employee of the
Department of Corrections assigned to the State Correctional
Institution at Chester, delaware County, Pennsylvania.
        2.      Plaintiffs' complaint alleges unconstitutional
conditions of confinement at SCI-Waymart.
        3.      Defendants allege that, but for Defendant Sobotor, all
other Commonwealth defendants carry out their official duties, aand
reside in the Middle District of Pennsylvania.
        4.      All of the events that gave rise to this suit occurred
within the Eastern District of Pennsylvania; And, **not the Middle
District of Pennsylvania**.
        WHEREFORE, this action should be stayed to remain in the
Eastern District of Pennsylvania where venue properly lies: since
ALL defendants, but for the named three, carry out their official
duties within the Eastern District of Pennsylvania;  And, in which,
Plaintiffs have alleged in their complaint the incidents occured,
as well as were located.

Respectfully submitted.

PLAINTIFFS PRO. PER.:

*John Carter*
John Carter

*Jimmy McWhirter*
Jimmy McWhirter

*Mariano Pellot*
Mariano Pellot

*David L. Campbell*
David Campbell

*Arthur Carmichael*
Arthur Carmichael

By: Arthur Carmichael
    P.O. Box 256
    Waymart, Pa. 18472-0256

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
JOHN CARTER, et al.,              :
            Plaintiffs            :
        V.                        :        No.  99-CV-6517
MARTIN HORN, COMMISSIONER         :        (Judge Brody)
DEPT. OF CORRECTIONS, et al.,     :
            Defendants            :
```

## CERTIFICATE OF SERVICE

I, Arthur Carmichael, Plaintiff in the above titled action, hereby certify that on this date I caused to be served the Foregoing, **Motion in Opposition To Commonwealth Defendants' Motion To Transfer** by depositing a copy of same in the United States mail, postage prepaid, in SCI-Waymart, Pa., addressed to the following:

Seath A. Mendelsohn (DAG)
Office of Attorney General
15th Flr., Strawberry Sq.
Harrisburg, PA  17120

By:  Arthur Carmichael
     # DD-0875
     P.O. Box 256
     Waymart, PA 17842-0256

DATED:  2-28-         ,2000 c.e.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT F PENNSYLVANIA

JOHN CARTER, ET AL.,                          :

        Plaintiffs                            :

        V.                                    :        NO. 99-CV-6517

MARTIN HORN, COMMISSIONER,      F I L E D        (Judge Brody)

DEPT. OF CORRECTIONS, et al.,                 :

        Defendants                                    6 2000

                                              KUNZ Clerk

                                              . Clerk

_____

BRIEF IN SUPPORT OF PLAINTIFFS' MOTION

@        IN OPPOSITION TO COMMONWEALTH DEFENDANTS'

MOTION TO TRANSFER

STATEMENT OF THE CASE

        This is a civil rights case for damages and injunctive relief
brought pursuant to 42 U.S.C. § 1983 by Plaintiffs proceeding Pro
se, and alleging unconstitutional conditions  of confinement at the
State Correctional Institution at Waymart, located  in Wayne County
,Pennsylvania( SCI-Waymart).  Plaintiff seeks class action
certification.

        Plaintiffs' complaint names thirteen Commonwealth defendants,
of which defendants, Martin Horn and Jeffrey A. Beard are employed
by the Department of Corrections located in Camp Hill, Cumberland
County, Pennsylvania.  Defendants Colleran, Wynder, Shemo,
Patterson, DelRosso, Chipego,  Friedman, Patterson, Booth, and
Herbert are employees of the Department of corrections and assigned
to the SCI-Waymart, i Wayne County,PA.  Defendant Gerald Sobotor is

is an employee of the Department of Corrections assigned to the
State Correctional Institution at Chester, Delaware County,
Pennsylvania.

On February 17,2000, Commonwealth defendants filed a motion
to transfer plaintiffs' case to the United States District Court
for the MIddle District of Pennsylvania/ along with a supporting
brief.

ARGUMENT

PLAINTIFFS' CASE SHOULD NOT BE TRANSFERRED

TO THE MIDDLE DISTRICT OF PENNSYLVANIA

The Defendants claim that," for the convenience of parties and
witnesses, in the interest of justice", this Court may transfer an
action, if it could have been brought in the proposed forum; And,
that the transfer would promote the convenience of the parties'
witness and would be in the interest of justice.

Plaintiffs suggest that there must be an express statutory
grant as a condition precedent to the initiation of transfer of any
cause from one Federal Court to another, and every essential factor
must be present to confer jurisdiction on the Court to which the
case is sent. See Felchlin V. American smelting S Refining Co.,
D.C. Cal. (1955) 136 F. Supp. 577.
Plaintiffs maintain that whether their complaint could have  been
brought in the Middle District is left to the discretion of the
Eastern District Court, wherein plaintiffs filed their complaint;
And, since all allegations in plaintiffs' complaint arose out of
SCI-Waymart, which is located in the Eastern District;  And, since

_ 2 _

all of the Commonwealth defendants, but two (Horn and Beard), at
the time of the events giving rise to plaintiffs' claims
occured were performing their official duties at SCI-Waymart, in
the Eastern District of Pennsylvania; Thus, venue is properly
established in the Eastern District Court.   Defendant Sobotor,
previously employed at SCI-Waymart, at the time relevant to
Plaintiffs' cause of action, and was re-assigned to the State
Correctional Institution at Chester, Delaware County,
Pennsylvania. Thus Plaintiffs maintain that Venue is proper as to
all, but defendants Horn and Beard. See 28 U.S.C. § 1391(a)(1) (a
Judicial District where any defendants reside in the same State).
28 U.S.C.§ 1391 § (b)(2) (a JUdicial District i which a substantial
part of the events or omissions giving rise to the claim occurred .

    Judicial power under this section  transferring jurisdiction
may only be exercised in strick accordance with statutory
grant. See  Puget Sound Tug S Barge Co. V. The Go Getter,
D.C. (1952) 106 F.Supp. 492; AIso, Hendricks Vs. Alcoa
S.S. Co.,D.C. (1962) 206 F.Supp 693.

    No federal  District Court has inherent authority to transfer
a cause of cause of action  to another District, and there must be
express statutory grant as a condition president to initiation of
transfer, and every essential factor must be present or District
Court t which papers are sent will not acquire
jurisdiction. U.S. VS. 11 Cases, More or less,
Ido-Pheno-Chon,D.C. or (1950) 94 F. Supp.925.

    Despite Commonwealth defendants contention that ALL, the

Commonwealth defendants reside in the Middle District: there is
nothing to show that the Middle District would be more convenient
for any of the parties, therefore, there is no need to transfer
plaintiffs' action to the Middle District Court. See Union
Pac. R. Co. VS. Woodahl, D.C. Mont. (1970) 308 F.Supp. 1002.

In the interest of justice this court may transfer any civil
action to any district or division where it might have been
brought;  However, before motion to transfer may be granted it must
appear that conditions necessary to satisfy the special venue
provision existed on date action was commenced. See Illinois
Scientific Development, Inc., VS. Sirica, (1968) $!) F.2d 237,133
U.S. App. D.C. 249;  Also, National Equipment Rental Limited
VS. Fowler, C.A. 2 (N.Y.)(9161) 287 F.2d 43.

The Defendants have suggested that the Middle District is the
more convenient forum;  And, they cite the various factors to be
considered, based upon identifiable factors set forth by the
Supreme Court in Gulf Oil Corp, V. Gilbert, 330 U.S. 501
(1947)(citing factors to be considered if a case should be
transfered); And, among those factors stated are;
1.  Private Interest, which include choice of forum of the
plaintiff, ease of access to sources of proof, availability of
compulsory process over unwilling witnesses . the coat of
attendance of willing witnesses, obstacles to a fair trial, and the
possibility of a jury view of the premises..
The Public Interest, include court congestion and other

administrative difficulties, placing the burden of jury duty on those having the closest ties to the action, local interest in having the matter adjudicated at home and familiarity of the forum court with the applicable law;  And the Commonwealth defendants claim that consideration of these factors show that this matter should be transferred to the Middle District of Pennsylvania. And, Plaintiffs Disagree.

The Commonwealth defendants claim that plaintiffs choice of forum **should be given less deference** because the Eastern district is not the plaintiffs' "home turf";  And, that as inmates incarcerated in SCI-waymart, they are located in the Middle District. Plaintiffs disagree with such analogy; Because,

(a). Plaintiffs did not choose the Eastern District Forum, because it was, or was not plaintiffs' "home turf"; On the contrary, Plaintiffs choice of the Eastern District Court was based on the fact that because all of the alleged incidents set forth in plaintiffs' complaint occurred in SCI-Waymart, which is located in the Eastern District of Pennsylvania;  Moreover, plaintiffs still contend that as inmates imprisoned at SCI-Waymart, they are located in the Eastern District of Pennsylvania: causing venue to properly lie in the Eastern District Court of Pennsylvania.

Even assuming arguendo, that some private interest for the Commonwealth defendants might favor the Middle District: the interest of justice would disfavor a transfer of this action to the Commonwealth defendants'"home turf; Because, since plaintiffs allegations in their complaint stem from conditions of confinement

while at SCI-Waymart, would certainly present a great obstacle to

plaintiffs being able to select a fair and impartial jury, from

among those citizens residing in Wayne County, whereat most of

those citizens are either employees working at SCI-Waymart, have

relatives working therein, or have friends and/ or associates who

are  employed therein; And,  especially, when the citizens of Wayne

County are dependent upon the jobs allocated to Wayne County

citizens, in order to maintain economic stability.  Consequently,

plaintiffs suggest that in the instant case, placing the burden of

jury duty on those having the closest ties to the action, where res

ipso loquitur, that local interest in having the matter adjudicated

on Commonwealth defendants' "home turf", in view of the plaintiffs'

allegations of unconstitutional conditions of confinement at

SCI-Waymart, where many of the Wayne County Citizens are employeed

by the Department of corrections: would cause plaintiffs to suffer

a manifest injustice under the law. Therefore consideration of this

vital factor/s/  shows that this cause of action should remain in

the Eastern District.

     Plaintiffs suggest that as to any documents or witnesses from

any of the entities located in the Middle District where, as

Commonwealth defendants assert that compulsory process would not be

available: plaintiffs suggest that those are conclusions  of law

to which no response is required; Because, plaintiffs believe that

such a determination is left to the discretion of this Court;

Moreover, as to the cost of witnesses to attend trial: then

plaintiffs pray the Court will consider the fact that the

Commonwealth defendants' witnesses, and not the plaintiffs'

witnesses will be presented with costs of producing said witnesses to a trial of this action; Contrariwise, as to any witnesses plaintiffs may have cause to testify at a trial, could be done by way of either sworn declarations and/ or depositions.

Transportation of plaintiffs to trial would of necessity cause the Commonwealth to bear the expense, and rightly so:  since plaintiffs are wards of the Commonwealth, and Legislature provides for such transportation of inmates.  Furthermore, plaintiffs maintain that where they have filed a meritorious complaint, which they are prepared to present substantial evidence in support of their claims, then the interest  of justice  demands that "money is no object" where, as in the case  of plaintiffs, rights guaranteed under the United States Constitution has been wantonly violated. Consequently, this action should not be transferred to the Middle District;  Accordingly, the Eastern District of Pennsylvania is the more appropriate forum for this action.

<u>CONCLUSION</u>

For the above reasons, the action should be stayed and remain
in the Eastern District of Pennsylvania.


Respectfully submitted,

PLAINTIFFS <u>PRO. PER.</u>:

John Carter

Jimmy McWhirter

Mariano Pellot

David campbell

Arthur Carmichael


By: Arthur carmichael

P.O. Box 256

Waymart, Pa. 18472-0256,,


— — 8 — —

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN CARTER, et al., | : | |
| Plaintiffs, | : | |
| v. | : | No. 99-6517 |
| MARTIN HORN, COMMISSIONER, | : | (Judge Brody) |
| DEPT. OF CORRECTIONS, et al., | : | |
| Defendants | : | |

## ORDER

AND NOW, this_____ day of _____, 2000, upon consideration of Plaintiffs' motion in opposition to Commonwealth defendants' motion to transfer, it is hereby ordered that the motion is GRANTED. It is further ordered that Commonwealth Defendants shall file an answer or otherwise plead to this complaint within twenty days following Commonwealth defendants' counsel being notified by the Clerk of Court in the Eastern District that the case has been stayed and docketed in the Eastern District of Pennsylvania.

_____

Anita B. Brody,    J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, et al.,           :
        Plaintiffs             :
    v.                         :        No. 99-CV-6517
MARTIN HORN, et al.,           :        (Judge Brody)
DEPT. OF CORRECTIONS, et al.,  :
        Defendants             :

_____

PLAINTIFFS' MOTION IN OPPOSITION TO
COMMONWEALTH DEFENDANTS' MOTION TO TRANSFER

        Plaintiffs, John Carter, Jimmy McWhirter, Mariano Pellot,
David Campbell, and Arthur Carmichael, Pro se, and pursuant to 28
U.S.C. § 1331, and § 1391(a)(1),(2), request this Court to deny
Commonwealth defendants' motion to transfer this case to the Middle
District of Pennsylvania;  And, in support of this motion set forth
the following facts:
        1.      Plaintiffs are prisoners at the
State Correctional Institution at Waymart (SCI-Waymart), located in
Wayne County, Pennsylvania. complaint names Eighteen defendants; Of
which, Thirteen are Commonwealth defendants, and five defendants
are contracted via the Corrections Physicians Services, Inc.,
Defendants Martin Horn and Jeffrey A.
 Beard are employed by the Department of Corrections located in
Camp Hill, Pennsylvania.  Defendants Colleran, Wynder, Shemo,
Peterson, DelRosso, Chipego, Friedman, Patterson, Booth and herbert
are employees of the Department of Corrections, and assigned to
SCI-Waymart.  Defendant Sobotor is presently an employee of the
Department of Corrections assigned to the State Correctional
Institution at Chester, delaware County, Pennsylvania.
        2.      Plaintiffs' complaint alleges unconstitutional
conditions of confinement at SCI-Waymart.
        3.      Defendants allege that, but for Defendant Sobotor, all
other Commonwealth defendants carry out their official duties, aand
reside in the Middle District of Pennsylvania.
        4.      All of the events that gave rise to this suit occurred
within the Eastern District of Pennsylvania; And, not the Middle
District of Pennsylvania.
        WHEREFORE, this action should be stayed to remain in the
Eastern District of Pennsylvania where venue properly lies; since
ALL defendants, but for the named three, carry out their official
duties within the Eastern District of Pennsylvania;  And, in which,
Plaintiffs have alleged in their complaint the incidents occured,
as well as were located.

Respectfully submitted.

PLAINTIFFS PRO. PER.:

*John Carter*
John Carter

*Jimmy McWhirter*
Jimmy McWhirter

*Mariano Pellot*
Mariano Pellot

*David Campbell*
David Campbell

*Arthur Carmichael*
Arthur Carmichael

By: Arthur Carmichael
    P.O. Box 256
    Waymert, Pa. 18472-0256

~ 2 ~

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT F PENNSYLVANIA

JOHN CARTER, ET AL.,                  :

      Plaintiffs                        :

    V.                                    :        NO. 99-CV-6517

MARTIN HORN, COMMISSIONER,            :        (Judge Brody)

DEPT. OF CORRECTIONS, et al.,         :

      Defendants                         :

---

BRIEF IN SUPPORT OF PLAINTIFFS' MOTION

@    IN OPPOSITION TO COMMONWEALTH DEFENDANTS'

MOTION TO TRANSFER

STATEMENT OF THE CASE

    This is a civil rights case for damages and injunctive relief brought pursuant to 42 U.S.C. § 1983 by Plaintiffs proceeding Pro se, and alleging unconstitutional conditions  of confinement at the State Correctional Institution at Waymart, located  in Wayne County ,Pennsylvania( SCI-Waymart).  Plaintiff seeks class action certification.

    Plaintiffs' complaint names thirteen Commonwealth defendants, of which defendants, Martin Horn and Jeffrey A. Beard are employed by the Department of Corrections located in Camp Hill, Cumberland County, Pennsylvania.   Defendants Colleran, Wynder, Shemo, Patterson, DelRosso, Chipego,  Friedman, Patterson, Booth, and Herbert are employees of the Department of corrections and assigned to the SCI-Waymart, i Wayne County,PA.  Defendant Gerald Sobotor is

is an employee of the Department of Corrections assigned to the State Correctional Institution at Chester, Delaware County, Pennsylvania.

On February 17,2000, Commonwealth defendants filed a motion to transfer plaintiffs' case to the United States District Court for the MIddle District of Pennsylvania/ along with a supporting brief.

## ARGUMENT

### PLAINTIFFS' CASE SHOULD NOT BE TRANSFERRED

### TO THE MIDDLE DISTRICT OF PENNSYLVANIA

The Defendants claim that," for the convenience of parties and witnesses, in the interest of justice", this Court may transfer an action, if it could have been brought in the proposed forum; And, that the transfer would promote the convenience of the parties' witness and would be in the interest of justice.

Plaintiffs suggest that there must be an express statutory grant as a condition precedent to the initiation of transfer of any cause from one Federal Court to another, and every essential factor must be present to confer jurisdiction on the Court to which the case is sent. See Felchlin V. American smelting S Refining Co., D.C. Cal. (1955) 136 F. Supp. 577.

Plaintiffs maintain that whether their complaint could have been brought in the Middle District is left to the discretion of the Eastern District Court, wherein plaintiffs filed their complaint; And, since all allegations in plaintiffs' complaint arose out of SCI-Weymart, which is located in the Eastern District;  And, since

- 2 -

all of the Commonwealth defendants, but two (Horn and Beard), at
the time of the events giving rise to plaintiffs' claims
occured were performing their official duties at SCI-Waymart, in
the Eastern District of Pennsylvania; Thus, venue is properly
established in the Eastern District Court.  Defendant Sobotor,
previously employed at SCI-Waymart, at the time relevant to
Plaintiffs' cause of action, and was re-assigned to the State
Correctional Institution at Chester, Delaware County,
Pennsylvania. Thus Plaintiffs maintain that Venue is proper as to
all, but defendants Horn and Beard. See 28 U.S.C. § 1391(a)(1) (a
Judicial District where any defendants reside in the same State).
28 U.S.C.§ 1391 § (b)(2) (a JUdicial District i which a substantial
part of the events or omissions giving rise to the claim occurred .

Judicial power under this section  transferring jurisdiction
may only be exercised in strick accordance with statutory
grant. See  Puget Sound Tug S Barge Co. V. The Go Getter,
D.C. (1952) 106 F.Supp. 492; Also, Hendricks Vs. Alcoa
S.S. Co.,D.C. (1962) 206 F.Supp 693.

No federal  District Court has inherent authority to transfer
a cause of cause of action  to another District, and there must be
express statutory grant as a condition president to initiation of
transfer, and every essential factor must be present or District
Court t which papers are sent will not acquire
jurisdiction. U.S. VS. 11 Cases, More or less,
Ido-Pheno-Chon,D.C. or (1950) 94 F. Supp.925.

Despite Commonwealth defendants contention that ALL, the

— 3 —

Commonwealth defendants reside in the Middle District; there is
nothing to show that the Middle District would be more convenient
for any of the parties, therefore, there is no need to transfer
plaintiffs' action to the Middle District Court. See Union
Pac. R. Co. VS. Woodahl, D.C. Mont. (1970) 308 F.Supp. 1002.

In the interest of justice this court may transfer any civil
action to any district or division where it might have been
brought;  However, before motion to transfer may be granted it must
appear that conditions necessary to satisfy the special venue
provision existed on date action was commenced. See Illinois
Scientific Development, Inc., VS. Sirica, (1968) $!) F.2d 237,133
U.S. App. D.C. 249;  Also, National Equipment Rental Limited
VS. Fowler, C.A. 2 (N.Y.)(9161) 287 F.2d 43.

The Defendants have suggested that the Middle District is the
more convenient forum;  And, they cite the various factors to be
considered, based upon identifiable factors set forth by the
Supreme Court in Gulf Oil Corp, V. Gilbert, 330 U.S. 501
(1947)(citing factors to be considered if a case should be
transfered); And, among those factors stated are;
1.  Private Interest, which include choice of forum of the
plaintiff, ease of access to sources of proof, availability of
compulsory process over unwilling witnesses . the cost of
attendance of willing witnesses, obstacles to a fair trial, and the
possibility of a jury view of the premises..
The Public Interest, include court congestion and other

administrative difficulties, placing the burden of jury duty on those having the closest ties to the action, local interest in having the matter adjudicated at home and familiarity of the forum court with the applicable law;  And the Commonwealth defendants claim that consideration of these factors show that this matter should be transferred to the Middle District of Pennsylvania. And, Plaintiffs Disagree.

The Commonwealth defendants claim that plaintiffs choice of forum should be given less deference because the Eastern district is not the plaintiffs' "home turf";  And, that as inmates incarcerated in SCI-waymart, they are located in the Middle District. Plaintiffs disagree with such analogy; Because,

(a). Plaintiffs did not choose the Eastern District Forum, because it was, or was not plaintiffs' "home turf"; On the contrary, Plaintiffs choice of the Eastern District Court was based on the fact that because all of the alleged incidents set forth in plaintiffs' complaint occurred in SCI-Waymart, which is located in the Eastern District of Pennsylvania;  Moreover, plaintiffs still contend that as inmates imprisoned at SCI-Waymart, they are located in the Eastern District of Pennsylvania; causing venue to properly lie in the Eastern District Court of Pennsylvania.

Even assuming arguendo, that some private interest for the Commonwealth defendants might favor the Middle District: the interest of justice would disfavor a transfer of this action to the Commonwealth defendants'"home turf; Because, since plaintiffs allegations in their complaint stem from conditions of confinement

while at SCI-Waymart, would certainly present a great obstacle to plaintiffs being able to select a fair and impartial jury, from among those citizens residing in Wayne County, whereas most of those citizens are either employees working at SCI-Waymart, have relatives working therein, or have friends and/ or associates who are  employed therein; And,  especially, when the citizens of Wayne County are dependent upon the jobs allocated to Wayne County citizens, in order to maintain economic stability.  Consequently, plaintiffs suggest that in the instant case, placing the burden of jury duty on those having the closest ties to the action, where res ipso loquitur, that local interest in having the matter adjudicated on Commonwealth defendants' "home turf", in view of the plaintiffs' allegations of unconstitutional conditions of confinement at SCI-Waymart, where many of the Wayne County Citizens are employeed by the Department of corrections: would cause plaintiffs to suffer a manifest injustice under the law. Therefore consideration of this vital factor/s/  shows that this cause of action should remain in the Eastern District.

Plaintiffs suggest that as to any documents or witnesses from any of the entities located in the Middle District where, as Commonwealth defendants assert that compulsory process would not be available: plaintiffs suggest that those are conclusions  of law to which no response is required; Because, plaintiffs believe that such a determination is left to the discretion of this Court; Moreover, as to the cost of witnesses to attend trial: then plaintiffs pray the Court will consider the fact that the Commonwealth defendants' witnesses, and not the plaintiffs'

witnesses will be presented with costs of producing said witnesses
to a trial of this action; Contrariwise, as to any witnesses
plaintiffs may have cause to testify at a trial, could be done by
way of either sworn declarations and/ or depositions.

Transportation of plaintiffs to trial would of necessity cause
the Commonwealth to bear the expense, and rightly so:  since
plaintiffs are wards of the Commonwealth, and Legislature provides
for such transportation of inmates.  Furthermore, plaintiffs
maintain that where they have filed a meritorious complaint, which
they are prepared to present substantial evidence in support of
their claims, then the interest  of justice  demands that "money is
no object" where, as in the case  of plaintiffs, rights guaranteed
under the United States Constitution has been wentonly
violated. Consequently, this action should not be transferred to
the Middle District;  Accordingly, the Eastern District of
Pennsylvania is the more appropriate forum for this action.

_ 7 _

## CONCLUSION

For the above reasons, the action should be stayed and remain

in the Eastern District of Pennsylvania.


Respectfully submitted,

PLAINTIFFS PRO. PER.:

*John Carter*

John Carter

*Jimmy McWhirter*

Jimmy McWhirter

*Mariano Pellot*

Mariano Pellot

*David Campbell*

David campbell

*Arthur Carmichael*

Arthur Carmichael


By: Arthur carmichael

P.O. Box 256

Waymart, Pa. 18472-0256,,


— — 8 —

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, et al.,            :
        Plaintiffs              :
        v.                      :       No.  99-CV-6517
MARTIN HORN, COMMISSIONER       :       (Judge Brody)
DEPT. OF CORRECTIONS, et al.,   :
        Defendants              :

---

CERTIFICATE OF SERVICE

I, Arthur Carmichael, Plaintiff in the above titled action,
hereby certify that on this date I
caused to be served the Foregoing, **Motion in Opposition To
Commonwealth Defendants' Motion To Transfer** by depositing a copy of
same in the United States mail, postage prepaid, in SCI-Waymart,
Pa., addressed to the following:

        Seath A. Mendelsohn (DAG)
        Office of Attorney General
        15th Flr., Strawberry Sq.
        Harrisburg, PA  17120

                By:   Arthur Carmichael
                      # DO-0875
                      P.O. Box 256
                      Waymart, PA 17842-0256

DATED: 2-28-        ,2000 c.e.



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, <u>et al.</u>,                    :

        <u>Plaintiffs</u>                    :

      V.                    :        Civil ACTION No. 99-CV-6517

MARTIN HIRN, COMMISSIONER,        :        ( Judge Brody )

DEPT. OF CORRECTIONS, <u>et al.</u>,    :

        Defendants                    ;

---

<u>ORDER</u>

    <u>AND NOW,</u>  this _____, day of _____, 2000

upon consideration of Plaintiffs' **Declaration In Opposition to the Motion**

**of Taṃrat Bekele, M.D., Laslo Kiraly, M.D., Glen Jeffes, and Janan Loomis,** to Dismiss

Plaintiffs' complaint against them pursuant to Rule 12(b)(¢)  of the Federal

Rules of Civil Procedure,  it is **ORDERED**  that the Motion is **DENIED** .

BY THE COURT

_____

                       J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, et al.,          :
          Plaintiffs          :
                              :
     VS.                      :      Civil Action NO. 99-CV-6517
                              :
MARTIN HORN, COMMISSIONER     :      ( Judge Brody )
DEPT. OF CORRECTIONS,et al.,  :
          Defendants          :

**FILED**

MAR 1 3 2000

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

PLAINTIFFS'' MOTION IN OPPOSITION TO MOTION
OF TAMRAT BEKELE,M.D., LAZSLO KIRALY,M.D.,
GLEN JEFFES, AND JANAN LOOMIS TO DISMISS THE COMPLAINT

     Plaintiffs John Carter, Jimmy McWhirter, Mariano Pellot, David Campbell
and Arthur Carmichael, hereby move this Court to deny the moving defendants'
Motion to dismiss Plaintiffs' complaint;  And, in support of this motion,
Plaintiffs incorporate by reference the attached Memorandum of Law.

                    JOHN CARTER,et al.

BY PLAINTIFF:   _Arthur Carmichael_
                Arthur Carmichael Pro.Per.
                DD - 0875

                P.O. Box 256
                Waymart,  PA  18472-0256

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, et al.,                    :

      Plaintiffs               :

    V.                                 :    No.   99-CV-6517

MARTIN HORN, COMMISSIONER,              :    ( Judge Brody )

DEPT. OF CORRECTIONS, et al.,           :

      Defendants               :

**FILED**

MAR 1 3 2000

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

---

MEMORANDUM OF LAW

IN SUPPORT OF PLAINTIFFS MOTION IN OPPOSITION TO MOTION

OF TAMRAT BEKELE,M.D., LAZSLO KIRALY,M.D., GlEN JEFFES, AND JANAN LOOMIS

TO DISMISS PLAINTIFFS" COMPLAINT PURSUANT TO 12(b)(6),Fed.R.Civ.P.

      Plaintiffs John carter, Jimmy McWhirter, Mariano Pellot, David Campbell, Arthur Carmicheal,and all others similarly situated at SCI-Waymart (collectively referred to herein as " Plaintiffs " ), respectfully submit this Memorandum of Law in Support of their Motion to Deny the Motion to Dismiss Plaintiffs' Complaint of Tamrat Bekele,et al.,(hereinafter " Moving Defendants ").

      Plaintiffs  proceeding pro se have brought this civil rights action against  the named defendants alleging among other claims: violations of Plaintiffs' Eight Amendment right to be free of cruel and unusual punishment relating to plaintiffs' incarceration .

      The Moving Defendants are two privately employed  doctors (Drs. Bekele and Kiraly), both of whom perform medical services at the State Correctional

Institution in Waymart, Pennsylvania( "SCI-Waymart" ),a medical administrator

(Jeffes) and a Physician's Assistant, Ms. Loomis.

The Moving Defendants, in their Preliminary Statement, claims that the allegations against them tend to be no more than many conclusory recitations continually repeated of legal standard of "deliberate indifference" to plaintiffs aleged medical needs. Plaintiffs disagree that their allegations are but repetitious conclusory recitations; Nor, does Plaintiffs' pleading fall short of the requirements to plead a constitutional claim under the Civil Rights Act for inadequate medical care. Plaintiffs maintain that in their Complaint, ¶ 14(A)and (B) at pgs.9-10; Also,¶¶ 31-36 at pgs.38-43, they have sufficiently alleged factual acts or omissions which were harmful enough to evidence deliberate indifference by the Moving Defendants; And, which therefore states a cognizable claim under the Civil Rights Act.

The Moving Defendants claim that as opposed to generalized conclusory complaints of the degree of treatment received, that otherwise only one specific allegation in the entire complaint concerning inadequate medical care, i.e. that of plaintiff McWhirter. Plaintiffs disagree; Because, the Moving Defendants failed to take proper note of the fact that while it is true that on September 14, 1999, Plaintiff McWhirter did see a Physician, relating to his urinating blood: at that time the only treatment accorded McWhirter, was a review of his medical jacket, where the Physician found that plaintiff McWhirter had been given a blood-count months before when said blood count was deemed sufficiently controlled; And, further promised that McWhirter would be seeing a Urologist in latter part of September; However, no further examination was given Plaintiff McWhirter: and the blood-flow continued well into October.

Aside from that one specific allegation, plaintiffs have set forth numerous valid inadequate medical care and treatment claims, under the paragraphs and pages set forth above, and reallege herein as if fully set forth, which plaintiffs suggests fall under the prevailing standards relating to Eight Amendment medical care claims.'

Plaintiffs maintain that inasmuch as they have not had an opportunity to effect Discovery, in order to more fully give weight to their claims.

The Moving Defendants alluding to the fact that plaintiffs' medical care claims as being "disagreements" with a prescribed treatment regiment , not being actionable under the Civil Rights Act; because such Act does not Federalize medical malpractice claims, mischaracterizes plaintiffs' claims. Plaintiffs claims goes far beyond mere disagreement with a prescribed treatment regiment;

And, alleges inadequate medical treatment and care, which does fall within the "cruel and unusual" premises of the Eight Amendment ; Consequently, plaintiffs suggest that they have stated a viable claim/s/ upon which relief could be granted.    Furthermore, contrary to the Moving Defendants' assertion that Plaintiffs' class action allegations are insufficient : plaintiffs deem such assertion to be a conclusion of Law to which no response is required;  Because, whether plaintiffs' claims are or are not sufficient to state a claim upon which relief could be granted is a decision to be determined by this Court in its discretion.    Therefore, the Moving Defendants Motion to Dismiss should be denied.

II.  STANDARDS FOR THIS MOTION:

On a motion to dismiss a complaint for failure to state a claim for relief pursuant to Fed. R. Civ. P. 12(b)(6): while the burden of demonstrating a prima facie case is upon the plaintiff,  the court is required to read the complaint " in a light most favorable ' to the claimant and only dismiss the action if it appears inconceivable that the plaintiff could produce dispositive evidence justifying relief under any legal theory.  Conley V. Gibson, 355 U.S. 41,78S.Ct. 99, 2 L.Ed. 2d 80 (1957); Cf. Cruz V. Beto 405 U.S. 319 (1972) ( complaint "should not be dismissed for failure t o state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  In Haines V. Kerner, 404 U.S. 519(1972), the court added that in considering a motion to dismiss, a "pro se complaint" should be held to less stringent standards than the formal pleadings drafted by lawyers."404 U.S. at 520.

In consideration of a motion to dismiss pursuant to Rule 12(b)(6), the court must limit itself to facts stated in the Complaint, documents attached thereto, and matters of which judicial notice may be taken under Fed. R. Evid.201. Kramer V. Time Warner, Inc., 937 F.2d 767,773 (2d Cir.1991), and related cases.

Plaintiffs were unable to attach Affidavits and/or other documents in support of their Complaint, was due to the fact that there is at SCI-Waymart a prohibition against any prisoner, who is detected going about collecting names and numbers for the purpose of filing against the Prison Administration;

Moreover, the  physical make-up of the Blocks and Dormitories precludes
Plaintiffs from gaining access to many prisoners, who have stated to Plaintiffs
in travel to and fro from the yard, dining room, etc., that they would be
willing to write affidavits and/or testify at trial in support the claims set
forth in Plaintiffs' Complaint.  Consequently, Plaintiffs pray that the court in
consideration of the motion to dismiss will take judicial notice of these facts,
and Order a continuance of this instant matter, for the purpose of giving
Plaintiffs time to collect affidavits..... Harris V. Pate, 440 F.2d 315,318 (7th
Cir. 1971);  And, to further issue an ORDER upon the Superintendent of
SCI-Waymart, to allow Plaintiffs to interview witnesses.

    In § II, ¶ 3, pg.4, of Moving Defendants' Motion to Dismiss: Plaintiffs
would agree  that a motion to strike class allegations pursuant to Rules 23 and
12(b)(6) of the Fed. R. Civ. P. should be granted if plaintiffs' pleadings do
not comport with Rule 23;  And,"that mere allegation that a proceeding  is a
class action does not conclusively make it so".  Cross V. Oneida Paper Products
Co., 117 F. supp. 919,921 (D.J.N. 1954);  However, it is untrue, as Moving
Defendants suggests: that plaintiffs' claims fail to fall within the applicable
standards under the Eight Amendment and § 1983;  Therefore, Plaintiffs maintain
that according to Rule 8(a), their claims show that plaintiffs are entitled to
relief;

    Plaintiffs maintain that contrary to Moving Defendants claim that
Plaintiffs' claims should be dismissed  as against Drs. Bekele and Kiraly and
Physician Assistant Loomis, because Plaintiffs  have failed to meet the
criteria for determining  whether a class action may proceed, and be maintained
as a certified class action.  Plaintiffs will demonstrate  below that the MOving
Defendants have mis-characterized the factual allegations of plaintiffs'
complaint; And, have avoided fully addressing ALL of the factual allegations of
plaintiffs' complaint and/or the true legal basis underlying Plaintiffs' claims


III.     FACTUAL ALLEGATIONS OF THE COMPLAINT
         AGAINST THE MOVING DEFENDANTS


    A.   Contra. Factual Allegations Relating To The Named Plaintiffs


    The MOving defendants claim that specific allegations of _fact_ relating to
alleged medical treatment claims are extremely sparse in the Complaint; And,

have set forth in §§ 1 through 5 those portions  of the Complaint which they
claim are the only allegations  relating to medical treatment which contain
anyspecifics whatsoever.  Plaintiffs AGREE in part

   It is AGREED that Plaintiff Mcwhirter began to urinate blood on September 14,
1999; And, that he requested and was seen by a Physician: That he requested and
was sent to the medical department, seen by a physician;  However, it is
disagreed that Plaintiff was given any physical examination; On the contrary,
the Physician merely reviewed a portion of Plaintiffs' prior medical record, to
take note that Plaintiff McWhirter had been given a blood-count some time ago;
And on that basis stated that the " present blood-flow will not hurt". Yet no
physical examination of the present blood flow was taken. Plaintiff McWhirter
was told that he would be seeing a Urologist in the latter part of
September. Plaintiff did not see a Urologist  until late in the month of
October; In the interim, Plaintiff continued to suffer the It was not until the
filing of Plaintiffs' Complaint that Plaintiff McWhirter begag to receive any
effective treatment by the medical department. Not until the filing of this
Complaint was Plaintiff McWhirter informed that he had cancerous spots on his
lung: among other critical ailments, which were life threatening.  Please See
Compound Exhibit " A " accompanying this motion.

      2.    AGREED in part, and DISAGREED in part:

It is agreed that Plaintiff Carter had suffered a back injury from a car
accident prior to being incarcerated; And , that he had received treatment  for
same while at SCI-Somerset, but was denied such treatment upon arrival at
SCI-Waymart. It is also true that Plaintiff Carter did receive an extra pillow
and mattress prior to the filing of this Complaint;  However, what the Moving
Defendants have failed to add are the reasons why Plaintiff was eventually given
the mattress and pillow: was the result of Plaintiff Carter beginninng the
exhaustion process; Wherein, he was able to show how false statements were made
to him regarding his not being given a mattress a nd pillow,because such was a
security issue; And, that Plaintiff carter was able to prove that the Physician
had falsified a statement  in the record;  And, also, because Plaintiff Carter
was able to show that the Staff Doctors, Ms. Loomis, (P.A.) and other staff
members that their statement to him  that, "  WE do not give extra mattresses
and pillows here." was a  false statement, in the face of Plaintiff Carter
naming Four  white inmates on his Block had been issued such items.
Furthermore the Moving Defendants have failed to note at paragraph 17(g), Lines

6-11, indicating " other medical  remedies " which to date has been denied
Plaintiff Carter; To Wit, a Back Brace, which without,  Plaintiff Carter is
unable to do any bending without severe pain. PLease See  Exhibit " B "
accompanying this motion.

3.  TRUE.  Since Plaintiffs have not had opportnity to effect
Discovery, to give validity to this allegation: Plaintiffs Carter and Carmichael
nevertheless believe the allegation/s/ to be true.

4.  AGREED.  However, the Moving Defendants failed to make note of the
fact that Dr. Bekele refused to act on an approved order to send Plaintiff
Campbell to be treated by the outside Orthopedic Surgeon, by stamping Cancelled
on the Order, to be transported to the outside Hospital, in order to receive Six
or eight nerve-block injectios to bring relief to his pain. Dr. Bekele based his
refusal to obey the Orthopedic's orders by stating that, "If no pain lessening
effect were noticed after the first two shots, then the rest would do no good.
Please See Exhibit " C " accompanying this motion.

5.  AGREED in part.    DENIED in part.

It is agreed that Plaintiff Carmichael, was given a perfunctory examination
by Physician's Assistant Loomis; And, did prescribe Motrin .  It is denied that
he has alleged no further complications;  Because, in that same ¶ 34 on Pgs. 41
and 42, plaintiff alleged in Paragraph (3), that subsequenct to his transfer to
SCi-Waymart, Plaintiff was never examined as to post-operation results, relating
to the two operations he had received just prior to being transferred here, from
SCI-Coal Township, despite his complaints of daily pain in the lower back area;
Moreover, as alleged in paragraph (3): Plaintiff was informed by one Nurse, that
he had serious imphosema; By P.A. Loomia, that Plaintiff had Bronchitis: then
was told by Dr. Bekele that he had neither of such ailments; So that plaintiff
has had to continue to take Motrin, which has caused him to suffer vision    and
Bladder problems, from taking Three ( 400 to 600 MG Tabs ) Motrins daily, since
July of 1999.   Not until the filing of Plaintiffs' Complaint, was Plaintiff
told by Dr. Bekele that I was suffering from Asthma,  Bronchitis, and Arthritis.
Moreover, not before the filing of Plaintiffs' Complaint had Plaintiff been
giving medication sufficient to stem plaintiff's Pain and suffereig from the
above ailments;  Thus, Plaintiff's allegation herein is that had Dr. Bekele, and
P.A. Nurse Loomis  inquired into plaintiffs record which had been made at
SCI-Coal Township, Dr. Bekele would have  been in a better position so as to
make a professional judgement, which, in turn, would have eliminated the need

for plaintiff to endure needless pain and suffering since he was sent here in June Of 1999.

In Paragraph (4), of ¶ 34(c):  Plaintiff alleged a denial of a high protean diet needed to restore plaintiff's stamina and health, following the two operations mentioned above. Dr. Bekele would not grant this prescription, despite the fact that after six months of the items afforded in "A Supplement Bag, plaintiff showed no positive results from the Supplement Bag contents. Plaintiff's being weighed showed that in fact he had gone from the 119 Lbs. which he weighed after his operations, down to 119 lbs. Also, included within the same Paragraph is plaintiff's allegation of Bias and unprofessional conduct by P.A. Janan Loomis; who threatened plaintiff with being put in RHU, simply because he tried to explain to her about the effective medical treatment he had received at SCI-Coal Township;  And, because I stated to her that I desired to see the Doctor, which she refused to do; Thus, contrary to Moving Defendants' assertion that I had stated no further complications, as shown herein, plaintiff in fact did state other complications; Therefore, Plaintiffs' claim that their allegations as against the Moving Defendants, state a claim for violation of Plaintiffs' Eight Amendment rights  for deliberate,  and wilful indifference to their medical needs, despite knowledge as demonstrated herein, and to be more fully demonstrated if afforded a chance and time to effect Discovery process, of a substantial risk of serious harm.  Wherefore, the motion of the Moving Defendants should be  denied, because their are factual disputes which require a jury trial .

    B.        FACTUAL ALLEGATIONS RELATING TO CLASS STATUS

7.    It is true that plaintiffs have alleged that there are an estimated 1.600 inmates who have suffered inhumane conditions of confinement and treatment since 1993.  It is also true that plaintiffs have not alleged HOW MANY of the 1600 have received improper medical care.  And, the reason for this is that plaintiffs, absent a Court Order, are unable to make an accurate or specific count  of those 1,600, who have received improper medical care. However, Plaintiffs' claims of improper medical care is based upon , not only their individual contact and bad experiences in dealing with the medical Department, as alleged in their Complaint at   ¶¶ 14(A),(B); ¶ 15(A)and (C); § G. ¶¶ 1-3, And, ¶ 32,(pg.38), ¶¶ 33-35 ( pgs. 39-40);  Moreover, Plaintiffs' claim and belief that a greater majority of the inmates at SCI-Waymart have and yet

experience a similar lack of medical care, is based upon daily talks with
inmates in the yard, law library,etc., who complains of the same type improper
medical treatment as the Plaintiffs;  Therefore, contrary to the Moving
Defendants claim, that Plaintiffs allegation are purely conclusory, and simply
recite the various qualifying criteria of Rule 23 are without merit; Because,
whether or not Plaintiffs allegations  are conclusory is a matter requiring such
finding by the Court and/ or a Jury;  Also, Plaintiffs suggest that they have
set forth Factual allegations in their Complaint, which are common to the CLASS
as a whole; Furthermore, Plaintiffs maintain that contrary to the Moving
Defendants allegation that Plaintiffs have failed to meet the four criteria for
determining whether plaintiffs' class action may proceed, Plaintiffs fully
disagree; Because, thus far, (to the best of their ability, under prevailing
difficult conditions) plaintiffs have and shall continue to so represent the
CLASS effectively as possible.  AS to questions of law and fact common to the
Class, typicality and defenses of the Class by representatives of same :
Plaintiffs maintain again, that they do meet Rule 23 (a) criteria; and, that
same have been satisfied by the allegations of Plaintiffs' Complaint, from
which, (prior to discovery) the strongest inferences may be drawn, and suffice
to show that the Moving Defendants have in fact acted and/ or refused to act in
a way, which constitutes policies and practices contrary  to the U.S. and State
Constitutions: where they have instituted "on the spot policies", " refusal to
act in accord with out-side Physicians prescriptions and orders", denying an
inmates right to speak to a Physician"  " showing racial bias and
discrimination"; As well as, a practice of violating DC-ADM 820, §VI.PROCEDURE,
at 2. (c) " Institution transfer screening, which was omitted in Plaintiffs
Carter and Carmichael's  case; And, on information and belief, it was not done
for many others transfered to SCI-Waymart. Please See Exhibit "B" (declaration
of Plaintiff Carter). Nor was Plaintiff Carmichael provided such an initial
transfer examinition.  Also, 2. e.( Medical service provided to an inmate during
a follow-up appointment scheduled by a Health Care Professional employed by a
health care professional employed by the DOC or its contractors.  j. (long term
care to an inmate not in need of hospitalization.  l. ( medical service provided
to an inmate during a medical emergency).  p. ( Medication prescription
subsequent to the initial medication prescription provided to an inmate for the
same illness or condition).   For Example: See (Declaration of Plaintiff Carter

at Exhibit "B".  All the foregoing shows either violation of established policy
and/ or institution of illegal on-the- spot policies.  When an inmate objects to
such procedures, they are met with such responses as, " Maybe they did this at
the Institution you came from, but here at SCI-Waymart, we have <u>OUR OWN WAY OF
DOING THINGS</u> ".  Or, " <u>that kind of talk (opposing what is said) will get you in
RHU.</u>

IV.                    PLAINTIFFS" COMPLAINT STATES A CLAIM
                       UNDER THE EIGHTH AMENDMENT AND 4U.S.C. §1983
                       WITH RESPECT TO INADEQUATE MEDICAL CARE

        In regards to overall prison conditions , prisoners need only prove that
the actions of prison officials constitute deliberate indifference.
        As to health care, the proper analysis of Eithth Amendment  challenges to
prison conditions involves both an <u>objective</u> and <u>subjective</u> component: the
conditions must be objectively serious, and subjectively culpable; And,
Plaintiffs maintain that they have meet these components throughout the
allegations of their Complaint.
        In <u>Estelle V. Gamble,</u> 429 U.S. 97(1976) the court held (JUstice Marshall
writing for the majority) that " deliberate indifference to serious medical
needs of prisoners" constitutes the "unnecessary and wanton infliction of pain"
proscribed by the Eighth Amendment. <u>id.</u> at 104;  Thus, the standard enunciated
in <u>Estelle,</u> is two-pronged
        1. It requires deliberate indifference on part of the prison officials (
the subjective component); and,it requires the prisoner's medical needs to be
serious (the objective component). <u>West V. Keve,</u> 571 F.2d 158 , 161 (3rd
Cir. 1978); Also, the deliberate indifference standard applies equally to
serious mental or emotional illnesses as well as physical needs. <u>Inmates of
Allegheny County Jail V. Pierce,</u>612 F.2d 754, 763 (3rd Cir. 1979).
        In determining " deliberate indifference ", the proper inquiry is whether
a medical professional or organization having diagnosed an illness or injury as
requiring treatment, which is obvious  even t o a lay person, and fails to give
it proper attention. <u>See  Monmouth County Correctional Institutional Inmates
V. Lanzaro,</u>834 F.2d 326,347 (3d Cir. 1987).

Under this definition, life-threatening emergencies, such as those alleged
by PLlaintiffs in their Complaint, which involves substantial pain and suffering
are serious medical needs within the meaning of Estelle. See  Mandel V. Doe, 888
F2d 783 (11th Cir. 11989);  Hill V. Marshall, 925 .2d 1209 (6th Cir. 1992);

Moreover, where, as in the instance of many of the Plaintiff Class,   who
have received medical attention of some kind (as distinguished from a complete
deniall of medical care), like that of Plaintiffs Carmichael, whose  physical
illness though serious, has only been prescribed Motrin for months, without in
any way alleviating Plaintiff's pain and suffering: Plaintiff maintains that
such treatment was so inadequate as to constitute no treatment at all, which
PLaintiffs suggests rises to the level of deliberate indifference See: West
V. Keve,571 F.2d 158,162 (3rd Cir. 1978)( although prisoner was provided with
aspirin after leg operation, "this may not constitute adequate  medical care");
For example, in Mandel V. Doe, 888 F.2d 783 (11 Cir. 1989) a prisoner, who had
sustained a fractured hip joint; and, despite repeated request for access to a
Physician and x-prays, the prison's medical assistant (as in plaintiff's carter
and carmichael's case) prescribed only Motrin and five days bed rest id.at
785. The court concluded that the record amply demonstrated deliberate
indifference."id. at 787. " When the need for treatment is obvious, medical care
which is so cursory as to amount to no treatment at all may amount to deliberate
indifference.   Under these standards plaintiffs' claims clearly sate a claim
for relief Therefore the Moving Defendants motion to dismiss must be denie

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CARTER, ET AL.,                    :

   Plaintiffs                    :

   V.,                             :        No.  99-CV-6517

MARTIN HORN, COMMISSIONER,              :        ( Judge Brody )

DEPT. OF CORRECTIONS, et al.,           :

   Defendants                   :

---

VERIFICATION

I,  Arthur Carmichael, Plaintiff in the above titled action

do hereby verify that the contents of the foregoing  Motion In Opposition

To Moving Defendants' Motion To Dismiss,  are true and correct, to the best

of my knowledge, information and belief. (Pursuant to 28 U.S.C § 1746

Carter V. Clark, 616 F.2d 228 ( 1980).


         JOHN CARTER,  et al.


BY PLAINTIFF:   *Arthur Carmichael*

       Arthur Carmichael  Pro. Per.

       DD - 0875
       P.O. Box 256
       Waymart, PA   18472-0256

DATED:  March 9, 2000 c.e.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOHN CARTER, et al.,                    :

            Plaintiffs                  :

            V.                          :        NO.  99'CV-6517

MARTIN HORN, COMMISSIONER,              :

DEPT. OF CORRECTIONS, et al.,           :        ( Judge  Brody )

            Defendants                  :

---

### CERTIFICATE OF SERVICE

# FILED

MAR 1 3 2000

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

    I,   Arthur Carmichael,  hereby certify that on this date

I caused to be served the foregoing Motion In Opposition to the Moving Defendants'

Motion To transfer, by depositing the same in the SCI-Waymart's L-1 (U.S.

Mailbox, Postage Prepaid, and addressed to the following Person/s/ :


Lawrence A, Silverman, Esquire

2  Penn Center Plaza

Suite  910

Philadelphia, PA  19102

---

BY PLAINTIFF :        *Arthur Carmichael*

                      Arthur Carmichael  Pro. Per.

                      DD - 0875

                      P.O. Box  256

                      Waymart, PA  18472-0256


DATED:  March 9,  2000 c.e.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN CARTER, et al., | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 99-6517 |
| | : | |
| MARTIN HORN, COMMISSIONER, | : | |
| DEPT. OF CORRECTIONS, et al. | : | |
| | : | |
| Defendants. | : | |

**FILED**

MAR 3 1 2000

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

## O R D E R

**AND NOW**, this 30th day of March, 2000, because all of the events alleged in the complaint occurred in the Middle District of Pennsylvania, I **ORDER** that defendants' motion to transfer venue to the Middle District of Pennsylvania (Docket Entry #5) is **GRANTED** and this matter be **TRANSFERRED** to the United States District Court for the Middle District of Pennsylvania.


ANITA B. BRODY, J.


Copies **FAXED** on 3-31-2000 _____ to:    Copies **MAILED** on _____ to:

Lawrence M. Silverman, Esq.


_____
Anita B. Brody, J.

BY MAIL ON: 3/31/00

TO: J. Carter, G. McWhorter
M. Pellat, D. Campbell

2:99-cv-06517

LAWRENCE M. SILVERMAN, Esq.                          js
SILVERMAN, COOPERSMITH AND FRIMMER
TWO PENN CENTER PLAZA
SUITE 910
PHILA, PA  19102                          FAX 215-636-3999

-------------------------------

-------------------------------

```
************* -COMM.JOURNAL- ************************ DATE MAR-31-2000 **** TIME 11:38 *** P.01

        MODE = MEMORY TRANSMISSION              START=MAR-31 11:37    END=MAR-31 11:38

            FILE NO.= 221

        NO.   COM   ABBR/NTWK   STATION NAME/     PAGES   PRG.NO.   PROGRAM NAME
                                TELEPHONE NO.

        001   OK    ☎           2156363999       002/002

                                                         -JUDGE BRODY              -

    ************************************** -         - **** -              - *********
```

2:99-cv-06517

LAWRENCE M. SILVERMAN, Esq.                              js
SILVERMAN, COOPERSMITH AND FRIMMER
TWO PENN CENTER PLAZA
SUITE 910
PHILA, PA  19102                               FAX 215-636-3999

------------------------------

------------------------------

EXHIBITS

( PLAINTIFF McWHIRTER )

## HONORABLE COURT

DECLARATION:

### I HAVE BEEN DIAGNOSED WITH THE FOLLOWING MEDICAL PROBLEMS:

1.) BLADDER CANCER

2.) RESPIRATORY PROBLEMS, EMPHYSEMA, ASTHMA

3.) CHRONIC SINUSITIS

4.) HERNIA, LOWER LEFT ABDOMEN

5.) SPINE AND NERVE DAMAGE, DUE TO SEVERE ACCIDENT

6.) NARROWING AND DEGENERATE VERTEBRATE IN NECK

7.) ENLARGED PROSTATE

8.) ARTHRITIS, IN KNEES, HIPS, BACK, HANDS AND NECK

9.) KIDNEY STONES

I WAS DIAGNOSED WITH BLADDER CANCER AND CANCER TREATMENTS
WERE PRESCRIBED BY DR. JORGE MIRANDA, UROLOGIST, 141 SALEM
AVE. CARBONDALE, PA 18407. SINCE THAT TIME THE MEDICAL STAFF
HERE AT SCI-WAYMART, HAS DISREGARDED DR. MIRANDA"S WRITTEN
ORDERS BY CAUSING ME TO MISS MANY OF MY SCHEDULED APPOINTMENTS.

DR. MIRANDA, (MY TREATING UROLOGIST), STATED TO ME THAT IT
WOULD BE IMPOSSIBLE FOR HIM TO CONTINUE TO COMPETENTLY AND
PROFESSIONALLY TREAT MY CANCER AS LONG AS THERE WAS SUCH A
BLATANT DISRESPECT AND SUCH A TREMENDOUS DISREGARD TO THE
SCHEDULED OUTSIDE APPOINTMENTS.

THIS TOTAL DISREGARD AND COMPLETE NEGLIGENCE OF THE STAFF
HERE AT SCI-WAYMART, TO KEEP THESE SCHEDULED APPOINTMENTS
HAS CAUSED ME ADDITIONAL HARDSHIP, PAIN AND SUFFERING, BY
ALLOWING THE CANCER TO GO UNTREATED FOR AN ADDITIONAL AMOUNT
OF TIME AND HAS ALLOWED MY CONDITION TO WORSEN AND ADVANCE TO

A MORE CRITICAL STAGE.

I am steadfastly losing my fight with Cancer, due to the prison's deliberate indifferance to the seriousness of this illness and to the advancement and progressiveness of the Cancer, due to the lack of professional treatment and prolonged intervals between outside medical visits.

Dr.Miranda, told me that as many as (9) months of treatments had been missed and that by the institution not complying with the outside facility's directive and scheduled treatments for Cancer, the Cancer could spread throughout my entire body.

On 9/14/1999, I was given a Cystoscope, by Dr. Miranda, at Marion Community Hospital, at which time I started bleeding. I was sent back to S.C.I. Waymart, still bleeding, dark red blood and large clots while urinating. One month later, I was sent back to Marion Comm. Hospital, where Dr. Jorge Miranda injected my bladder with Chemo. I was still bleeding and I informed Dr. Miranda of this and was told by him that he didn't want to go back into my bladder because he was afraid he would cause more damage, I was again sent back to S.C.I. Waymart, still bleeding.

The blood clots kept stopping up my urinal tract causing me terrible pain. I was irrigated numerous times over a ten (10) week period. I was losing blood from a tear in my bladder, caused by the Cystoscope.

On 11/30/1999, my urinal track was stopped up and the medical department could not help me. I was sent to Marion Comm. Hosp. emergency room, where I was irrigated and they found my blood count to be (7) seven and I had to have an I.V.Drip of two units of blood. I was stableized and taken by ambulance to Wilkes Barre General Hospital where I was irrigated through the night and given medication for my pain, and I was given breathing treatments.

On 12/2/1999, I was taken to the O.R. where my bladder was repaired and two (2) Cancerous Tumors were taken out. I recovered and was transported back to S.C.I. Waymart again.

On 9/14/1999, Dr. Jorge Miranda tore my bladder, causing me to bleed for ten (10) weeks.

He never reported the tear or the two (2) Canerous Tumors to Dr. Bekele the medical director at S.C.I. Waymart, causing me to go through unnecessary pain and suffering for the ten (10) weeks, and nearly caused my death from the loss of blood. Also Dr. Miranda did not want to treat me and told the institutions medical department to send me to another Urologist to be treated.

On 12/3/1999, I went to Doctor Call (Waymart Sick Call) and talked to Dr. Bekele Medical Director for S.C.I. Waymart. Dr. Bekele, told me "Dr.Jorge Miranda does not like the way the Medical Department here at S.C.I. Waymart is run." He also told me Dr. Miranda would not be treating me again.

Dr. Bekele told me that "Delta Group at Scranton's Mercy Hospital would not take my case because they will not clean up Dr. Miranda's mistakes."

Dr. Bekele told me, "Now that Dr. Miranda is not on my case anymore, Delta Group may take my case." He told me I have an appointment with Delta Group and we will see if they will keep the appointment.

As of this date I have no Cancer Doctor to treat me.

RESPECTFULLY SUBMITTED

DATE _____

*Jimmy Lee McWhirter*

Jimmy Lee McWhirter CC 8387
P.O. BOX 256
Waymart, Pa. 18472-0256

ADDITION OF DECLARATION OF McWhirter

After having an Hernia operation, I was taken to Transport Van, which had no steps.  Two C/Os picked me up and stood me in the Van. I stepped on the leg-chains, and fell between the seat and the cage: tearing open my stiches inside.

I was brought back to Waymart, where I informed the Prison Doctor.  I was told that he would check on the Hernia in Six (6) months.  I told Dr. Fiske, C.H.C.A., about the fall in the Van, but, he denied that I had fallen.  After two (2) years of trying to get the Hernia operated upon, Mr. Fiske told me that I now had Cancer, which he claimed to be more serious than the Hernia condition to worry about; And, the Hernia has never to date been operated upon, despite my constant compleints of the pain I was experiencing from the Hernia condition.

**DC-804**
PART 1

## COMMONWEALTH OF PENNSYLVANIA
### DEPARTMENT OF CORRECTIONS
P.O. BOX 598
CAMP HILL, PA. 17001-0598

**OFFICIAL INMATE GRIEVANCE**                    GRIEVANCE NO.

| TO  GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| COMRC | S.C.I. WAYMART | 9/3/1999 |

| FROM: (Commitment Name & Number) | INMATE'S SIGNATURE |
|---|---|
| JIMMY LEE McWHIRTER CC-8387 | *Jimmy Lee McWhirter* |

| WORK ASSIGNMENT | QUARTERS ASSIGNMENT |
|---|---|
| UNASSIGNED | WAYMART 1-BLOCK 1018-6 |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

Dear Sirs, I have been told by a reliable source that Cancer treatments have been ignored by medical sfaff. My source is irreproachable and these are outside appointments that are suppose to be kept according to Federal Law! Grievance written to Grievance Coordirator on 8/4/1999 was not responded to by anyone and I considered no answer as deliberate indifference to my medical needs at S.C.I. WAYMART!!!

B. Actions taken and staff you have contacted before submitting this grievance:

MR. MILTON FRIEDMAN- UNIT MANAGER; MR. RONALD ROSS- COUNSELOR

MR. RON RICHARDS- GRIEVANCE COORDINATOR; MR. RAYMOND COLLERAN- SUPT.

our grievance has been received and will be processed in accordance with DC-ADM 804.

| Signature of Grievance Coordinator | Date |

(PLAINTIFF CARTER)                    *Declaration*

This declaration is true in fact and context as I swear and affirm to all that is written: That on or about 3-3-99, I John Carter, an inmate previously of SCI Somerset, who was transfer to this institution, SCI Waymart on 3-3-99 had implied to block officer of reception unit about receiving extra mattress and pillow to compensate weight distribution from on going back problem. Officer informed this inmate that only medical department could accommodate request. So on on about 3-4-99, I signed up and was called to review area of inmate medical department, whereas I was seen by one PA Janan Loomis. At the interview I stated my problem to Ms. Loomis who promptly denied my request, stating that I did not need or would not require the use of an extra mattress and pillow, that my back pain would be alleviated if I were to lose weight. She proceeded to issue me pamphlets and other material about weight loss and walking exercises, which at this time I had informed her that I indeed had been given that information at Somerset, and that after this treatment was deemed ineffective, other treatments were tried and were somewhat affective. These treatments were done while I was housed at SCI Somerset. Prior treatment given was issuance of a back brace upon request, double mattress and pillow to distribute weight and relieve pressure on lower back while sleeping and a walking apparatus, Upon request if needed to relieve pressure on the lower back while walking, Motrin prescribed whenever needed to relieve pain. I informed her of these things which should have been stated within my medical file, yet her decision was to deny my request, stating "I do not feel that an extra mattress would help you therefore I will not issue one to you". When I asked her why she was denying me the treatment I had been receiving, her response was merely to sign my return pass and offer me Motrin for any pain that I would experience. So I requested to see a doctor, because I felt that she either misunderstood my problem, or was not qualified to deny me treatment that had been prescribed by a licensed doctor. Not only did she not refer me to a doctor, she informed me that it was her decision to make. I accepted the Motrin, 3X 6days. This was the first of many confrontations with the medical department here at SCI Waymart.

The second occurance came on or about 3-12-99, when I once again applied to the review line to inquire about my extra mattress and why I had not been referened to a doctor as I had previously requested on 3-4-99, (a request made to PA Loomis) as to why I was denied my prescribed treatment by a doctor while at SCI Somerset. Upon entering the examination room, I was once again interviewed by PA Loomis who then informed me that SCI Waymart did not issue double mattresses on pillows, that this action was considered a security issue, and was therefore a dead issue. I informed her that I had witnessed other inmates with extra mattresses on my unit, (then D-1), had inquired to the unit officer, who instructed me as to how to go about getting the items I sorely needed, which his response was as the other officer of C-1 unit, to write medical. PA Loomis then stated that the medical department did not issue mattresses and that her implication was that officers and inmates conspired together to break institutional policy, that her exact words were: "those inmates must know someone because it was not Waymart policy to issue extra bedding. Once again she prescribed Motrin 3X day 6days.

Sometime after these two prior incidents I again signed up for review line and this time was interviewed by one Doctor Kinaly. Thinking that he was the head doctor I related my problems to him. Not only was this doctor's language hard to understand, I found him to be unprofessional and non-responsive to complaints and requests. When I asked him about issuing me an extra mattress and pillow as was prescribed by a doctor from my last institution, he too confirmed that SCI Waymart did not issue extra mattresses on pillows, that they could be used as implements of escape, his exact words being as far as I could understand then, " you could use the extra mattress to go over the fence and wine and escape!" He too prescribed me Motrin and placed me on a cardiac diet for twenty eight days. A cardiac diet is for those who have complained of chest pains or were diagnosed as heart attack risk, to which I was neither.

After tiring of the medical nonsense for the next 4 months, I once again signed up for medical review because the problem had become worse than I could bare, so much to the point that on certain mornings I could not even get out of bed to do anything, that one day i had to ask the unit officer to call medical to get relief from a spasm attack that had affected my abdominal area. After he had called medical he informed me that she I would have to pay the co-payment if she examined me. Because of the severity of my condition I had no other choice but to accept. After being examined by PA Loomis, I was given a med-pass for one (1) days ration of Motrin, which I was also charged for, total being $4.00 dollars for that emergency visit. To receive more medication I was told to sign up for medical review line for the next day. I finally was able to see the director of medical treatment, one Doctor Tamrat Bekele which occurred on 7-20-99 when I signed up to renew pain medication and to inquire as to why I was refused my initial request for continued treatment as was prescribed by the doctor at SCI Somerset, and to inquire about medication that was prescribed by

another PA. During the interview Dr. Bekele did a cursory examination which consisted of poking his finger in the small of my back, and striking my knees with a rubber hammer. He then told me that I had soft tissue damage and that I would always this problem and that he did not feel that an extra mattress would help me therefore he would not prescribe one. When I inquired as to why this institution was denying me the treatment That had worked for me at one institution, his reply was" That was there, I am in change here and I don't care about anywhere else. You are at Waymart and I make all the decisions here!" When I got up to leave I inquired to him as to his name, because I did not know who I had been examined by and his response was, "I'm not telling you my name, you know my name!" I told him that I did not know his name and therefore asked it again. With his refusal to give it too me came yet another unprofessional reply stating, "go ask out there (indicating outside of the examination room). So I went to the desk and asked the relieving officer the doctors name as he refused to give on his own and the officer wrote it on the back of my sick call slip.

I filed a DC 804 (inmate grievance) in response to the unprofessional attitude and manners of both Dr. Bekele and Ms. Loomis, because they both refused to honor the treatment prescribed by the doctor from SCI Somerset, that my inquiring as to why was met with sarcasm, threats and intimidation. I filed two DC 804 grievances in regards to one this institutions refusal to continue prescribed treatment, unprofessional attitude, and deliberate indifference to my medical needs, and one regarding the lack of sensitivity, unprofessional attitude of one Dr. Bekele, for refusal to give his name when requested, and refusal to give explanation as to his refusal to honor prescribed treatment as it related to my problem. The grievance was then forwarded to one Donald Fiske, CHCA of this institution, and I was subsequently called to his office, July 30th, 1999 at approx. 2:30 p.m. which happened to be on a Friday. At that meeting Mr. Fiske and I discussed the issue at hand and came to the conclusion that we should both meet with the Dr. Bekele and arrive at a solution to benefit everyone involved. He instructed me to re-sign up for review line, upon issuing to me one of his business cards, he informed me to have the desk officer call him on Monday August 2, 1999. On August 2, 1999 I was report to review line and did as I was instructed, had the CO ( officer Penci ) to call Mr. Fiske, which he did three times within a 40 minute spand, to no avail. He then returned me to my unit. On or about 8-11-99 I received my copy of the initial inmate response from Mr. Donald Fiske and in the response he stated facts that were both arbitrary and capricious on it's face, because it stated facts that were untrue and bias in nature. When I addressed these issues in my appeal to the superintendent, that through an investigation it was founded that Mr. Fiske did indeed make false statements on the record, and that in order to remedy the situation, the medical department conceded the extra mattress and pillow, after seven months of hassle and harassment by this medical department. For the record, it is because he (Donald Fiske) made false statements on the record is the only reason I received the extra mattress and pillow, not out of concern for my medical needs, but as justification for my reporting of the false statements made on record by one of it's administrators.

As to my present condition, because of the denial of prescribed treatment by this institution's medical staff, my condition has gotten worse, as I am now experiencing further complications, enduring more pain, and have gained weight from the use of the medication that has been prescribed by both Drs. Bekele, Kinaly and PA Loomis. Since motrin has been the only medication given for my condition I have been experiencing certain side effects, such as abdominal cramps, urinating all night, lack of sleep, back spasms and no relief from the initial pain. I was prescribed motrin 3x's a day, 28 days per month and i have been taking it a total of 11 months to date (2-29-00). I have also gained over thirty pounds, experienced increased problems with mobility, and I have become irritable and frustrated. Added to my increasing frustrations is the fact that i am mentally anxious about being housed without my permission or knowledge with an inmate who suffers from various communicable diseases, that i have come in physical contact with this person, have shared drinking utensils and consumable items with this person, has even touched accidentally this person's saliva. I was placed into a side room with one Michael Casey BI-6146 who had been paroled September 30th, 1999. Two weeks prior to his release, Mr. Casey was having some emotional problems that he confided to me, that in affect caused me to worry. He informed me that he had been having dreams of death, and that he was worried that it was a sign from God pertaining to his lifestyle prior to being incarcerated. He informed me that he had been having unprotected sex with someone he was aware had been infected with the HIV virus, the virus that causes AIDS. He went on to say that he was also aware that he had contracted Herpes amongst other things, and that he was going to take all of these problems home to his family. He also stated that these weeks prior to leaving that he had be diagnosed with Hepatitis C and B. I asked him why he was telling me all of this now, and he said that he was trying to come clean before he went home, and he wanted to know just what he should do about his home

situation. I could not really help him, because my mind was busy absorbing the information he had laid on me. Mr. Casey was employed in food service here at SCI Waymart. He job duties included but were not limited to serving both diet and regular meals, and even handled the duty of making up supplemental diet bags for inmates. I also thought about the many times we have shared a cup of coffee, or a bag of potatoe chips or even jostling about as friends would do. After receiving this information from him, I began to worry about my personal health and welfare, why no one in authority made it known to me that I would be housed with an inmate who suffered from the many life threatening illnesses this inmate had, and have subsequently subjected me to exposure to one or all of his illnesses. It goes in showing that this institution cares little of the personal health of the inmates at this institution, that it's main concern is filling bed space. It is my contention that inmates are put at risk of contracting certain diseases because SCI Waymart does not have a special needs unit in which to house at risk inmates, and afford protection to the other inmates here at SCI Waymart. It is my deepest fear that I have contracted something and will never know it because this medical department does not inform it's inmates properly. I can personally attest to this statement, for I have had X-rays taken, and blood test taken, yet information was not made available to me as to show if anything was indeed wrong or not wrong with me.

### Affirmation

I John Carter CN-1404 do swear that all statements made and written are indeed true and concise to the best of my knowledge and I do make these claims under ~~title~~ 18 (Pa.) § 4904.


Declaree _____

John Carter CN-1404



DEAR SIR:

I WAS TRANSFERED FROM SCI-MAHANOY TO SCI-WAYMART, IN WAYMART, PENNSYLVANIA; FOR MEDICAL REASONS PERTAINING TO PROBLEMS WITH MY RIGHT LEG.

SINCE MY ARRIVAL HERE AT SCI-WAYMART, I HAVE BEEN TREATED WITH DELIBERATE AND CALLOUS INDIFFERENCE, ASSOCIATED WITH THE CARE AND MEDICATION, (MEDICAL TREATMENT), OF MY LEG. THE HOLE IN MY LEG, IS STILL OPEN AND I AM PLAGUED WITH INFECTION, DUE TO IMPROPER MEDICAL TREATMENT AND FAULTY DIAGNOSIS OF NEEDED MEDICATIONS.

I HAVE FILED TWO GRIEVANCE'S AGAINST THE MEDICAL STAFF, IN AN ATTEMPT TO TRY TO OBTAIN BETTER MEDICAL CARE, TO AVOID THE UNNECESSARY POSSIBILITY OF AMPUTATION.

ON 6/24/99 I SEEN THE DOCTOR BECAUSE THERE WAS SOMETHING
WRONG WITH MY KNEE. THE DOCTOR LOOKED AT IT AND SAID, THERE
IS NOTHING WRONG WITH MY KNEE. I TOLD HIM THAT PUSS WAS
COMING OUT OF MY KNEE AND IT WAS SWOLLEN. HE ORDERED
MEDICATION EMYCIN 250 MG. AFTER 7 DAYS I SAW THE OTHER
DOCTOR AND HE SAID THE FIRST DOCTOR GAVE ME MEDICATION THAT
WAS NO GOOD. SO HE STUCK NEEDLES IN MY KNEE AND TOOK PUSS
OUT OF MY KNEE AND HE ORDERED A NEW MEDICATION. DICLYCILLIN
500 MG THAT WAS ON THE 7/1/99. WHEN I WENT TO PICK UP MY
MEDS. THE WOMAN TOLD ME IT WASN'T THERE COME BACK THE NEXT
DAY. SO I DID AND SHE TOLD ME THAT IT STILL WASN'T THERE AND
THAT SHE DON'T HAVE IT IN STOCK. SHE SAID BECAUSE IT IS ON
THE WEEKEND OF A HOILDAY THATS WHY I DIDN'T GET IT. SO ON
THE 7/4/99 I WENT TO TREATMENT AND I SAW THE DOCTOR AND I
TOLD HIM WHAT HAPPENED AND HE SAID THAT THEY DO HAVE THAT
MEDICATION DICLOXACILLIN 500 MG IN STOCK AND HE DON'T KNOW
WHY THE NURSE SAID THEY DON'T HAVE IT. I WENT 3 DAYS WITHOUT
THE MEDICATION. ON MONDAY THE NEXT DAY 7/5/99 THE DOCTOR
CALLED AND SAID HE WANTED TO SEE ME. THE NURSE THAT WAS
THERE WITH THE DOCTOR DIDN'T KNOW WHAT TO SAY WHEN THE
DOCTOR ASK WHY THEY DIDN'T GIVE ME THE MEDICATION WHEN THEY
KNEW IT WAS IN STOCK. SO SHE WENT AND GOT IT AND COME BACK.
SHE TOLD THE DOCTOR THAT THEY DIDN'T GIVE IT TO ME BECAUSE
THE DOCTOR ORDERED THE MEDICATION FOR 14 DAYS AND THE PACKS
THEY HAD WAS ONLY FOR 10 DAYS. THE DOCTOR ASK HER WHAT
DIFFERENCE DOES IT MAKE. YOU SHOULD HAVE GIVEN IT TO HIM
UNTIL HIS MEDICATION CAME IN. WHEN THE DOCTOR SAID THAT THE
NURSE DIDN'T KNOW WHAT TO SAY. THEN THE DOCTOR TOOK MORE
PUSS OUT OF MY KNEE AND THEN HE WAS GOING TO GIVE ME THE
MEDICATION THAT HE ORDERED. I TOLD THE DOCTOR THAT I GET A
REACTION FROM SOME KINDS OF MEDICATION BUT I COULDN'T
REMEMBER WHAT KIND. I TOLD HIM TO LOOK IN MY MEDICAL RECORDS
AND HE WILL SEE WHICH ONES I CAN'T TAKE. SURE ENOUGH I
COULDN'T TAKE THAT MEDICATION. SO HE ORDERED KIFFEX 500 MG.
THAT MEDICATION WAS ALSO ONE I WASN'T SUPPOSE TO TAKE.
BUT THE DOCTOR ORDERED ME TO TAKE IT ANYWAY AND IF IT MAKES
ME SICK TO LET HIM KNOW. THESE DOCTORS ORDER MEDS. FOR YOU
TO TAKE EVENIF YOU ARE NOT SUPPOSE TO TAKE THEM. FOR MONTHS
I HAVE SUFFERED WITH PAIN BECAUSE THESE DOCTORS WILL NOT
LISTEN OR LOOK IN THE INMATES RECORDS AND THEY REALLY DON'T
KNOW WHAT THEY ARE DOING.

TODAY IS 7/28/99 AT 10:00 AM. I SAW THE OUTSIDE DOCTOR. THE
DOCTOR ASK ME WHAT HAPPENED TO MY KNEE. I TOLD HIM FOR 14 MONTHS
I HAVE BEEN TELLING THE WAYMART DOCTOR THAT MY LEG IS HURTING A
LOT AND IT'S NOT GETTING ANY BETTER BECAUSE I'M WALKING ON MY
STUMP AND THE WEIGHT I'M PUTTING ON MY LEG IS NOT LETTING MY LEG
HEAL. BECAUSE OF THE WEIGHT ON MY LEG MY KNEE IS SWELLING VERY
BADLY AND PUSS IS COMING OUT. SO HE PUT A NEEDLE IN MY KNEE AND
PULLED A LOT OF PUSS OUT OF MY KNEE AND GAVE ME SOME MEDICATION.
KIFFEX 500 MG FOR THE INFECTION AND HE TOLD ME IF THERE WAS
SOMETHING IN MY LEG HE WOULD HAVE TO GO IN IT AND TAKE IT OUT. I
TOLD HIM IF THESE DOCTORS WOULD GIVE ME THE RIGHT MEDICAL CARE
THIS WOULDN'T HAVE HAPPENED TO ME. IF THE WAYMART DOCTORS WOULD
READ MY RECORDS NONE OF THIS WOULD HAVE HAPPENED. I NEVER HAD
MUCH PROBLEM WITH MY LEG UNTIL I WENT TO MAHANOY AND UNTIL I CAME
HERE. BOTH OF THESE PLACES HAVE PUT ME THRUOGH MANY DAYS OF PAIN
AND SUFFERING. TILL THIS DAY THEY ARE STILL NOT GIVING ME THE
RIGHT MEDICAL CARE. I'M AFRAID IF THEY KEEP DOING THIS TO ME I AM
GOING TO LOSE MY LEG!!

7/30/99 I SAW MR. FISKE CHCA AND WE TALKED ABOUT THE GRIEVANCE I
SENT HIM ABOUT THE DOCTORS AND THE REST OF THE MEDICAL STAFF.
MR. FISKE SAID HE WOULD TELL THE NURSES AT NIGHT TO GIVE ME MY
MEDICATION WHEN I COME DOWN FOR TREATMENT SO I WOULD NOT HAVE TO

WALK ON MY LEG TO COME BACK AGAIN AT 8:00 PM.7/30/99 AT NIGHT
I WENT TO TREATMENT AND TOLD THE NURSES WHAT MR. FISKE SAID, AND
THAT HE HAD WROTE A NOTE TO MEDICAL STAFF TO LET THEM KNOW HE
APPROVED OF THEM GIVING ME MY MEDS. WHERE I WOULD NOT HAVE TO
MAKE ANOTHER TRIP DOWN TO MEDICAL. WHEN I ASK THE NURSE WORKING
THAT NIGHT IN THE PILL ROOM FOR MY MEDS. SHE SAID NO!! SHE SAID I
WOULD HAVE TO WALK BACK DOWN AT 8:00 PM. ON 7/30/99 I WENT DOWN
AGAIN TO PICK UP MY SELF MEDS THAT WAS SUPPOSED TO BE ORDERED
7/28/99 AND THEY STILL WASN'T IN THE NURSE SAID TRY AGAIN
TOMORROW.THEY KEEP SAYING THEY DON'T KNOW WHY THE MEDICATION
ISN'T THERE WHEN THEY KNOW IT HASN'T EVEN BEEN ORDERED!!

TODAY IS 31st. JULY. I WENT DOWN AGAIN TO PICK UP MY SELF
MEDICATION, AND AGAIN THE WOMAN IN THE MEDICATION ROOM WHOM I
KNOW AS CANDY TELLS ME SHE DOSEN'T HAVE MY MEDICATION TRY AGAIN
TOMORROW. SO I ASK HER TO PLEASE DO SOMETHING BECAUSE I NEED
MY MEDICATION. SHE SAID THERE IS NOTHING SHE CAN DO.

JULY 31st. AT NIGHT I WENT TO GET TREATMENT AT 7:05 PM AND I TOLD
NANCY WHAT WAS HAPPENING AND SHE TOLD ANOTHER PERSON WHO WAS
WORKING WITH HER TO GO TO THE MEDICATION ROOM AND FIND OUT WHAT
WAS WRONG AND WHY I'AM NOT GETTING MY MEDICATION. SO HE WENT
TO LOOK AND CAME BACK AND SHOWED ME AN ORDER FOR MY MEDICATION
BUT IT HAD NOT BEEN ORDERED LIKE THE DOCTOR ORDERED THEM TO DO.
SO I HAVE BEEN WITHOUT MEDICATION SENCE THE 28th. OF JULY. HE
TOLD ME THAT THEY HAD ALL THE MEDICATIONS I NEEDED IN THE
MEDICATION ROOM AND HE DON'T KNOW WHY THEY DIDN'T GIVE ME WHAT I
NEEDED UNTIL MY MEDS. WERE ORDERED FROM THE CPS PHARMACY SERVICE
INC. AFTER TALKING TO THE DOCTOR THEY SENT ME TO THE MEDICATION
ROOM AND ALL OF A SUDDEN THEY DID HAVE THE MEDS. I NEEDED IN
STOCK AND THEY GAVE ME THE MEDS. I NEEDED BUT IT WAS AFTER
PUTTING ME THROUGH PAIN AND SUFFERING JUST AS THEY HAVE FOR THE
LAST 15 MONTHS. THESE PEOPLE JUST DON'T LIKE TO DO THEIR JOB, AND
PEOPLE LIKE MYSELF HAVE TO SUFFER WHICH IS WRONG.

I TALKED TO MR. FISKE CHCA- AGAIN TODAY AND TOLD HIM THAT THE
PAPER HE HAD LEFT FOR THE LADY IN THE MEDICATION ROOM WAS NOT
THERE THE LADY SAID. MR. FISKE TOLD ME HE WOULD HAVE TO TALK TO
THE SUPERVISOR. MR. FISKE ALSO SAID HE WOULD ASK THE SUPERVISOR
ABOUT GIVING ME MY NIGHT MEDICATION WHEN I COME DOWN FOR
TREATMENT. THIS IS SOMETHING THE WOMEN WHO WORK IN THE PILL
WINDOW WOULDN'T DO, LIKE I SAID THESE WOMEN DON'T WANT TO TAKE
THE TIME TO LOOK FOR THE MEDICATION THAT I AND OTHERS NEED. THEY
KNOW THEY HAVE EXTRA MEDICATION IN STOCK IN CASE A MEDICATION
ORDER DON'T COME IN ON TIME.

PELLOT
BE 2490

ON 2-1-00 they took me to see the out side Docto
who is going to operation on my Leg this is some
they should have done before it got this bad
Also I have a peper that give me Authorizatio
to wear sneaker but I couldn't fine my copy
I Know that the Institution has a copy because
gave it to them. when they took me out to se
the Doctor the sargent made me wear Institution
shoes which cause me alot of pain I told him
to call the hospital here And they would of told
him that I can't wear shoes but he did not wan
to do that he told me take my ~~ sneaker off
And put the shoes on.

2-9-00:

I saw the doctor yesterday the doctor from the street he take care of legs + feet he order for them here to do something to my leg so they know how bad infection do I have he also order them to give me something for the infection.

2-10-00          Bekele ~~Kelly~~

To day I saw the doctor from here and he told me that he already know so he is not going to do what the other doctor order and he Also said that he wasn't going to give me Anything for the infection

I also told him that the other doctor that works here put in my records that I'm to wear sneakers at all time This doctor that I saw was the same doctor I saw at Mahanoy and they their together with the other jails I been to gave me a paper that said that I can wear sneakers to courts to outside hospital and also to visits. but he told me that he can not order that because they said he can't order that for me I told him like I told the other doctors that I can't put shoes on because it hurts my leg a lot I have not put on shoes from Nov. 75 until to day year 2000 and I'm not going to put on shoes that is going to cause me to suffer a lot of pain just because this is what they want me to do they also know the pain they cause me when they took me to the out side hospital a few weeks ago.

2/14-00
        I went to see the Doctor And he order
some medication for my stomach, I have been
on self meds for a Long time but every time
that the Doctor orders for me they keep on
telling me that the medications hasn't come
in I can understand that it takes two Day
for my medication to come in but what I don't
understand that every time the Doctor order
medication for me they keep on telling me
that they still don't have the medication
And I have to waite, After two day they tell
me that the medication came in but not
for self meds but I know that the doctor
order it for self meds so I ask them to pleas
tell the doctor what happen with the medicati
but they still keep telling me that I have
to waite for a Lable to come in so they can
put it on my medication pack and I can keep
it with me on the block, but they Always
Keep making mistakes with my meds.
They also Let the medication runs out
they Als like a medication the Doctor
order on the 2-14-00 until the 3-2-00
I never got it this is what happens to
me every time I go to pick my medication
I need that medication for my stomach
and that act but for 7 days they keep
telling me that they will talk to the
Doctor the medications ran out and the
Doctor still hasn't order it for me.

( 3 )

DAVID CAMPBELL

## DECLARATION

On or about September 23, 1997, I sustained injury to my right shoulder: Because a guard forced me to climb up to a top bunk, after I told him that I could not climb: because of a medical problem. However I obeyed his command; And, as a consequence of doing so, It caused my shoulder-blade to tear loose and protrude from my back: a couple of inches, which was clearly visible to the naked eye.

I went to Medical, and there I was told that I had just sprained it, and gave me some Aspirin.   I was then immediately Classified and transferred.

I arrived at SCI-Waymart on October 4, 1997; And, I went to Medical because of pain in my shoulder and a severe headache it was causing.  I was given Motrin, which did no good.

I kept returning to Medical almost weekly for the problem; And, eventually was given a sling for my arm: And, was told to " Live with it ". and not to do any work.  Meanwhile the Meds. were changed to Naprosyn, then Indoczn.
After approxiately Six months, a visiting Orthopedic Doctor looked at the injury, and injected something into my back, and said, " I don't think this will do any good, but we'll try it anyway".  He also told me, that he was not going to recommend an operation, because, he thought it would be too dangerous.

I repeatedly went to Medical about the pain and headaches, only to be told, " Sorry. there is nothing we can do about it". " Learn to live with it".

After numerous Grievances, they decided to send me an outside Hospital. The Doctor there ( Dr. Prehdel ) recommended a serious of injections to control the pain and nerve block.   He told me that it would take 6 to 8 Shots before any real relief would be felt.  On my third visit, he wanted me to see a Specialist there in the Hospital:  However, when he called here
At SCI-waymart, for permission:  Doctor Bekele Cancelled all treatment; And, when I asked him why, he told me, if it dosen't work after the first couple of shots it wasn't going to.

I still go to Medical for the Indoczn to keep the severe headaches down; But, I still have no use of my right arm.

Furthermore, they have only attempted to control the pain; And, they have done absolutely nothing for what's causing it.  This has left me without the use of my arm, painful suffering.

I believe that any layman could see that there is a serious problem with my shoulder;  Because, I have even been asked my various C/Os, and Staff members, who have witnessed the condition of my shoulder; and, have asked what Medical Doctors are going to do about it;  And, I could only reply, by telling them what the Medical Personnel have said to me, and done so far.

I have to sit in this Institution with this damaged shoulder:  when, on information received: was that all required to fix the shoulder is an operation.  And, like other inmates I know, who have injuries which an operation could mend: they all give me the same response; Which is, that the Medical Officials don't wish to spend the costs of such operations.

I feel bad, because I know that I am being treated wrongfully.

David Campbell
David Campbell

DATED: 2/ 16     ,2000

A F F I D A V I T

    I, Larry Shaw,  making this Affidavit of my own free will,
hereby state:
    That I am an inmate incarcerated at SC_-Waymart;
    That I have been a diabetic for Eighteen (18) years;  And,
on January 8, 2000, on or around 9:30
a.m., I went on a visit with my daughter.  I returned to my housing
unit  about 4:30 p.m.
    I requested and received from the Unit C/O, a Pass to go to the
Medical Department:  in order to get my insulin shot.  When the C/O
called the Medical Department, he talked with a Nurse named Nancy;
And, she asked the C/O if I had eaten.  The C/O asked me if I had
eaten; And, I stated to him that I had eaten while on the visit.
    Following his response, from me, to the Nurse, she in turn
refused to allow me to come down to get the vital insulin shot.

ON ANOTHER OCCASION, ONE DAY IN November, I signed up for Sick Call;
And, when I was interviewed by the Doctor, and complained of bad
pain in my back;  And,  while I was trying to explain to the Doctor
where the pain was located, I was hurt and shocked when he told me
to shut up; Then, he failed to either examine me or even prescribe
any treatment.  This sort  of response is typical  of most of the
Staff Doctors and Nurse.  They just want you to give them symptoms,
and without examination, or allowing an inmate to voice any
response.

DATED:  2--11      2000        Respectfully submitted,

                                  *Larry J. Shaw*
_____        Larry J. Shaw

_____    CERTIFICATION
    I, Larry J. Shaw, do hereby certify under penalty of perjury
that the foregoing Affidavit is true and correct, to the best of my
knowledge, information and belief, pursuant to  28 U.S.C. §
1746      Carter v. Clark, 616 F.2d 228 (1980).

                                  Pro. Per.
    # DY4168
    P.O. Box 256
    Waymart, Pa. 18472